UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

**TANYA ASAPANSA-JOHNSON WALKER,**
**and**

**CECILIA GENTILI**,

*Plaintiffs*,

v.

**ALEX M. AZAR II, in his official capacity as**
**the Secretary of the United States**
**Department of Health and Human Services,**
**and**

**UNITED STATES DEPARTMENT OF**
**HEALTH AND HUMAN SERVICES**,

*Defendants*.

CIVIL ACTION NO.   20-cv-2834

**COMPLAINT FOR DECLARATORY**
**AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.     Amid an ongoing, worldwide pandemic and a national crisis of violence against

transgender individuals, particularly transgender women of color, Defendant United States

Department of Health and Human Services ("HHS" or "the Department") chose to revise the

Department's interpretation of Section 1557 of the Patient Protection and Affordable Care Act

(the "ACA")—the ACA's primary anti-discrimination provision—to eliminate protections

against discrimination in health care for members of the lesbian, gay, bisexual, transgender, and

queer ("LGBTQ") community.  *See Nondiscrimination in Health and Health Education*

*Programs or Activities, Delegation of Authority*, 85 Fed. Reg. 37,160 (June 19, 2020) (the "2020

Rule").  This defies HHS's stated mission to "enhance and protect the health and well-being of

*all* Americans . . . by providing for effective health and human services."  U.S. Dep't of Health

& Human Servs., *About HHS*, https://www.hhs.gov/about/index.html (last visited June 25, 2020).

2.      The 2020 Rule directly contravenes the Supreme Court of the United States'

recent holding in *Bostock v. Clayton Cty., Georgia.*, No. 17-1618, 590 U.S. ___, 2020 WL

3146686, at *9 (June 15, 2020), that discrimination "on the basis of sex" includes, without

reservation, discrimination based on an individual's gender identity, including transgender status,

or sexual orientation.

3.      If allowed to take effect, the 2020 Rule will directly threaten the ability of

members of the LGBTQ community to access medically necessary, potentially life-saving

medical and health care by removing clear prohibitions against discrimination.  And even if

members of the LGBTQ community are able to access such health care, the 2020 Rule puts them

at grave risk of inadequate care wrought with discrimination solely on account of their identities,

which the 2020 Rule makes permissible.

4.      Medical studies confirm that LGBTQ individuals face greater risks of

discrimination in health care.  More than half (56%) of lesbian, gay, or bisexual ("LGB")

individuals reported that they experienced *at least* one of the following instances of

discrimination: being refused health care, being subjected to excessive precautions from health

care professionals or health care professionals refusing to touch them at all, being subjected to

abusive language, being subjected to rough or abusive physical treatment, or being shamed by

the very professionals that they have gone to for medical assistance.  *Human Rights Campaign*

*Comments on Proposed Rule 1557 Re: Public Comment in Response to the Notice of Proposed*

*Rulemaking Addressing Nondiscrimination in Health Programs and Activities*, *1557 NPRM (RIN*

*0945-AA02)*, at 1 (submitted Nov. 9, 2015), available at https://www.regulations.gov/document?

D=HHS-OCR-2015-0006-0830.  For transgender and gender nonconforming individuals, those

statistics increased to seventy percent (70%).  *Id.*  Further, the LGBTQ community's experience

with discrimination in health care fuels serious concerns that they will be refused health care treatment in the future when they most need it.

5.    The guiding principle behind Congress's passing the ACA was to increase *all* Americans' ability to access affordable and quality health care.  In furtherance of that purpose, Congress enacted Section 1557 of the ACA, 42 U.S.C. § 18116 ("Section 1557"), which prohibits discrimination in the provision of health care on the basis of race, color, national origin, sex, age, or disability.

6.    Section 1557(b), "Continued application of laws," provides that nothing therein shall act to "invalidate or limit the rights, remedies, procedures, or legal standards available to individuals aggrieved under . . . title VII of the Civil Rights Act of 1964."  Title VII makes it "unlawful . . . for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's race, color, religion, *sex*, or national origin." 42 U. S. C. §2000e–2(a)(1) (emphasis added).

7.    Section 1554 of the ACA prohibits the Secretary of HHS (the "Secretary")— currently Defendant Alex M. Azar II ("Azar")—from promulgating a regulation that would act to preclude or impedes one's access to medical care.  42 U.S.C. § 18114.  The Secretary shall not promulgate any regulation that: "(1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care; (2) impedes timely access to healthcare services; (3) interferes with communications regarding a full range of treatment options between the patient and the provider; (4) restricts the ability of healthcare providers to provide full disclosure of all relevant information to patients making healthcare decisions; (5) violates the principles of informed consent and the ethical standards of healthcare professionals; or (6) limits the availability of healthcare treatment for the full duration of a patient's medical needs."  *Id.*

8.      To further the ACA's statutory directive, on May 18, 2016—after approximately three years of development and close to 25,000 public comments—HHS issued a final rule that broadly protected the LGBTQ community in their pursuit of health care and health insurance coverage.  *See Nondiscrimination in Health Programs and Activities*, 81 Fed. Reg. 31,376 (May 18, 2016) (the "2016 Rule").  The 2016 Rule provided protections from discrimination on the basis of gender identity and sex stereotyping, consistent with widely accepted precedent concerning what constitutes discrimination "on the basis of sex."  In addition to incorporating these prevailing legal standards, the 2016 Rule's extensive public commentary overwhelmingly called for the need to protect the LGBTQ community fully from all forms of discrimination in the health care setting.

9.      As noted by the Center for American Progress the nondiscrimination provisions of the ACA have been effective in resolving issues of discriminatory policies and practices against LGBTQ individuals.  *See* Sharita Gruberg and Frank J. Bewkes, *The ACA's LGBTQ Nondiscrimination Regulations Prove Crucial*, Center for American Progress, Mar. 7, 2018, https://www.americanprogress.org/issues/lgbtq-rights/reports/2018/03/07/447414/acas-lgbtq-nondiscrimination-regulations-prove-crucial/ (last visited June 25, 2020).  The enforcement of these provisions of the ACA assures LGBTQ individuals that health care providers will not turn them away because they are LGBTQ.  *Id.*

10.     On June 12, 2020, four years to the date of the mass shooting at Pulse nightclub in Orlando, Florida, which tragically killed 49 LGBTQ people, HHS issued the 2020 Rule, which undermines the ACA's guiding purpose of expanding access to affordable and quality health care to all.  Consistent with the Trump Administration's record of singling out the LGBTQ

community for exclusion, subordination, and discrimination, the 2020 Rule appears to be singularly motivated by LGBTQ animus.

11.     The 2020 Rule purports to reverse the broad protections that were articulated meticulously in the 2016 Rule, which defined discrimination "on the basis of sex" to encompass discrimination on the basis of gender identity, defined as "an individual's internal sense of gender, which may be male, female, neither, or a combination of male and female."  45 C.F.R. at § 92.4.  That definition also included discrimination on the basis of "sex stereotyping," which the 2016 Rule defined as "stereotypical notions of masculinity or femininity, including expectations of how individuals represent or communicate their gender to others, such as behavior, clothing, hairstyles, activities, voice, mannerisms, or body characteristics."  *Id*.

12.     The 2020 Rule eliminates this language completely and attempts to limit discrimination on the basis of "sex" to discrimination on the basis of "biological binary of male and female that human beings share with other mammals."  85 Fed. Reg. at 37,161–62, 37,178–79.

13.     The 2020 Rule was published even though four days prior, the Supreme Court wholly and unequivocally rejected that view in *Bostock*, declaring "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."  2020 WL 3146686, at *7.

14.     As a direct and proximate result of the 2020 Rule, members of the LGBTQ community will be subject to discrimination in the provision of health care without recourse through HHS.  The negative health outcomes will be foreseeable, tangible, and tragic:  simply put, LGBTQ Americans will die.

15.     Plaintiffs Tanya Asapansa-Johnson Walker's and Cecilia Gentili's collective experience before and after the 2016 Rule offers a glimpse into the devastating consequences should the 2020 Rule go into effect.  Both Plaintiffs are transgender women of color who have frequently avoided seeking urgently needed health care for fear that the various forms of mistreatment and discrimination they have suffered on account of their gender identity will repeat themselves.

16.     For example, Plaintiffs have suffered physical and verbal abuse, substandard care, the verbal violence and humiliation of being misgendered, and cultural ignorance displayed by the very people they entrusted with their care.  Moreover, at various points in their lives, they were forced to engage in survival sex work simply to access and afford what medical professionals and the laws of many jurisdictions consider basic and necessary health care for transgender and gender nonconforming individuals.

17.     Health care professionals and staff have discriminated against Plaintiffs prior to and after the promulgation of the 2016 Rule, and Plaintiffs fear that the 2020 Rule will only increase the likelihood that they will experience this discrimination again.

18.     HHS is unilaterally attempting to write Section 1557 out of the ACA through the promulgation of the 2020 Rule; such action is not a permissible exercise of rulemaking authority or discretion under the Administrative Procedure Act (the "APA").  Further, the 2020 Rule was promulgated without any of the diligence expected of a responsible federal agency and required by federal law.

19.     Particularly offensive is that pursuant to a letter dated June 18, 2020 (attached hereto as Exhibit A), HRC invited the Administration to withdraw and reconsider the 2020 Rule immediately after the Supreme Court's June 15, 2020 holding in *Bostock*, which held that

discrimination against LGBTQ individuals constitutes unlawful sex discrimination.  But the Administration chose not to do so.  2020 WL 3146686, at *7, *9.

20.      Accordingly, Plaintiffs bring this action against Defendants under the APA to challenge the 2020 Rule as contrary to law, in excess of statutory authority, arbitrary, capricious, an abuse of discretion, and in violation of the equal protection guarantee of the Fifth Amendment of the United States Constitution.  The 2020 Rule is causing and will continue to cause irreparable harm to LGBTQ individuals, including Plaintiffs, who ask the Court to vacate, set aside, and declare unlawful the 2020 Rule.

## PARTIES

21.      Plaintiff **Tanya Asapansa-Johnson Walker** is an honorably discharged veteran of the United States Army and a transgender woman in need of health care, medical treatment, and health insurance coverage.  At all relevant times, Ms. Walker has been and continues to be a resident of the State of New York, living in New York City in the borough of Manhattan.

22.      Plaintiff **Cecilia Gentili** is a transgender woman in need of health care, medical treatment, and health insurance coverage.  At all relevant times, Ms. Gentili has been and continues to be a resident of the State of New York, living in New York City in the borough of Queens.

23.      Defendant **HHS** is a cabinet agency within the executive branch of the United States government and is an agency within the meaning of 5 U.S.C. § 552(f).  Headquartered in the District of Columbia, HHS is responsible for, among other things, enhancing and protecting Americans' health and well-being via the provision of health and human services.  HHS promulgated the 2020 Rule and is responsible for its enforcement.

24.    Defendant **Azar** is the Secretary of HHS and is sued in his official capacity, as are his successors.  The Secretary is responsible for all aspects of the operation and management of HHS, including the adoption, administration, and enforcement of the 2020 Rule.

## JURISDICTION AND VENUE

25.    This Court has subject matter jurisdiction over the claims alleged in this Complaint under 28 U.S.C. § 1331, as this case arises under the United States Constitution and the APA, 5 U.S.C. § 701 *et seq.*, and challenges final agency action for which there is no other adequate remedy, 5 U.S.C. § 704.

26.    The Court has the authority to issue declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and the APA, 5 U.S.C. § 701 *et seq.*

27.    Defendants are subject to suit in any federal jurisdiction in challenges to federal regulations, and no real property is involved in this action.  28 U.S.C. § 1391(e)(1).

28.    Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b) and (e)(1) because at least one Plaintiff resides in this District, defendant HHS is an agency of the United States, and defendant Secretary Azar is an officer of the United States sued in his official capacity.

29.    The challenged 2020 Rule is final and subject to judicial review under 5 U.S.C. §§ 702, 704, and 706.

## STATEMENT OF FACTS

## I.    PLAINTIFF TANYA ASAPANSA-JOHNSON WALKER

30.    Ms. Walker is a Black transgender woman and veteran of the United States Army, honorably discharged in 1984.  She identifies as pansexual, meaning that her attraction towards others is not based on their gender identity.  *See* Decl. Tanya Asapansa-Johnson Walker ¶¶ 1-2,

13.  The Declaration of Tanya Asapansa-Johnson Walker is attached hereto as Exhibit B (hereafter referred to as "Walker Decl.").

31.     Ms. Walker is the co-founder of the New York Transgender Advocacy Group ("NYTAG"), an organization dedicated to the advancement of equal rights and protections for transgender and gender non-conforming individuals.  Her work with NYTAG has included representing it as a stakeholder in the Advocates Coalition, a group that included other LGBTQ organizations and the staff of New York Governor Andrew Cuomo, focused on LGBTQ issues including support for New York's Gender Expression Non-Discrimination Act.  Walker Decl. ¶ 5.

32.     Ms. Walker is a two-time lung cancer survivor and is HIV-positive.  Walker Decl. ¶¶ 27, 29.

33.     Throughout her life, Ms. Walker suffered discrimination, harassment, and violence on account of her race, perceived sexual orientation, and gender identity.  Ms. Walker both experienced and witnessed discrimination, verbal harassment, emotional abuse, and was subjected to excessive and aggressive physical contact and treatment in both seeking and/or receiving health care.  Walker Decl. ¶¶ 2, 9, 25, 30, 36-49, 53-54, 57-64, 69-73, 79.

34.     Specifically, on various occasions, Ms. Walker has been refused medical care (including the prescription of hormone medication).  She has been shamed by medical professionals, had her case file passed from one professional to another when they did not want to treat her, and was misgendered and deadnamed by medical professionals and staff.  In doctors' waiting rooms, staff have refused to properly address Ms. Walker by her true chosen name or by feminine pronouns.  Walker Decl. ¶¶ 36-38, 46-49, 54, 59-64, 70-73, 79.

35.     "Misgendering" and "deadnaming" are unique and specific verbal assaults against transgender, gender nonconforming and non-binary ("TGNCNB") individuals.  These are not terms or phenomena applicable to the cisgender community.  Walker Decl. ¶ 32.

36.     "Misgendering" is when someone intentionally refers to a person as the wrong gender or uses language to describe a person that does not align with that person's affirmed gender.  For example, calling a transgender woman a "guy" is a form of misgendering.  Walker Decl. ¶ 33.

37.     "Deadnaming," like misgendering, is a harmful form of discrimination. Deadnaming occurs when someone calls or refers to a TGNCNB individual by the name that the individual was assigned at birth rather than their current chosen name.  Walker Decl. ¶ 34.

38.     Misgendering and deadnaming are acts of discrimination against TGNCNB individuals.  They stigmatize the individual, by "othering" that person, and are ultimately dehumanizing.  Misgendering and deadnaming can also "out" the individual to others in the vicinity in ways intended to cause shame and humiliation.  Misgendering and deadnaming can cause a severe and negative impact on the person's self-esteem and sense of self and can expose the individual to the risk of physical or bodily harm by others.  Walker Decl. ¶ 35.

39.     Misgendering and deadnaming contribute to a culture that demeans the TGNCNB community, a community that is already at an increased risk of physical violence, discrimination, and harassment.  Walker Decl. ¶ 35.

40.     Ms. Walker has found that there is a lack of training and protocols for medical professionals when encountering TGNCNB individuals.  As a result, she often finds herself in the position of having to try to educate those treating her on how to address and refer to transgender individuals, all while she is ill and seeking medical treatment.  This is not something

cisgender individuals encounter when seeking medical care and treatment.  Walker Decl. ¶¶ 44-45.

41.     The discrimination in health care that Ms. Walker was subjected to and witnessed traumatized her.  As a result, she avoids or delays medical treatment for as long as possible out of fear that she will be harassed, harmed, or even killed due to discrimination because she is a transgender woman.  Walker Decl. ¶¶ 26, 37-38, 50, 80.

42.     Since she was around five years old, Ms. Walker knew that she was transgender, but did not know how to describe it.  For years, she identified as a gay before being able to live as a transgender woman.  During that period, the only time Ms. Walker was able to be herself and "live in her gender" was on Halloween when she put on a costume.  Like other members of the LGBTQ community, and because of her race, Ms. Walker was the subject of verbal and physical harassment and abuse in school.  Walker Decl. ¶¶ 8, 15.

43.     The harassment and abuse Ms. Walker experienced growing up continued after she joined the U.S. Army, where she was sexually, physically, and verbally assaulted.  She did not report her sexual assault because her perpetrator was male, and she feared being discharged for being labeled as gay.  Walker Decl. ¶ 12.

44.     Despite efforts by individuals to "out" her and have her dishonorably discharged, Ms. Walker received an honorable discharge after serving in the military for several years.  Walker Decl. ¶¶ 12-13.

45.     Ms. Walker began transitioning around 1988 after she survived a car accident, deciding that life was too short for her not to live authentically.  Walker Decl. ¶¶ 16-17.

46.     "Transitioning" for many transgender and gender nonconforming people may include a range of medical treatments and social changes, the array of which are different for

each individual.  For Ms. Walker, this meant that she began to outwardly express her identity as a woman by making changes in how she dressed, groomed, and behaved.  She also sought hormones to further express her identity through her physicality.  She could not, however, find or receive formal medical care and treatment for her transition.  Her transition was also not covered by insurance.  Walker Decl. ¶ 18.

47.     Ms. Walker purchased hormone medication from pharmacists and/or doctors in cash because insurance would not cover those treatments.  She would have to share needles with other individuals in order to inject herself with the hormone medication that she purchased.  She believes she was infected with HIV due to sharing needles while self-treating with hormones she purchased on the street to assist with her gender transition.  Walker Decl. ¶¶ 20, 28.

48.     Ms. Walker was also unable to obtain employment due to discrimination on account of her being a Black transgender woman.  Consequently, she could not obtain medical insurance through employment and she could not earn a living through conventional means.  In order to raise the requisite funds, Ms. Walker, a veteran, turned to survival sex work, a reality that many members of the transgender community faced and continue to face.  Walker Decl. ¶¶ 22-24.

49.     Ms. Walker turned to public interest health providers for assistance.  One of those was an organization on Staten Island where, despite identifying as female, the staff doctor dismissed her gender identity, derisively saying that she could not handle being a "gay man." Walker Decl. ¶ 37.

50.     The doctor prescribed Ms. Walker with schizophrenia medication without a benztropine to reduce the side effects of the schizophrenia medication.  By taking the schizophrenia medication without a benztropine, Ms. Walker suffered psychotropic effects of the

medication.  The schizophrenia medication was medically unnecessary as Ms. Walker does not experience schizophrenia.  Ms. Walker never returned to that doctor for treatment.  No other doctor has diagnosed Ms. Walker with schizophrenia.  Walker Decl. ¶ 38.

51.     It was not until around 1999 that Ms. Walker obtained, for the first time, health insurance coverage through her employment as a case manager at Housing Works, a non-profit based in New York City that addresses HIV/AIDS and homelessness.  Walker Decl. ¶¶ 40, 43.

52.     As a case manager, Ms. Walker assisted clients with their needs, which included bringing them to medical appointments.  Tragically, she saw many of her TGNCNB clients receive the same discriminatory treatment that she did, including misgendering, deadnaming, transphobic comments, and mistreatment.  Walker Decl. ¶ 40.

53.     The discriminatory treatment and harassment that Ms. Walker's clients received caused some of them to refuse to seek medical treatment when they needed further care or prescriptions.  Some of them died because of their fear and distrust of the health care system and medical professionals and staff.  Walker Decl. ¶ 41.

54.     In 2013, Ms. Walker was diagnosed with lung cancer.  Even though she had been suffering with a chronic cough and feeling deeply unwell for months, she refused to see a doctor until it became urgent.  Walker Decl. ¶ 53.

55.     One night she was watching television with her partner when she began to cough up blood.  Her partner wanted to call an ambulance, but Ms. Walker refused due to her fear that she would be mistreated as a transgender woman.  The next day, when her symptoms continued, she relented and went to the hospital.  Walker Decl. ¶ 53.

56.     Immediately upon arriving at the hospital and before she received any treatment, a doctor and a nurse cornered her in an empty room and began asking her invasive questions about

her gender and her genitalia demanding to know "what" she had "down there."  Walker Decl. ¶ 54.

57.     Ms. Walker answered their questions because she felt like the doctor and nurse would withhold care or treatment if she did not.  Only after she answered their invasive questions did they conduct an examination of her and ordered tests.  The doctor diagnosed her with pneumonia, prescribed medication and discharged her.  However, Ms. Walker's symptoms did not change over the course of the next five months and she had to plead with the doctors to conduct further testing.  She was tested again in October 2013, which is when she was diagnosed with lung cancer.  Walker Decl. ¶ 54.

58.     A few months later, in January 2014, Ms. Walker underwent surgery where the middle lobe of her right lung was removed.  Walker Decl. ¶ 55.

59.     Between 2014 and 2017, Ms. Walker continued to receive treatment for lung cancer that included routine tests to detect recurrence.  Walker Decl. ¶ 56.

60.     Ms. Walker was again diagnosed with lung cancer in 2017 and she returned to the same hospital to undergo another surgery to remove the upper right lobe of her right lung.  Walker Decl. ¶ 57.

61.     During this surgery, Ms. Walker was being subjected to physical, verbal and mental harassment by hospital staff.  The treatment that she received shows that discrimination against the TGNCNB community is still severe and pervasive.  Walker Decl. ¶¶ 58-64.

62.     The staff assigned to care for her after her invasive and traumatic surgery violated their duty of care to her by refusing to recognize and respect her gender identity.  Walker Decl. ¶¶ 58-64.

63.     While in the hospital for surgery, hospital staff:

(i)      Willfully misgendered Ms. Walker, despite her efforts to correct and
educate the staff about her proper pronouns and how to treat members of
the TGNCNB community, something she never should have had to do in
the first place.  In response, Ms. Walker was told:  "I am going to call you
by how I see you;" and "however you look, and whoever you say you are
out there, in here, I am going to call you as I see you;" which Ms. Walker
understood to mean that the nurse saw her as a man;

(ii)     Unnecessarily disclosed Ms. Walker's gender identity—i.e., that she is
transgender—to other staff members and hospital visitors;

(iii)    Deliberately, on repeated occasions, exposed Ms. Walker's genitalia to her
roommate by failing to close the curtains around her bed and removing the
sheets from her bed while she was lying down;

(iv)    Caused physical harm to Ms. Walker's genitals by violently inserting and
removing her catheter, causing her great pain, blood loss, and
embarrassment;

(v)     Failed to properly attend to Ms. Walker's care, negligently leaving her to
lie in her own feces for hours, forcing her to crawl, while dragging her
oxygen tank and IV pole—all with one arm (her other was immobile due
to the location of her lung cancer operation)—to the bathroom to clean
herself, the bathroom itself and then her own bed and the floor;

(vi)    Withheld some of Ms. Walker's HIV medication, risking Ms. Walker's
health because she could build up a resistance to the HIV medication and
her viral load could increase; and

     (vii)    Failed to provide Ms. Walker with clean cups to take her medication, instead giving her a water-filled dirty cup from a fast food chain that someone had brought into the hospital from outside to take medications.

Walker Decl. ¶¶ 58-64.

64.     After she made multiple complaints, a nurse representative apologized to Ms. Walker for the treatment she received, but no one remedied the situation and the discriminatory treatment did not stop.  Walker Decl. ¶ 65.

65.     This discriminatory and abusive behavior prevented Ms. Walker from sleeping and properly recovering from her cancer surgery.  The very people that were supposed to help her and treat her subjected her to discrimination, harassment, embarrassment and pain, both mental and physical.  Walker Decl. ¶¶ 58-64, 66.

66.     Unfortunately, Ms. Walker's experience exemplified the fears and risks that members of the TGNCNB community experience in health care, something their cisgender compatriots do not experience.  Walker Decl. ¶¶ 25-26.

67.     Ms. Walker is seeking to undergo gender confirmation surgery.  One of the prerequisites to receiving the surgery is that the patient must obtain a letter from a medical professional stating why the gender confirmation surgery is medically necessary for the individual.  Walker Decl. ¶¶ 68-69.

68.     Ms. Walker met with multiple therapists assigned to her by Veterans Affairs ("VA") and they all refused to prepare the requisite letter she required for gender confirmation surgery.  Walker Decl. ¶¶ 70-73.

69.     Ms. Walker met with a therapist assigned by the VA in 2012.  She asked the therapist to write the letter required for the gender confirmation surgery, which the therapist refused to do without explanation.  Walker Decl. ¶ 70.

70.     Ms. Walker requested that the VA assign her a new therapist, which it did.  Ms. Walker went to the new therapist and requested the requisite letter.  Again, the therapist assigned by the VA refused to write the letter, only asking Ms. Walker if she felt like she was going to commit self-harm and whether she was depressed.  The therapist further said that she did not know what to write.  Ms. Walker explained what the letter was and used her phone to show the therapist a website that discussed gender confirmation surgery and the content of the requisite letter.  Instead of looking at the information, the therapist physically turned away from Ms. Walker's phone and again refused to write the letter.  Walker Decl. ¶ 71.

71.     Ms. Walker complained to the administration at the VA that the second therapist that the VA assigned to her was not culturally competent to treat members of the LGBTQ community and Ms. Walker requested a new therapist.  Walker Decl. ¶ 72.

72.     Indeed, the third therapist assigned by the VA therapist also refused to write the letter, telling Ms. Walker that "it is too painful," without explaining her statement.  Walker Decl. ¶ 73.

73.     Ms. Walker ultimately needed to find a therapist outside of the VA that was willing to work with her to meet her treatment needs.  Walker Decl. ¶ 78.

74.     Ms. Walker needs medical care and treatment throughout the rest of her life in connection with her prior diagnoses and other health care issues that may arise going forward.  Walker Decl. ¶ 82.

75.     Ms. Walker needs further medical care and treatment in connection with her gender confirmation surgery as well as follow-up appointments in connection with same. Walker Decl. ¶ 81.

76.     As a cancer survivor and an HIV-positive individual, Ms. Walker is in need of continuous medical check-ups and care in relation to her diagnoses.  Walker Decl. ¶ 81.

77.     In connection with her prior cancer diagnoses, Ms. Walker needs a computerized axial tomography (CAT) scan of her chest every six months for the rest of her life.  Walker Decl. ¶ 82.

78.     In connection with her HIV positive status, Ms. Walker requires blood tests every three months to ensure that the HIV medication she is taking is still effective and that she is not suffering dangerous side effects.  Walker Decl. ¶ 83.

79.      It has been widely reported that the risk factors for death from contracting COVID-19, which attacks the lungs, include: (i) being a racial minority; (ii) having a condition that weakens or compromises the immune system; and (iii) having a pre-existing lung condition. Walker Decl. ¶ 76.

80.     Ms. Walker meets each of these risk factors.  She is a Black transgender woman with severely limited lung capacity living in New York City, the global epicenter of the COVID-19 pandemic.  Walker Decl. ¶ 76.

81.     The 2020 Rule, if permitted to go into effect, would give license to medical professionals to deny Ms. Walker medical treatment or provide her with substandard care because she is transgender.  This puts Ms. Walker at imminent risk of death if she contracts COVID-19.  Walker Decl. ¶ 76.

82.     The 2020 Rule makes Ms. Walker feel vulnerable, scared, and enraged.  For

someone who depends so much on the health care system to survive, the 2020 Rule deprives Ms.

Walker of any peace of mind.  Walker Decl. ¶¶ 75-80, 82-85, 88-90.

## II.     PLAINTIFF CECILIA GENTILI

83.     Cecilia Gentili is a transgender woman who was born in Santa Fe, Argentina in

1972.  Although growing up under a conservative dictatorship in Argentina prevented her from

having the words to describe her identity, Ms. Gentili knew from a young age that she was not a

boy and that she was queer.  *See* Decl. Cecilia Gentili ¶¶ 1, 3, 17.  The Declaration of Cecilia

Gentili is attached hereto as Exhibit C (hereafter referred to as "Gentili Decl.").

84.     After spending years feeling like an outsider, Ms. Gentili met a transgender

person when she was around 18 years old.  It was a revelation to Ms. Gentili to see another

person embody what she was experiencing.  She realized that she was transgender and that there

was a term to describe her identity.  Equally important, she realized that there were other people

like her.  Around that same time, she began her transition.  Gentili Decl. ¶¶ 17-19.

85.     A few years later, Ms. Gentili moved to Miami, Florida.  She was not able to get a

job and relied on survival sex work.  She was at a pronounced risk of physical and behavioral

health issues, but she had difficulty getting the treatment she needed.  Gentili Decl. ¶ 20.

86.     For example, while she was in Miami, Ms. Gentili went to a doctor for routine

treatment.  When Ms. Gentili disrobed for the examination, the doctor responded with shock.  He

made it clear that he did not want to see her body and that he could not treat her.  She left in fear

in humiliation.  Gentili Decl. ¶ 22.

87.     Since then, she has had comparable experiences, including doctors being

judgmental about her transgender status.  Some have told her that she should not be transgender.

Others, against Ms. Gentili's stated wishes, advocated various treatment options that revealed

ignorance of her needs.  Most lacked the requisite knowledge to treat her.  For instance, one doctor in particular continually told her that, to be a woman, she needed to have a vaginoplasty.  The doctor repeatedly said this even as Ms. Gentili continually told her that she was not interested.  That doctor simultaneously refused to prescribe Ms. Gentili hormone treatments that she requested.  Gentili Decl. ¶ 27.

88.     Ms. Gentili eventually moved to New York City, where she continued to suffer from physical and behavioral issues and continued to engage in survival sex work.  Experiencing significant mental health issues, Ms. Gentili turned to substance abuse to cope.  After long periods of substance abuse and addiction Ms. Gentili eventually sought help.  Gentili Decl. ¶¶ 23-24.

89.     Ms. Gentili found assistance from a charitable organization that sponsored her 17-month stay in a long-term addiction treatment program.  Gentili Decl. ¶¶ 23-24.

90.     Her reliance on charitable support for substance abuse treatment impacted Ms. Gentili's experiences while receiving care.  For example, her stay at the long-term treatment facility was co-ed.  The facility assigned her to a male residential area where she slept and showered for the entire year and a half.  Although this was inconsistent with her gender identity, she felt like she had no choice because she was determined to break her drug dependence and someone else was paying for her treatment.  Gentili Decl. ¶ 25.

91.     While getting help for substance abuse, Ms. Gentili saw a psychiatrist who also did not understand her needs.  The doctor repeatedly told Ms. Gentili that her gender identity was the sole cause of her substance abuse and addiction.  Gentili Decl. ¶ 27.

92.     In or around late 2011, Ms. Gentili finished long-term treatment and became sober.  At around this time, Ms. Gentili stopped engaging in survival sex work and started seeing

a counselor at The Lesbian, Gay, Bisexual & Transgender Community Center in New York City (the "Center"). The counseling led to her being invited to serve as an intern at the Center. This marked the beginning of her advocacy for the LGBTQ community. Gentili Decl. ¶ 26.

93.     Since then, Ms. Gentili's advocacy and activism have included prior service as Policy Director at the Gay Men's Health Crisis, the world's first and leading provider of HIV/AIDS prevention, care, and advocacy, and Vice President of the Board of Directors for Transcend Legal. From 2012 to 2016, she ran the Transgender Health Program at Apicha Community Health Center, a clinic in New York City that specializes in improving the health of LGBTQ individuals and people living with HIV/AIDS. Gentili Decl. ¶¶ 7, 11, 12.

94.     In 2018, she founded, and continues to run, Transgender Equity Consulting, which provides services on transgender sensitivity and inclusion issues. Gentili Decl. ¶ 4.

95.     She is also currently a member of the boards of Stonewall Community Foundation, TransLatinx Network, and The New Pride Agenda. Gentili Decl. ¶¶ 8-10.

96.     As a result of discrimination and mistreatment Ms. Gentili has received from medical providers, she continues to experience significant anxiety whenever she needs to see an unfamiliar health care provider. Gentili Decl. ¶¶ 21, 31, 32.

97.     In late 2018, Ms. Gentili was diagnosed with chronic obstructive pulmonary disease ("COPD") and emphysema. She has to closely monitor this condition because she can quickly have extreme difficulty breathing requiring immediate emergency treatment. Even though she lives two to three blocks away from a hospital, her breathing can become so difficult that she needs an ambulance to take her from her home to the hospital. She is on various medications for these issues but still must see her doctor every three to four months. Gentili Decl. ¶¶ 45, 48.

98.     Since her diagnosis, Ms. Gentili has been hospitalized on several occasions. On one occasion, she was subjected to misgendering, with a nurse telling her they do not have any "male rooms," even though she requested and had the right to be in a women's room.  Gentili Decl. ¶ 57.

99.     Complicating her COPD, Ms. Gentili has latent tuberculosis, which is asymptomatic, but requires ongoing treatment and could become an active infection at a later point in her life.  It also restricts the type of medications she can take as the prescriptions could interact with the disease to suppress her immune system.  Gentili Decl. ¶ 46.

100.    Ms. Gentili is also Hepatitis-C positive.  Due to extensive treatment that she underwent in 2016, she is considered cured because the virus is undetectable, but she must undergo regular blood testing to confirm her status.  Gentili Decl. ¶ 47.

101.    Ms. Gentili also has psoriasis.  She previously went to a dermatologist for treatment, but the experience was humiliating.  The dermatologist seemed more curious about her genitalia than anything else, causing Ms. Gentili to avoid going to back to this or any other dermatologist.  Although she uses a topical treatment for her psoriasis, she foregoes the most effective treatment because of these experiences.  Gentili Decl. ¶ 40.

102.    Ms. Gentili also seeks care from a psychiatrist, who provides her with gender-sensitive care and allowed her to understand how medical care should be provided to TGNCNB individuals.  Gentili Decl. ¶ 53.

103.    About 2 years ago, Ms. Gentili had a medical issue requiring her to use the restroom constantly and that caused a burning sensation.  Ms. Gentili initially refused to seek treatment due to her prior health care experiences.  But, around 2:00 a.m. one night, she woke up in extreme pain and had no choice but to go to the emergency room.  While there, she was

subjected to a triage nurse humiliating her about her gender identity in front of a waiting room full of people.  Specifically, the nurse loudly and continually pressed Ms. Gentili to provide a date for her last menstruation, notwithstanding Ms. Gentili's repeated explanation about her transgender status.  Gentili Decl. ¶¶ 37-39.

104.   On another occasion a few years ago, Ms. Gentili was having a minor procedure during which she was subjected to transphobic remarks.  The doctor called her by her dead name and repeatedly misgendered her.  The experience left Ms. Gentili feeling terrible.  Gentili Decl. ¶ 31.

105.   Today, Ms. Gentili relies on her health insurance coverage for her hormone, which are related to her transgender status.  Her primary care doctor prescribes them and requires a visit every four months to see if modifications are needed.  She takes two types of hormones daily and is terrified of what would happen if her insurance refused to cover them.  Gentili Decl. ¶¶ 43, 48-49.

106.   Ms. Gentili is particularly cautious when she travels for work.  Although her job takes her around the country, she fears having to seek treatment outside of New York.  She has particular fears about what she would do, or what would happen, if she became seriously ill on one of her trips.  This is a particularly acute fear because she has a lung disease that sometimes requires urgent medical treatment.  Gentili Decl. ¶ 58.

107.   Around September 2019, Ms. Gentili was in Louisiana for approximately ten days.  While there, she spoke with several other transgender women who informed her that the closest doctor providing appropriate and gender-sensitive treatment was in the next state.  Given that her lung issues could cause immediate and emergent problems, Ms. Gentili was terrified.

She spent the remainder of her time on the trip in emotional distress at the prospect of what would happen if she needed care.  Gentili Decl. ¶ 60.

108.    In early 2020, Ms. Gentili was in Florida when the COVID-19 virus was declared a global pandemic.  She knew that she was at heightened risk if she got the virus because of her lung issues. She was panicked about what would happen if she was exposed while in Florida. Gentili Decl. ¶¶ 62-63.

109.    When it is safe to resume work-related travel, Ms. Gentili has plans to travel to California, Texas, Georgia, and Florida in connection with her work.  Because Florida, Georgia, and Texas do not have state laws barring discrimination in health care on the basis of gender identity, the potential absence of federal protections terrifies Ms. Gentili.  She is already anxious about what would happen if she needed care in one of those states.  Gentili Decl. ¶¶ 64-65.

110.    A friend of Ms. Gentili, who also was a transgender woman, recently got sick and showed symptoms indicative of COVID-19, including a cough and fever.  Though Ms. Gentili told her friend that she needed to go to the doctor, the friend refused out of fear for how she would be treated on account of being transgender.  Because she did not seek the health care she needed, the friend did not receive treatment and lost her life to COVID-19.  Gentili Decl. ¶¶ 33-35.

111.    The 2020 Rule makes Ms. Gentili feel vulnerable, scared, and enraged.  It leaves her uneasy that her access to medical care is dictated by which administration is in power. Gentili Decl. ¶ 75.

112.    The 2020 Rule allows health care providers to deny her critical health care necessary for her well-being and survival, including, but not limited to, the regular monitoring of her lung condition, Hepatitis-C, and even potentially life-saving intervention should she have

another respiratory attack.  The 2020 Rule also allows her health care insurer and prescription

drug providers to deny her access to her hormone treatments and other necessary medications.

Gentili Decl. ¶¶ 63, 66-67.

113.    For someone who depends so much on the health care system to survive, the

2020 Rule strips Ms. Gentili of any peace of mind.  Gentili Decl. ¶¶ 41-43, 59, 66-67, 71-75.

## STATUTORY AND REGULATORY BACKGROUND

### III.    THE ACA PROHIBITS DISCRIMINATION BROADLY ON THE BASIS OF SEX

114.    The ACA was enacted against a historical backdrop and factual record clearly

reflecting that the LGBTQ community faces discrimination solely because of who they are.

115.    Lesbian, gay, bisexual and queer individuals regularly face discrimination

because of their sexual orientation, that is, their sexual identity in relation to the sex to which

they are attracted.

116.    TGNCNB individuals face potential discrimination because their gender identity

or gender expression differs from the gender or sex marker that they were assigned at birth.

117.    The LGBTQ community's risk of sex discrimination—that is, unfavorable

treatment based upon their sex—is widely documented in both case law and medical studies.

118.    Indeed, as articulated by the Supreme Court in *Bostock*, discrimination on the

basis of sexual orientation or gender identity is discrimination on the basis of sex.  2020 WL

3146686, at *7, *9.

119.    Compounding the LGBTQ community's risk of discrimination is the fact that

state-level health care laws often have no or few nondiscrimination protections and have set up a

patchwork of laws and jurisdictional coverage.

120.    Even states that have enacted protections can vary significantly in the protections

extended to the LGBTQ community, both across states and between municipalities.

121.     In the absence of statewide laws and protections for the LGBTQ community,

counties, cities and municipalities within the state may enact nondiscrimination ordinances that

prohibit discrimination based on an individual's sexual orientation and/or gender identity.  For

example, when there are no statewide non-discriminatory protections for the LGBTQ

community, certain counties, cities, and municipalities within the state may enact some

enumerated protections in the areas of housing, employment, and public accommodations.

122.     Given the patchwork of protections across regions and complete lack of

protections in many others, and against the backdrop of the longstanding history of

discrimination against the LGBTQ community in obtaining health care and health insurance

coverage, Congress adopted an expansive federal prohibition on discrimination in the ACA.

123.     Section 1557 of the ACA prohibits discrimination on the basis of race, color,

national origin, sex, age, or disability in covered health programs and activities.  *See* 42 U.S.C. §

18116.  Section 1557 explicitly provides that:

> [A]n individual shall not, on the ground prohibited under title VI of the Civil
> Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education
> Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of
> 1975 (42 U.S.C. 6101 et seq.), or section 794 of title 29, be excluded from
> participation in, be denied the benefits of, or be subjected to discrimination under,
> any health program or activity, any part of which is receiving Federal financial
> assistance, including credits, subsidies, or contracts of insurance, or under any
> program or activity that is administered by an Executive Agency or any entity
> established under this title (or amendments).

*Id.*

124.     At the time Congress enacted the ACA, the weight of legal authority recognized

that the definition of "sex," and therefore sex discrimination, covered gender identity, sex

stereotyping, and sexual orientation.  *See, e.g.*, *Smith v. City of Salem*, 378 F.3d 566, 571–75 (6th

Cir. 2004); *Rosa v. Park West Bank & Trust Co.*, 214 F.3d 213, 215–16 (1st Cir. 2000); *Schwenk*

*v. Hartford*, 204 F.3d 1187, 1199–1201 (9th Cir. 2000).  On June 15, 2020, the Supreme Court of

the United States affirmed that this interpretation was correct and that discrimination on the basis

of "sex" literally and logically encompasses discrimination against LGBTQ persons.  *See*

*Bostock*, 2020 WL 3146686, at *9.

125.    Evidencing the import of the nondiscrimination provisions, the ACA provided

that the enforcement mechanisms provided for, and available under, Title VI of the Civil Rights

Act of 1964, Title IX of the Education Amendments of 1972, the Age Discrimination Act of

1975, and Section 794 of Title 29 (also known as Section 504 of the Rehabilitation Act of 1973),

shall apply for purposes of addressing violations of Section 1557.

**IV.    HHS DEVELOPED AND RELIED ON AN EXTENSIVE RECORD TO SUPPORT
         ITS DEVELOPMENT OF THE 2016 RULE**

    **A.    The Development of the 2016 Rule**

126.    On August 1, 2013, HHS's Office for Civil Rights ("OCR") published a Request

for Information in the Federal Register to solicit information on issues arising under Section

1557 and received hundreds of responses.  *See* 78 Fed. Reg. 46,558–60 (Aug. 1, 2013).

127.    On September 8, 2015, after receiving those responses, the OCR issued a

proposed rule, "Nondiscrimination in Health Programs and Activities," in the Federal Register

(the "Proposed 2016 Rule"), and invited comments on the Proposed 2016 Rule by all interested

parties.  *See* 80 Fed. Reg. 54,171–221 (Sept. 8, 2015).

128.    Evidencing the high interest in the Proposed 2016 Rule, the OCR received

approximately 24,875 comments on the Proposed 2016 Rule.  *See* 81 Fed. Reg. at 31,376.  Those

comments came from a wide variety of stakeholders, including, but not limited to: (i) civil

rights/advocacy groups, including language access organizations, disability rights organizations,

women's organizations, and organizations serving LGBTQ individuals; (ii) health care

27

providers; (iii) consumer groups; (iv) religious organizations; (v) academic and research

institutions; (vi) reproductive health organizations; (vii) health plan organizations; (viii) health

insurance issuers; (ix) state and local agencies; and (x) tribal organizations.  *See id.*

129.    The comments analyzed: (i) the pervasive discrimination against LGBTQ

individuals by health care providers and insurers; (ii) statistics establishing the heightened risk of

psychological and physical medical issues that the LGBTQ community faces; and (iii) the import

of the Proposed 2016 Rule.  *See, e.g.*, *id.* at 31,455, 31,460

130.    The comments underscored that, notwithstanding this heighted need for medical

care, LGBTQ individuals have historically been deterred, impaired, and precluded from

accessing health care to address their health and medical needs solely due to their gender identity

or sexual orientation.

131.    The comments also highlighted that, for LGBTQ individuals who were able to

seek medical care, they faced the risk of discrimination in receiving care if medical providers

refused to treat them due to their being LGBTQ or if the medical provider treated them

differently than their straight, cisgender counterparts.  *See, e.g.*, *id.* at 31,434–36.

132.    The Human Rights Campaign—the largest civil rights organization working to

achieve equality for lesbian, gay, bisexual, transgender, and queer Americans—submitted a

lengthy comment on behalf of its then-1.5 million members and allies in support of the Proposed

2016 Rule.

133.    The Human Rights Campaign comment noted that the "[p]ersistent and systemic

discrimination in accessing healthcare" faced by the LGBTQ community resulted in "stark health

disparities" for the community and that "[f]ear of discrimination causes many LGBT people to

avoid seeking healthcare."  *Human Rights Campaign Comments on Proposed Rule 1557 Re*:

*Public Comment in Response to the Notice of Proposed Rulemaking Addressing*

*Nondiscrimination in Health Programs and Activities*, *1557 NPRM (RIN 0945-AA02)*, at 1

(submitted Nov. 9, 2015), available at https://www.regulations.gov/document?D=HHS-OCR-

2015-0006-0830.  For those that did, they "are not consistently treated with the respect that all

patients deserve."

134.    The National Center for Transgender Equality conducted a survey in 2015 of

twenty-eight thousand (28,000) transgender individuals and found that nearly one-third of them

faced discrimination due to their gender identity from their medical provider.  *See*

https://www.transequality.org/sites/default/files/docs/USTS-Full-Report-FINAL.PDF, at 5–6

(last visited June 24, 2020).

135.    As the Transgender Legal Defense & Education Fund ("TLDEF") emphasized in

a comment to HHS, the Proposed 2016 Rule was needed based on evidence showing widespread

discrimination against transgender individuals.  *Transgender Legal Defense & Education Fund*

*Comments on Proposed Rule 1557 Re: Proposed Rule on Section 1557 of the Affordable Care*

*Act (RIN 0945-AA02), 1557 NPRM (RIN 0945-AA02)*, at 2 (submitted Nov. 9, 2015), available at

https://www.regulations.gov/document?D=HHS-OCR-2015-0006-2163.

136.    TLDEF directed attention to a survey that showed that "28% of transgender

individuals reported that when they were sick or injured, they postponed seeking medical

treatment out of fear of being discriminated against, and 19% of transgender individuals reported

being refused care due to their transgender or gender non-conforming status."  *Id*.  Further,

"[o]ver a quarter of the transgender individuals who are brave enough to seek medical

attention—approximately 28%—reported experiencing verbal harassment while doing so, and

2% even reported being victims of physical violence."  *Id*. at 2.

137.  Lambda Legal's comment in support of the Proposed 2016 Rule explained that:

> 70 percent of transgender and gender-nonconforming respondents had one or more of these experiences; and almost 63 percent of respondents living with HIV experienced one or more of these types of discrimination in health care.  Almost 8 percent of LGB respondents report[ed] having been denied needed care because of their sexual orientation, and 19 percent of respondents living with HIV reported being denied care because of their HIV status.  The picture was even more disturbing for transgender and gender-nonconforming respondents, who reported the highest rates of being refused care (nearly 27 percent), being subjected to harsh language (nearly 21 percent), and even being abused physically (nearly 8 percent).

*Lambda Legal Comments on Proposed Rule 1557 Re: Nondiscrimination in Health Programs and Activities*, *1557 NPRM (RIN 0945-AA02)*, at 19 (submitted Nov. 9, 2015), https://www.regulations.gov/document?D=HHS-OCR-2015-0006-1406.

138.  The Trevor Project, an organization focused on suicide prevention efforts for LGBTQ youth, highlighted the psychological risks faced by that component of the community in its comment in support of the Proposed 2016 Rule:

> Suicide is the second leading cause of death among youth ages 10 – 24 years old. Lesbian, gay and bisexual youth are four times more likely, and questioning youth are three times more likely, to attempt suicide as their straight peers.  Nearly half of young transgender people have seriously thought about taking their lives, and one quarter report having made a suicide attempt.  Suicide attempts by LGB youth and questioning youth are 4 to 6 times more likely to result in injury, poisoning, or overdose that requires treatment from a doctor or nurse, compared to their straight peers. Lesbian, gay and bisexual youth who come from highly rejecting families are 8.4 times as likely to have attempted suicide as LGB peers who reported no or low levels of family rejection.  Notably, research has shown that 45% of individuals who die by suicide had visited their doctor within one month of their death.

*The Trevor Project Comments on Proposed Rule 1557 Re: Nondiscrimination in Health Programs and Activities, Proposed Rule RIN 0945-AA02, 1557 NPRM (RIN 0945-AA02)*, at 3–4

(submitted Nov. 9, 2015), available at https://www.regulations.gov/document?D=HHS-OCR-2015-0006-1301.

139.    The LGBTQ community's barriers to accessing and receiving medical treatment and care have historically been compounded by discrimination from insurers and insurance providers.  Prior to the enactment of the ACA, an LGBTQ person's protection from discrimination in seeking health care and health insurance coverage was dependent on the state where they resided.

140.    As the American Civil Liberties Union noted in a comment to the Department, "LGB people also encounter discrimination in health insurance coverage.  In 2014, among LGB people whose incomes made them potentially eligible for financial assistance to gain coverage under the ACA, 27 percent of gay men, 21 percent of lesbians, and 27 percent of bisexuals did not have coverage." *American Civil Liberties Union Comments on Proposed Rule 1557 Re: Nondiscrimination in Health Programs and Activities, Proposed Rule, 1557 NPRM (RIN 0945-AA02)*, at 5 (submitted Nov. 9, 2015), available at https://www.aclu.org/sites/default/files/field_document/11-09-15_aclu_1557_comments.pdf (last visited June 25, 2020).

141.    Further, GLMA:  Health Professionals Advancing LGBT Equality noted that a 2011 study showed that a quarter of transgender and gender nonconforming individuals reported being denied access to appropriate health insurance coverage. *GLMA: Health Professionals Advancing LGBT Equality Comments on Proposed Rule 1557 Re: Nondiscrimination in Health Programs and Activities, Proposed Rule RIN 0945-AA02, 1557 NPRM (RIN 0945-AA02)*, at 2–3 (submitted Nov. 9, 2015), available at https://www.regulations.gov/document?D=HHS-OCR-2015-0006-1724.

142.   After careful consideration and an extensive and procedurally rigorous notice-and-comment period, HHS moved forward with its well-reasoned interpretation of civil rights protections under Section 1557.  On May 11, 2016, in accordance with the ACA, the case law, and the vast majority of the received comments, and in compliance with her statutory authority, then-Secretary of HHS Sylvia Mathews Burwell published the 2016 Rule.  *See* 81 Fed. Reg. at 31,375–473 (as codified at 45 C.F.R. § 92).

**B.    The Finalization and Enactment of the 2016 Rule**

143.   The Department explained that the purpose of the 2016 Rule was to "reflect the current state of nondiscrimination law" and to ensure "the most robust set of protections supported by the courts" to prevent discrimination in the health care context."  81 Fed. Reg. at 31,388.  This purpose was expounded upon by the OCR in the issuance of the 2016 Rule where it stated that "a fundamental purpose of the ACA is to ensure that health services are available broadly on a nondiscriminatory basis to individuals throughout the country."  *Id*. at 31,379.

144.   To that end, the 2016 Rule clarified and codified existing nondiscrimination requirements and sets forth new standards to implement Section 1557, particularly with respect to the prohibition of discrimination on the basis of sex in health programs other than those provided by educational institutions and the prohibition of various forms of discrimination in health programs administered by HHS and entities established under Title I of the ACA.

145.   HHS found, based on the extensive data before it, that:

[d]iscrimination in the health care context can often lead to poor and inadequate health care or health insurance or other coverage for individuals and exacerbate existing health disparities in underserved communities. Individuals who have experienced discrimination in the health care context often postpone or do not seek needed health care; individuals who are subject to discrimination are denied opportunities to obtain health care services provided to others, with resulting adverse effects on their health status. Moreover, discrimination in health care can lead to poor and ineffective distribution of health care resources, as needed resources fail to reach many who need them. The result is a marketplace

comprised of higher medical costs due to delayed treatment, lost wages, lost productivity, and the misuse of people's talent and energy.

*Id.* at 31,444.

146.    To further protect the LGBTQ community, the OCR concluded that "Section 1557's prohibition of discrimination on the basis of sex includes, at a minimum, sex discrimination related to an individual's sexual orientation where the evidence establishes that the discrimination is based on gender stereotypes." *Id.* at 31,390.

147.    The 2016 Rule had various key definitions and components. *See* 45 CFR § 92.4. HHS aimed to adopt definitions that provided the broadest protections possible and were most consistent with governing law. *See, e.g.*, 81 Fed. Reg. at 31,389 ("[W]e support a prohibition on discrimination based on sexual orientation as a matter of policy. We believe that it is critical to meeting the goals of Section 1557 and, more broadly, the ACA, to ensure equal access to health care and health coverage. Indeed, these policy goals are reflected in the increasing number of actions taken by Federal agencies to ensure that lesbian, gay, and bisexual individuals are protected from discrimination.").

148.    For example, Section 92.101 of the 2016 Rule, entitled "Discrimination prohibited," broadly prohibited discrimination in health care. 45 C.F.R. at § 92.101. It stated that " [e]xcept as provided in Title I of the ACA, an individual shall not, on the basis of race, color, national origin, sex, age, or disability, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any health program or activity to which this part applies." 45 C.F.R. at § 92.101(a)(1).

149.    HHS defined the term "gender identity" in a way that was consistent with the approach taken by a majority of courts and federal agencies. *See* 81 Fed. Reg. at 31,384–85.

150.    Namely, HHS defined "gender identity" as *"an individual's internal sense of gender, which may be male, female, neither, or a combination of male and female, and which may be different from an individual's sex assigned at birth.  The way an individual expresses gender identity is frequently called 'gender expression,' and may or may not conform to social stereotypes associated with a particular gender.  A transgender individual is an individual whose gender identity is different from the sex assigned to that person at birth."  45 C.F.R. at § 92.4.

151.    Likewise, HHS included a definition for "on the basis of sex."  *See id*.

152.    HHS anchored its interpretation in the Supreme Court's holding in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250–51 (1989), and a slew of subsequent decisions addressing "sex" and the statutory language of Section 1557.  *See* 81 Fed. Reg. at 31,387.

153.    HHS explained that the phrase "on the basis of sex" was developed to include, but not be limited to, "discrimination on the basis of pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, childbirth or related medical conditions, sex stereotyping, and gender identity."  *Id*.  In other words, "on the basis of sex" includes discrimination based on stereotypical notions of appropriate behavior, appearance, or mannerisms for each gender, constituted sex discrimination.  *Id*.

154.    The 2016 Rule's interpretation of "on the basis of sex" ensured that individuals would not be excluded from programs or other health activities simply because their gender identity did not align with other aspects of their sex.  *See id*. at 31,409.

155.    The 2016 Rule next defined "sex stereotypes."  *See* 45 C.F.R. at § 92.4.  Again, HHS drew on existing legal and medical definitions to reach beyond just purported biological differences between the sexes.  *See* 81 Fed. Reg. at 31,390–92.  It defined "sex stereotypes" to mean "stereotypical notions of masculinity or femininity, including expectations of how

individuals represent or communicate their gender to others, such as behavior, clothing, hairstyles, activities, voice, mannerisms, or body characteristics.  These stereotypes can include the expectation that individuals will consistently identify with only one gender and that they will act in conformity with the gender-related expressions stereotypically associated with that gender. Sex stereotypes also include gendered expectations related to the appropriate roles of a certain sex."  45 C.F.R. at § 92.4.

156.    Collectively, these various definitions were key in furthering HHS's policy of "banning discrimination in health programs and activities on the basis of sexual orientation," which HHS recognized as "critical to meeting the goals of Section 1557 and, more broadly, the ACA, to ensure equal access to health care and health coverage."  81 Fed. Reg. at 31,388–89.

157.    In addition to its key definitional sections and its recognition of the central role of insurance in the health care system, HHS took action to ensure that providers and insurance companies complied with the nondiscriminatory provisions of the ACA.

158.    Specifically, the 2016 Rule included Section 92.206, entitled "Equal program access on the basis of sex," and Section 92.207, entitled "Nondiscrimination in health-related insurance and other health related coverage."  45 C.F.R. at §§ 92.206–07.  The two provisions were designed to ensure that all individuals, "regardless of sex assigned at birth, gender identity, or recorded gender," received the care they needed.  81 Fed. Reg. at 31,429.

159.    Section 92.206 expressly stated that:  "A covered entity shall provide individuals equal access to its health programs or activities without discrimination on the basis of sex; and a covered entity shall treat individuals consistent with their gender identity, except that a covered entity may not deny or limit health services that are ordinarily or exclusively available to individuals of one sex, to a transgender individual based on the fact that the individual's sex

assigned at birth, gender identity, or gender otherwise recorded is different from the one to which such health services are ordinarily or exclusively available."  45 C.F.R. at § 92.206.

160.    The 2016 Rule also protected individuals from discrimination in the context of health insurance coverage.  *See* 81 Fed. Reg. at 31,429 n.227 ("We note that under § 92.207(a), a covered entity would be barred from denying coverage of any claim (not just sex-specific surgeries) on the basis that the enrollee is a transgender individual.").

161.    Section 92.207 broadly stated that: "A covered entity shall not, in providing or administering health-related insurance or other health-related coverage, discriminate on the basis of race, color, national origin, sex, age, or disability."  45 C.F.R. at § 92.207(a).

162.    Overall, through the 2016 Rule, HHS put in a place a comprehensive set of critical and lifesaving regulatory provisions to effectuate the ACA and prevent discrimination against the LGBTQ community in health care.  *See, e.g.*, 45 C.F.R. at §§ 92.301–03.

## V.    THE TRUMP ADMINISTRATION'S ANIMUS TOWARDS THE LGBTQ COMMUNITY

163.    The Trump Administration has not hidden its animus towards the LGBTQ community.  Indeed, it has been the Administration's calling card as evidenced by the actions taken since President Trump was sworn into office on January 20, 2017.

164.    Over the past three-and-a-half years, the Administration has systemically rolled back protections for LGBTQ individuals, through regulatory changes, Presidential orders, administrative actions, and tweets.

165.    For example, on January 20, 2017—the same day that President Trump took the oath of office— the White House website removed all mention of the LGBTQ community, which was followed by the websites for the Department of State and the Department of Labor. *See* Mary Emily O'Hara, *Trump Administration Removes LGBTQ Content From Federal*

*Websites*, NBC NEWS (Jan. 24, 2017, 2:01 P.M.), https://www.nbcnews.com/feature/ nbc-out/trump-administration-removes-lgbtq-content-federal-websites-n711416.  The erasure of the LGBTQ community from these websites served as a harbinger of what would follow in President Trump's treatment of the community.

166.    Nearly one month later, the Trump Administration targeted some of the most vulnerable members of the LGBTQ community—children.

167.    The prior administration issued guidance through the U.S. Department of Justice and the U.S. Department of Education, which prohibited discrimination "on the basis of sex" in Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 *et seq*.) and its implementing regulations (*e.g.*, 34 C.F.R. § 106.33), and required schools to prohibit discrimination against transgender students including by ensuring access to sex-segregated facilities based on gender identity.

168.    Under that guidance, for example, schools were expected to allow transgender students to use bathrooms and facilities that were consistent with their gender identity and not based upon the sex that the students were assigned at birth.  The guidance was designed to prevent a geographic patchwork of policies throughout the country, where transgender students' abilities to be free from discrimination, including by being able to use the restrooms that matched their gender identity, were dependent upon where they lived.  *See* Emanuella Grinberg, *Feds issue guidance on transgender access to school bathrooms*, CNN (May 14, 2016, 3:48 A.M.) https://www.cnn.com/2016/05/12/politics/transgender-bathrooms-obama-administration/.

169.    On February 22, 2017, the U.S. Department of Justice and the U.S. Department of Education rescinded the prior guidelines and, thus encouraged the geographic patchwork of state-specific school policies that preceded the 2016-era guidance.  *See* Ariane de Vogue, Mary

Kay Mallonee & Emanuella Grinberg, *Trump administration withdraws federal protections for transgender students*, CNN (Feb. 23, 2017, 10:16 A.M.) https://www.cnn.com/2017/02/22/politics/doj-withdraws-federal-protections-on-transgender-bathrooms-in-schools/index.html.

170.    In March 2017, President Trump appointed Roger Severino to be the head of the Department's Office of Civil Rights.  Severino has a history of LGBTQ animus, making comments such as:

> Gender identity and sexual orientation, unlike race or sex, are changeable, self-reported, and entirely self-defined characteristics.  Government should not grant special privileges on such bases when legal recognition of a group as a "protected class" is, with few exceptions, reserved for groups with objectively identifiable immutable characteristics.

Ryan Anderson & Roger Severino, *Proposed Obamacare Gender Identity Mandate Threatens Freedom of Conscience and the Independence of Physicians*, The Heritage Foundation (Jan. 8, 2016), https://perma.cc/5XKG-S79Z, at 4.

171.    Severino has similarly emphasized his view that:

> [A] lot of religious universities, a lot of world religions believe, people are created male and female, and as they are created male and female, they are created for each other in institutions like marriage.   Um, and these concepts are being assaulted by nondiscrimination laws under the cover of a new ideology that's redefining what it means to be a man or woman.

Todd Wilken with Guest Roger Severino, Issues, Etc., *1. A California Bill Threatening the Religious Liberty of California Religious Colleges*, Podcast (June 23, 2016), https://perma.cc/QLJ9-M625, at 04:18.  Severino, on the same podcast, also said:

> The left has said is "all we want to do is to have people live and let live, to let people live their identities when it comes to sexual orientation and gender identity.  And if you disagree, you can disagree on your own time, and you'll be fine, and the government won't, will leave you alone.  Just let us be who we are." That's being proved to be a lie.  It was not about leaving people alone.  It was first, um, elevating sexual orientation and gender identity in law, labeling people who disagree as bigots and discriminators, and then going after them as people were, ah, went after racists through the Civil Rights era and to, to today, to try and

exclude and marginalize and label and say that religious beliefs based on very foundational notions of creation—uh, what it means to be a man and woman—that these beliefs that have, that have served society well, ah, are now being labeled discriminatory.

*Id.*

172.    In July of 2017, President Trump continued his rollback of protections for the LGBTQ community by targeting TGNCNB members of the United States Armed Forces, people that, at great risk to themselves, volunteered to serve, protect and defend the United States of America.

173.    President Trump stated, via tweet, that transgender members of the United States Armed Forces would no longer be permitted to serve in any capacity.  *See* Abby Phillip, Thomas Gibbons-Neff & Mike DeBonis, *Trump announces that he will ban transgender people from serving in the military*, WASH. POST (July 26, 2017), https://www.washingtonpost.com /world /national-security/trump-announces-that-he-will-ban-transgender-people-from-serving-in-the-military/2017/07/26/6415371e-723a-11e7-803f-a6c989606ac7_story.html

174.    President Trump's tweet and the Administration's subsequent formal policy change acted to reverse the position taken by the U.S. Department of Defense, which permitted TGNCNB service members to serve openly and have access to gender-affirming medical and psychological care.  *See* U.S. DEP'T OF DEF., DTM 19-004, MILITARY SERVICE BY TRANSGENDER PERSONS AND PERSONS WITH GENDER DYSPHORIA (12 Mar. 2019) [hereinafter "DTM 19-004"].

175.    The prior policy was enacted after careful deliberation and an in-depth study at the Pentagon, which concluded that there would be no issues with the open service of transgender service people.  *See* Terri Moon Cronk, *Transgender Service Members Can Now Serve Openly, Carter Announces*, DOD NEWS (June 30, 2016), https://www.defense.gov/

Explore/News/Article/Article/822235/transgender-service-members-can-now-serve-openly-carter-announces/.

176.    In fact, President Trump's Joint Chiefs testified before Congress on President Trump's proposed ban on April 24, 2018 and stated that they were not aware of any issues with the open service of transgender members in their respective branches.  *See* Tara Copp, *All 4 service chiefs on record: No harm to units from transgender service*, MILITARY TIMES (APR. 24, 2018), https://www.militarytimes.com/news/your-military/2018/04/24/all-4-service-chiefs-on-record-no-harm-to-unit-from-transgender-service/.

177.    Despite the prior administration's consideration of the policy and the testimony from President Trump's chosen Joint Chiefs, on April 12, 2019, President Trump's administration formally implemented his tweeted policy and banned transgender and gender nonconforming individuals from enlisting.  *See* DTM 19-004.  The formalized policy also barred the then-serving members of the military diagnosed with gender dysphoria from serving in their gender identity and precluded them from medical care and treatment in connection with their gender identity.  *Id.*

178.    On October 5, 2017, then-U.S. Attorney General Jeff Sessions issued a memorandum that targeted the LGBT community.  *See* Charlie Savage, *In Shift, Justice Dept. Says Law Doesn't Bar Transgender Discrimination*, N.Y. TIMES (Oct. 5, 2017), https://www.nytimes.com/2017/10/05/us/politics/transgender-civil-rights-act-justice-department-sessions.html.  The memorandum withdrew a 2014 memorandum that interpreted Title VII's prohibition on sex discrimination to encompass discrimination based on gender identity, which included discrimination against transgender individuals.  *Id.*

179.     Attorney General Sessions' memorandum went even further, stating that discrimination under Title VII applied to men and women but did not "encompass discrimination based on gender identity per se, including transgender status."  *See* Laura Jarrett, *Sessions says civil rights law doesn't protect transgender workers*, CNN (Oct 5, 2017, 11:58 A.M.), https://www.cnn.com/2017/10/05/politics/jeff-sessions-transgender-title-vii/index.html.

180.     The next day, Attorney General Sessions issued another memorandum permitting discrimination under the guise of protecting religious beliefs.  *See* Matt Zapotosky & Sarah Pulliam Bailey*, Civil liberties groups decry Sessions's guidance on religious freedom*, WASH. POST (Oct. 6, 2017), https://www.washingtonpost.com/world/national-security/civil-liberties-groups-decry-sessionss-guidance-on-religious-freedom/2017/10/06/cd5cfcde-aaa7-11e7-92d1-58c702d2d975_story.html.

181.     The memorandum gave taxpayer-funded federal agencies, government employees, and government contractors a license to discriminate against LGBTQ employees in certain situations, on the ostensible grounds of religious freedom.  *Id*.  Under the memorandum, a federal employee could assert religious freedom as a basis to deny service to an LGBTQ individual.  *Id*.

182.     The following year, President Trump's agencies continued their efforts to rescind and weaken protections for members of the LGBTQ community.

183.     In March 2018, the Department of Housing and Urban Development proposed to change its mission statement to remove "free from discrimination" from the mission statement put forth by the prior administration.  *See* Tracy Jan, *Ben Carson's mission statement for HUD may no longer include anti-discrimination language*, WASH. POST (Mar. 7, 2018), https://www.washingtonpost.com/news/wonk/wp/2018/03/07/ben-carsons-mission-statement-

for-hud-may-no-longer-include-anti-discrimination-language/.  The prior administration's

mission statement was "to create strong, sustainable, inclusive communities" that were "free

from discrimination."  *Mission*, HUD, https://www.hud.gov/about/mission (last visited June 25,

2020)*.*

184.    Following through on this change, in May 2019, the "Department of Housing and

Urban Development announced a proposed rule that would allow homeless shelters to determine

what services, if any, to provide transgender homeless individuals.  *See* Veronica Stracqualursi,

*HUD proposes rule that would roll back protections for transgender homeless*, CNN (May 24,

2019, 3:00 P.M.), https://www.cnn.com/2019/05/23/politics/hud-rule-transgender-homeless-

shelters-ben-carson/index.html.

185.    This was designed to rollback a prior rule, colloquially known as the "Equal

Access Rule," which required homeless shelters that received certain funding to shelter

transgender individuals in accordance with their gender identity.  *Id*.

186.    LGBTQ youth are overrepresented in the homeless population, having been

expelled from their parents' homes due to their gender identity or sexual orientation.  *See*

*Lambda Legal Comments on Proposed Rule 1557 Re: Nondiscrimination in Health Programs*

*and Activities*, *1557 NPRM (RIN 0945-AA02)*, at 26 (submitted Nov. 9, 2015),

https://www.regulations.gov/document?D=HHS-OCR-2015-0006-1406.

187.    Not to be outdone, in August of 2019, the Department of Labor proposed a rule

undermining protections of LGBTQ employees of federal contractors from discrimination on the

basis of their gender identity and sexual orientation.  Federal contractors that discriminated

against LGBTQ employees could cite to their religious beliefs as a defense to claims of

discrimination.  Implementing Legal Requirements Regarding the Equal Opportunity Clause's

Religious Exemption, 84 Fed. Reg. 41,677 (Aug. 15, 2019) (to be codified at 41 C.F.R. pt. 60).

188.    In November 2019, HHS proposed a rule reversing a prohibition on child welfare

organizations receiving federal funds from discriminating against individuals on the basis of their

gender identity or sexual orientation and more broadly eliminating overarching

nondiscrimination protections for sexual orientation and gender identity applicable to all HHS-

funded programs.  *See* Office of the Assistant Secretary for Financial Resources; Health and

Human Services Grants Regulation, 84 Fed. Reg. 63,831 (Nov. 19, 2019) (to be codified at 45

C.F.R. pt. 75).

189.    The Trump Administration's animus towards the LGBTQ community continues

in its enactment of the 2020 Rule, which removes nondiscrimination protections for the LGBTQ

community in the areas of health care and health insurance coverage during the height of the

COVID-19 global pandemic.

190.    As of the date of the filing of this Complaint, the coronavirus pandemic continues

to spread rapidly across the United States, with almost 2.4 million Americans having been

formally diagnosed with the virus, and over 121,000 deaths.  *Coronavirus Disease 2019*

*(COVID-19): Cases in the US*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/cases-

updates/cases-in-us.html.

191.    The coronavirus pandemic has already begun to uniquely and disproportionately

impact the LGBTQ community and communities of color, in light of a variety of factors,

including increased exposure, economic disparities, health risk factors, and barriers to care.  *See*

*Coronavirus Disease 2019 (COVID-19): Racial & Ethnic Minority Groups*, CDC,

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-

minorities.html; Press Release, Nat'l LGBT Cancer Network & GLMA, Open Letter About

Coronavirus and the LGBTQ+ Communities (Mar. 11, 2020), https://cancer-network.org/wp-

content/uploads/2020/04/Press-Release-Open-Letter-LGBTQ-Covid19-17.pdf; *The Lives and*

*Livelihoods of Many in the LGBTQ Community are at Risk Amidst COVID-19 Crisis*, HRC,

https://www.hrc.org/resources/the-lives-and-livelihoods-of-many-in-the-lgbtq-community-are-at-

risk-amidst.

192.    The Trump Administration's attempts to remove protections from discrimination

in health care for communities that are already vulnerable evidences a particular cruelty that goes

far above and beyond mere irresponsible public policy.

## VI.    THE DEPARTMENT'S ACTIONS REGARDING SECTION 1557 CONTINUE THE TRUMP ADMINISTRATION'S ROLLBACK OF PROTECTIONS FOR THE LGBTQ COMMUNITY

193.    The Department's approach to Section 1557 is consistent with the

Administration's prior actions to reverse nondiscrimination measures and protections for the

LGBTQ community.

194.    After HHS promulgated the 2016 Rule, there was litigation challenging Section

1557's prohibition of discrimination on the basis of gender identity.  *E.g.*, *Franciscan All., Inc. v.*

*Burwell*, 227 F. Supp. 3d 660 (N.D. Tex. 2016).  Even though the ruling was inconsistent with

the bulk of existing case law, in *Franciscan Alliance, Inc.*, a Judge in the Northern District of

Texas enjoined HHS from enforcing this prohibition.  *See id.* at 696.

195.    Although HHS had a right to appeal the injunction in *Franciscan Alliance*—a

single decision inconsistent with existing law—it chose not to.  Instead, at summary judgment,

HHS asked the court for additional time so that it could "reevaluate the regulation."  *See*

*Franciscan Alliance, Inc. v. Burwell*, Civil Action No. 7:16–cv–00108–O, ECF Docket No. 92 at

p. 1.  HHS then argued a position not only inconsistent with existing law, but its own then-

existing regulation (the 2016 Rule), by stating that "the relevant provisions of Title IX and Section 1557 unambiguously exclude gender-identity discrimination." *Franciscan Alliance, Inc. v. Burwell*, Civil Action No. 7:16–cv–00108–O, ECF Docket No. 154 at p. 14.

196.    On June 14, 2019, the Department issued a Notice of Proposed Rulemaking that proposed to curtail the protections in the 2016 Rule substantially and proposed what ultimately became the 2020 Rule. *See* Notice of Proposed Rulemaking, *Nondiscrimination in Health and Health Education Programs or Activities,* 84 Fed. Reg. 27,846–48 (June 14, 2019).

197.    Notably, the Department invoked the *Franciscan Alliance* litigation as one of three reasons to support the revisions.  The Department said, "[t]he existence of lawsuits and court orders blocking enforcement of significant parts of the 2020 Rule for over two years indicates that changes in the proposed rule may minimize litigation risk."  84 Fed. Reg. at 27,849 (proposed June 14, 2019).

198.    Notwithstanding the bulk of case law and regulations that were consistent with Section 1557 and the 2016 Rule, the Department also vaguely invoked apparent "inconsistencies with . . . long-standing existing civil rights regulations."  84 Fed. Reg. at 27,849 (proposed June 14, 2019).

199.    The Department also vaguely hypothesized that proposed revisions to the 2016 Rule were warranted because they would save "unjustified" costs, though it did not make much of an attempt to corroborate its accompanying numerical figures, nor did it consider the impact of its proposed revisions on public health.

200.    In this regard, the Department's purported cost-saving is based almost entirely upon its estimation of what covered entities will save by no longer mailing out required notices. 84 Fed. Reg. at 27,849 (proposed June 14, 2019).  The Department declined, however, to

consider the cost of the proposed revisions' removal of healthcare protection for millions of LGBTQ Americans.

201.     In response, 198,845 "individuals, Members of Congress, state and local government[s], State-based Exchanges, tribes and tribal governments, healthcare providers, health insurers, pharmacies, religious organizations, civil rights groups, and nonprofit organizations submitted comments on the rule."  85 Fed. Reg. at 37,164 (proposed June 19, 2020).

202.     Like the comments to the 2016 Rule, these new comments detailed, among other things, that:

> 33 percent [of transgender, nonbinary, and gender non-conforming people] had at least one negative experience in a health care setting relating to their gender identity in the past year, and 23 percent did not seek health care when they needed it due to fear of being disrespected or mistreated as a transgender person.  These rates tend to be higher for non-white respondents and individuals with disabilities.

*American Medical Association Comments on Proposed Rule 1557 Re: Docket ID HHS-OCR-2019-0007, RIN 0945-AA11, Nondiscrimination in Health and Health Education Programs or Activities, 1557 NPRM (RIN 0945-AA11)*, at 4 (submitted Aug. 13, 2019), available https://www.regulations.gov/document?D=HHS-OCR-2019-0007-153453.

203.     Other evidence illustrated that "16 percent of LGBTQ persons reported experiencing discrimination when going to a doctor or health clinic," and that "18 percent of LGBTQ persons" had "avoided seeking medical care altogether out of concern that they would suffer discrimination."  *American Psychological Association Comments on Proposed Rule 1557 Re: Nondiscrimination in Health and Health Education Programs or Activities, Agency: Department of Health and Human Services, Docket No.: HHS–OCR–2019–0007, 1557 NPRM (RIN 0945-AA11)*, at 3–4 (submitted Aug. 13, 2019), available at

https://www.apa.org/advocacy/health-disparities/nondiscrimination.pdf (last visited on June 25, 2020).

204.     The American Medical Association informed the Department that "health inequalities and premature deaths cost the U.S. economy $309.3 billion a year; the proposed elimination of most of the anti-discrimination protections in the 2016 implementing regulations will likely increase this figure." *American Medical Association Comments on Proposed Rule 1557 Re: Docket ID HHS-OCR-2019-0007, RIN 0945-AA11, Nondiscrimination in Health and Health Education Programs or Activities, 1557 NPRM (RIN 0945-AA11)*, at 2 (submitted Aug. 13, 2019), available at https://www.regulations.gov/document?D=HHS-OCR-2019-0007-153453.

205.     And the American Psychological Association commented that transgender people:

> were approximately five times more likely than the general population to have been diagnosed with HIV, eight times more likely to have experienced serious psychological distress in the month prior to taking the survey, and nearly twelve times more likely to have attempted suicide.  Moreover, transgender people who represent multiple marginalized identities, experience even more disparities in health care systems.  For instance, in the aforementioned survey, 42% of transgender people with disabilities reported major barriers to health care.  Discrimination in health care settings makes transgender individuals less likely to seek treatment, allowing the outsized prevalence of conditions listed above to persist.

*American Psychological Association Comments on Proposed Rule 1557 Re: Nondiscrimination in Health and Health Education Programs or Activities, Agency:  Department of Health and Human Services, Docket No.: HHS–OCR–2019–0007, 1557 NPRM (RIN 0945-AA11)*, at 4 (submitted Aug. 13, 2019), available at https://www.apa.org/advocacy/health-disparities/nondiscrimination.pdf (last visited on June 25, 2020).

206.     Nevertheless, only one year after the 2020 Rule was initially proposed, Defendants issued the 2020 Rule on June 19, 2020 and made only "minor and primarily technical

corrections" despite the significant concerns raised during the comment period.  85 Fed. Reg. 37,160–248 (proposed June 19, 2020).

207.    The 2020 Rule interpreted discrimination "on the basis of sex" in the statute as being limited "to the biological binary of male and female that human beings share with other mammals."  85 Fed. Reg. at 37,178 (proposed June 19, 2020).

208.    The 2020 Rule added that discrimination on the basis of sex excludes "discrimination on the basis of gender identity," and does not "encompass[]. . . sexual orientation."  85 Fed. Reg. at 37,191, 37,194 (proposed June 19, 2020).

209.    The 2020 Rule drew a comparison between discrimination on the basis of gender identity and sexual orientation, and discrimination "based solely on [one's] political affiliation." 85 Fed. Reg. at 37,180 (proposed June 19, 2020).

210.    The 2020 Rule removed Section 92.101 of the 2016 Rule, entitled "Discrimination prohibited."

211.    The 2020 Rule removed Section 92.4 of the 2016 Rule and the definitions included therein, including the 2016 Rule's definition of "gender identity," "on the basis of sex," and "sex stereotypes."

212.    The 2020 Rule removed Sections 92.206 and 92.207 of the 2016 Rule.  As noted above, the two provisions were designed to ensure that all individuals "regardless of sex assigned at birth, gender identity, or recorded gender," received the health care they needed.

213.    The 2020 Rule removed Section 93.302(d) of the 2016 Rule providing parties with a private right of action for violations of Section 1557.

214.    In enacting this final rule, the Department relied on the same justifications it had in its 2019 Notice of Proposed Rulemaking.  It continued to rely on *Franciscan Alliance*,

apparent "confusion" in "civil rights law," and theoretical cost savings resulting from the 2020 Rule.  85 Fed. Reg. at 37,164, 37,180, 37,224 (proposed June 19, 2020).

215.     Additionally, the 2020 Rule makes a spurious and unsupported claim that "removing or weakening" some "reasonable sex-based distinctions" might "undermine the equality of the sexes by disproportionally harming women."  Absurdly, the Department's support for this contention is the United States Equal Employment Opportunity Commission briefing in the consolidated *Bostock* appeals, in which the Supreme Court just held that discrimination on the basis of one's gender identity or sexual orientation violates the prohibition against sex discrimination.  *Bostock*, 2020 WL 3146686, at *18.

## VII.    THE 2020 RULE WILL SEVERELY AND IRREPARABLY HARM PLAINTIFFS AND THE GREATER LGBTQ COMMUNITY

216.     If the 2020 Rule goes into effect, it will have a direct and devastating impact on Plaintiffs and the greater LGBTQ community by threatening their access to and receipt of medically necessary, adequate, and potentially life-saving health care by removing clear prohibitions against discrimination in medical and health care, and eviscerating their ability to seek recourse from HHS when they experience the same.  Walker Decl. ¶¶ 82-86; Gentili Decl. ¶¶ 41, 66-70, 73.

217.     Specifically, if the 2020 Rule goes into effect, Plaintiffs (and members of the greater LGBTQ community) will: (i) refuse to seek treatment they need out of extreme fear of discrimination, emotional distress, abuse, or assault; (ii) be denied the medical and health care they need by providers and insurers; (iii) receive inadequate or even abusive medical or health care due to their LGBTQ status; (iv) lack any recourse in response to such discrimination and abuse; and (v) be stigmatized just by virtue of the government's imprimatur of discrimination. Walker Decl. ¶¶ 79-80, 84, 87, 89-90; Gentili Decl. ¶¶ 66, 68-73.

218.     The 2020 Rule has caused and will continue to cause substantial emotional distress to Plaintiffs and other members of the LGBTQ community—and specifically transgender individuals—and will lead them to avoid or postpone health care treatment out of fear for how they will be treated.  Walker Decl. ¶¶ 76, 80, 86-88; Gentili Decl. ¶¶ 65, 69, 71-72, 74.

219.     Indeed, as a result of the 2020 Rule, Plaintiffs are afraid that their health care and prescription drug providers, and health care insurers, will deny them access or coverage to necessary treatments or medications.  Walker Decl. ¶¶ 76, 82-85; Gentili Decl. ¶¶ 43, 55, 63, 66, 71.

220.     As explained, evidence has been presented to HHS that at least twenty-eight percent (28%) of TGNCNB individuals who were sick or injured postponed seeking medical treatment out of fear of discrimination.

221.     Plaintiffs' collective experiences underscore this risk.  For example, Ms. Gentili is already distraught when she travels outside of New York for fear that she may get sick and have to go to a doctor she does not know.  She already has work travel scheduled to Texas, Georgia, and Florida.  Gentili Decl. ¶ 65.  If the 2020 Rule goes into effect, and there are no protections against discrimination, Ms. Gentili will be even more distraught when she travels and less likely to seek necessary treatment during such travels.  This is because in many places throughout the country, there are no medical providers who have any experience with the TGNCNB community, ignorance and bias is the norm, and there are no protections against discrimination at the state or local level.  Gentili Decl. ¶ 59.  The 2020 Rule puts her at a significant risk because she has a lung disease that sometimes requires urgent care.  Gentili Decl. ¶ 45.

222.    Indeed, Ms. Gentili is particularly concerned about the eventuality that she will suffer breathing trouble again and need emergency intervention.  As a result of the 2020 Rule, she is experiencing heightened and extreme anxiety, mental anguish, fear, and emotional distress about her ability to get such care.  She is also afraid that even if she is able to get such care, it will be accompanied by humiliation, mistreatment, and other forms of discrimination, as she has experienced so frequently in the past.  Gentili Decl. ¶ 71.  She is also concerned about her ability to get affordable hormone treatment and routine bloodwork which, without insurance, would cost her thousands of dollars a month.  Gentili Decl. ¶ 67.

223.    The 2020 Rule will also lead Ms. Walker to avoid or delay medical treatment.  As noted, Ms. Walker has already avoided or delayed medical treatment out of fear of discrimination.  Walker Decl. ¶¶ 26, 53.  Without protections against such discrimination, this emotional distress will compound, and Ms. Walker will be even less likely to seek necessary treatment.  Indeed, her prior experiences, coupled with the 2020 Rule's absence of non-discrimination protections, makes her afraid of further harassment in seeking and receiving health care, receiving substandard health care, or being denied health care outright, all on account of her gender identity.  Walker Decl. ¶ 80.

224.    Based on a consensus of research and other critical data, the 2020 Rule will also harm Plaintiffs and other members of the LGBTQ community because it will prevent them from receiving appropriate and necessary health care, and also lead to inadequate, and emotionally and physically abusive health care.  Walker Decl. ¶¶ 19-20, 25, 82-83; Gentili Decl. ¶¶ 68-71.

225.    For example, before HHS was evidence saying that at least nineteen percent (19%) of TGNCNB individuals reported being refused care due to their TGNCNB status.  And approximately twenty-eight percent (28%) reported experiencing verbal harassment.

226.     Similarly, HHS had before it evidence showing that almost eight percent (8%) of LGB respondents had been denied needed care because of their sexual orientation.  Similarly, nineteen percent (19%) of LGB individuals report being denied care because of their HIV status.

227.     HHS also had evidence before it showing that fifty-six percent (56%) of LGB people and seventy percent (70%) of transgender and gender nonconforming individuals reported experiencing discrimination by health care providers—including refusal of care, harsh language, and physical roughness—because of their sexual orientation or gender identity.  The evidence also showed HHS that twenty-seven percent (27%) of transgender individuals and 8 percent of LGB individuals reports that they had been denied necessary health care because of their gender identity or sexual orientation.

228.     This is a particular risk for Plaintiffs.

229.     As explained, Ms. Walker is a two-time cancer survivor and is HIV-positive, who is dependent on the VA for her care and further relies on her health care insurer and prescription drug provider to cover and provide her with life-saving medications.  Walker Decl. ¶ 85.  The 2020 Rule will only further enable the VA's discriminatory practices she has already experienced and threaten her access to her life-saving medications.  Walker Decl. ¶ 79.

230.     Further, Ms. Walker is seeking to undergo gender confirmation surgery.  But, as discussed, when Ms. Walker went for surgery and treatment for her second cancer care, she was physically, verbally, and mentally harassed in seeking and receiving the care that she needed.  She likewise has had difficulty obtaining the requisite letter she needed from a therapist to be eligible for gender confirmation surgery.  Walker Decl.  ¶¶ 70-73.  The 2020 Rule will add another roadblock to accessing such health care and ensuring that insurance will cover such health care.  It also adds anxiety and emotional distress about the quality of the health care she

requires and whether it will be accompanied by humiliation, mistreatment, or other forms of

discrimination or abuse, as she has experienced so frequently in the past.  Walker Decl. ¶ 88.

231.    Given Plaintiffs' medical needs, history of health care barriers, discriminatory

treatment when seeking care, and the prevalence of avoiding care altogether, the 2020 Rule

heightens the risk of their severe health consequences or death.  Gentili Decl. ¶ 74; Walker Decl.

¶ 77.

232.    The 2020 Rule is particularly devasting and inhumane to Plaintiffs in the middle

of the COVID-19 pandemic.

233.    Indeed, Ms. Walker is a racial minority, has a condition that weakens or

compromises her immune system, and has a pre-existing lung condition; she has every single

risk factor for COVID-19.  Walker Decl. ¶ 76.  If the Rule goes into effect, it would allow

medical professionals to deny her care or provide her with substandard care because of her

gender identity or sexual orientation.

234.    Likewise, Ms. Gentili is a racial minority with pre-existing lung conditions; both

factors that put her at a greater risk from COVID-19.  She fears that without federal non-

discrimination protections, a single biased or discriminatory doctor or nurse could be the

difference between her life or death.  Gentili Decl. ¶ 62.

235.    The 2020 Rule will also remove any recourse for Plaintiffs when they experience

discrimination.  Walker Decl. ¶¶ 86, 90; Gentili Decl. ¶ 73.

236.    Current law provides recourse for those subject to discrimination and for

violations of the 2016 Rule.  Specifically, it provides for all "enforcement mechanisms available

under" comparable anti-discrimination provisions and states that "[c]ompensatory damages for

violations of Section 1557 are available in appropriate administrative and judicial actions brought under this rule."  45 C.F.R. § 92.301.

237.    This provision permits individuals bringing claims of discrimination on multiple bases (that is, "intersectional discrimination") to bring a single claim under one theory.  Such an individual would not need to litigate each individual basis of discrimination under a different standard or through a different claim.

238.    The 2020 Rule, however, removes these protections, including the ability of Plaintiffs to pursue a claim of intersectional discrimination under a uniform theory.

239.    The removal of these protections in the 2020 Rule also contributes to Plaintiffs' heightened anxiety and mental distress about their health care.  Gentili Decl. ¶ 73; Walker Decl. ¶ 90.

240.    Finally, the 2020 Rule stigmatizes Plaintiffs.

241.    By removing necessary anti-discrimination protections, the 2020 Rule is putting its imprimatur on discrimination against the LGBTQ community.  This, alone, sends a signal that members of the community are inferior to others.  And this stigma, combined with the psychological impact it has on members of the community and Plaintiffs, constitutes long-lasting and irreparable harm.

242.    The 2020 Rule sends a message to Plaintiffs that they are "outsiders" who are not worthy of the same protections afforded to others.  It leads to feelings of shame, hopelessness, and negative self-esteem.  Walker Decl. ¶ 89; Gentili Decl. ¶ 72.

243.    Indeed, the Rule highlights the harsh reality for Plaintiffs and so many other members of the LGBTQ community of having to live in constant fear, anxiety, and uncertainty about whether or not they have certain fundamental, critical rights, simply depending upon who

is in power.  As the 2020 Rule shows, they are in a constant state of vulnerability because their basic human rights to live free from discrimination, particularly when seeking life or death health care treatment, can be "given" and then taken away at a whim.  Gentili Decl. ¶ 75.

## VIII.   THE 2020 RULE IS UNLAWFUL BECAUSE IT IS WHOLLY INCONSISTENT WITH THE SUPREME COURT'S DECISION IN *BOSTOCK* AND RELEVANT PRECEEDING CASE LAW

244.   The Supreme Court's decision in *Bostock* illustrates precisely why the 2020 Rule is unlawful.

245.   In *Bostock*, the Court evaluated whether "discrimination because of sex" in the context of Title VII barred discrimination on the basis of gender identity and sexual orientation. 2020 WL 3146686, at *7, *9.  As in the 2020 Rule, the government argued that "sex" was not so broad and only included the binary male or female.

246.   The Court disagreed.  It stated: "It is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock*, 2020 WL 3146686, at *7.

247.   The Court explained:

Consider, for example, an employer with two employees, both of whom are attracted to men.  The two individuals are, to the employer's mind, materially identical in all respects, except that one is a man and the other a woman.  If the employer fires the male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague.

It continued:

Or take an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female.  If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth.  Again, the individual

employee's sex plays an unmistakable and impermissible role in the discharge decision.

*Id*.

248.    The Court concluded:

At bottom, these cases involve no more than the straightforward application of legal terms with plain and settled meanings.  For an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part because of sex.

*Id*. at *8.

249.    This same logic applies to the term "sex" in the 2020 Rule and renders the

Department's interpretation equally impermissible here.

250.    The Supreme Court's view in *Bostock* is also consistent with the substantial legal

authority that Congress embraced when it enacted the ACA.

251.    For example, at the time Congress enacted the ACA, at least four federal courts of

appeals in various contexts had recognized that discrimination on the basis of "sex" includes

discrimination on the basis of gender identity.  *See, e.g.*, *Barnes v. City of Cincinnati*, 401 F.3d

729 (6th Cir. 2005); *Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004); *Rosa v. Park West

Bank & Trust Co.*, 214 F.3d 213 (1st Cir. 2000); *Schwenk v. Hartford*, 204 F.3d 1187 (9th Cir.

2000).

252.    Several federal district courts had done the same.  *See, e.g.*, *Schroer v. Billington*,

577 F. Supp. 2d 293 (D.D.C. 2008); *Lopez v. River Oaks Imaging & Diagnostic Group, Inc.*, 542

F. Supp. 2d 653 (S.D. Tex. 2008); *Mitchell v. Axcan Scandipharm, Inc.*, No. Civ. A. 05-243,

2006 WL 456173 (W.D. Pa. Feb. 17, 2006); *Tronetti v. Healthnet Lakeshore Hosp.*, No. 03–CV–

0375E(SC), 2003 WL 22757935 (W.D.N.Y. Oct. 21, 2003).

253.    By removing the various definitions from the 2016 Rule, and by failing to include protections on the basis of gender identity and sexual orientation, the 2020 Rule is inconsistent with Congress's core purpose in enacting the ACA.

254.    Even before the Supreme Court's ruling in *Bostock*, federal courts utilized analogous reasoning and consistently ruled that "sex" in Section 1557 covers gender identity, sex stereotyping, and sexual orientation.

255.    Notably, this includes the following: *Boyden v. Wisconsin*. 314 F. Supp. 3d 979 (W.D. Wisc. 2018); *Tovar v. Essentia Health*, 342 F. Supp. 3d 947 (D. Minn. 2018); *Prescott v. Rady Children's Hosp. San Diego,* 265 F. Supp. 3d 1090 (S.D. Cal. 2017); *Cruz v. Zucker*, 195 F. Supp. 3d 554 (S.D.N.Y. 2016); *Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509 (D. Conn. 2016); *Rumble v. Fairview Health Servs.*, No. 14–cv–2037, 2015 WL 1197415, at *2 (D. Minn. Mar. 16, 2015).

256.    Accordingly, the 2020 Rule is unlawful because it is entirely inconsistent with the Supreme Court's precedent in *Bostock*, the long line of federal case law consistent with the same, and the ACA itself, whose guiding purpose is to expand access to affordable and quality health care *to all*.

## COUNT ONE

## (Administrative Procedure Act, 5 U.S.C. § 706(2)(A)—Not in Accordance with Law)

257.    Plaintiffs incorporate by reference the foregoing paragraphs.

258.    Defendants are subject to the APA, 5 U.S.C. § 551 *et seq*.  *See* 5 U.S.C. § 703.

259.    The APA requires this Court to "hold unlawful and set aside agency action" that is "not in accordance with law."  5 U.S.C. § 706(2)(A).

260.    The 2020 Rule is a "final agency action" to which there is no other adequate remedy in a court because the 2020 Rule: (1) marks the consummation of the Department's

decision-making process, and (2) is one in which rights or obligations have been determined, or from which legal consequences will follow.  *See, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

261.    The 2020 Rule is contrary to Section 1554 of the ACA, which prohibits the Secretary of HHS from promulgating any regulation that: "(1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care; (2) impedes timely access to health care services; (3) interferes with communications regarding a full range of treatment options between the patient and the provider; (4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions; (5) violates principles of informed consent and the ethical standards of health care professionals; or (6) limits the availability of health care treatment for the full duration of a patient's medical needs."  42 U.S.C. § 18114.

262.    By eliminating the definition of "on the basis of sex" and by removing the nondiscrimination protections based on sex, gender identity, and association, the 2020 Rule creates unreasonable barriers to the ability of LGBTQ individuals to obtain appropriate medical care, impedes their timely access to health care services, interferes with communications regarding a full range of treatment options between an LGBTQ patient and the provider, and limits the availability of health care treatment for the full duration of an LGBTQ patient's medical needs.

263.    The 2020 Rule further contravenes the statutory provisions of Section 1557 of the ACA that state that "[a]n individual shall not, on [a] ground prohibited under title VI of the Civil Rights Act of 1964, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, or section 504 of the Rehabilitation Act of 1973, be excluded from participation in, be

denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance[.]"  42 U.S.C. § 18116(a).

264.    Additionally, the 2020 Rule is inconsistent with Supreme Court precedent, specifically the *Bostock* decision, and the majority of controlling case law incorporated into the ACA that defines "sex" as including sexual orientation, gender identity, and sex stereotyping.

265.    *Bostock* alone renders the 2020 Rule unlawful.

266.    The 2020 Rule is therefore not in accordance with law as required by the APA.

267.    Defendants' violation causes ongoing and irreparable harm to Plaintiffs.

## **COUNT TWO**

### **(Administrative Procedure Act, 5 U.S.C. § 706(2)(C)—Exceeds Statutory Authority)**

268.    Plaintiffs incorporate by reference the foregoing paragraphs.

269.    Section 706(2)(C) of the APA requires that a reviewing court "hold unlawful and set aside agency action" if that action is "found to be" "in excess of statutory jurisdiction, authority, or limitations, or short of a statutory right[.]"

270.    Defendants may only exercise authority conferred by statute.  *See City of Arlington v. FCC*, 569 U.S. 290, 297–98 (2013).

271.    The explicit text of Section 1557 of the ACA incorporates existing federal civil rights laws and applies them to federally funded health care programs: "[a]n individual shall not, on [a] ground prohibited under title VI of the Civil Rights Act of 1964, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, or section 504 of the Rehabilitation Act of 1973, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance[.]"  42 U.S.C. § 18116(a).

272.     Section 1557 affords the Secretary the authority to "promulgate regulations to implement this section."  42 U.S.C. § 18116(c).  It does not authorize the Secretary to revise the ACA's text to undermine the central purpose of the statue—to expand access to affordable and quality medical care and health care to all Americans.

273.     The 2020 Rule's elimination of nondiscrimination protections based on sex, gender identity, and association, as well as its interpretation of "sex" to be solely "biological sex" (i.e., based on a person's genetic sex at birth) are inconsistent with the statutory provisions that Defendants purport to be construing, as well as the plain, accepted meanings of the term "sex."  *See* 85 Fed. Reg. at 37,168, 37,177–79, 37,189 (proposed June 19, 2020).  As a result, Defendants' construction of the statutory provisions that they purport to be implementing is inconsistent with the plain scope and meaning of those provisions.

274.     The 2020 Rule thus exceeds Defendants' statutory jurisdiction because the ACA did not delegate authority to HHS to promulgate force of law regulations that rewrite the ACA's text to eliminate the protections against discrimination on the basis of sex, gender identity, and association.

275.     Defendants' violations cause ongoing and irreparable harm to Plaintiffs.

## COUNT THREE

### (Administrative Procedure Act, 5 U.S.C. § 706(2)(A)—Arbitrary and Capricious)

276.     Plaintiffs incorporate by reference the foregoing paragraphs.

277.     Section 706(2)(A) of the APA requires that a reviewing court "hold unlawful and set aside agency action" if that action is "found to be" "arbitrary, capricious, [or] an abuse of discretion[.]"

278.     The 2020 Rule is arbitrary, capricious, and an abuse of discretion because the Defendants issued the 2020 Rule without any valid legal, medical, or reasoned policy foundation,

and contrary to the opinions of professional medical and public health organizations.  Further, the Defendants ignored the evidence in the record supporting the 2016 Rule, its prior findings that justified the 2016 Rule, as well as the evidence developed in opposition to its 2019 Notice of Proposed Rulemaking.  The 2020 Rule is also inconsistent with this extensive evidence.

279.    Despite this extensive evidence—highlighted above and incorporated here—the Department somehow claimed that it knew "of no data showing that" the 2020 Rule will "disproportionately burden individuals on the basis of sexual orientation and/or gender identity." 85 Fed. Reg. at 37,182 (proposed June 19, 2020).  It added that it purportedly "lack[ed] data necessary to estimate the number of individuals who currently benefit from covered entities' policies governing discrimination on the basis of gender identity who would no longer receive those benefits after publication of the rule—nor data to estimate how many of those individuals may experience the workplace and health-related consequences" from the 2020 Rule.  85 Fed. Reg. at 37,225 (proposed June 19, 2020).  It further clamed to lack the data "to estimate what greater public health costs, cost-shifting, and expenses may result from entities changing their nondiscrimination policies and procedures after promulgation of this rule."  85 Fed. Reg. at 37,225 (proposed June 19, 2020).

280.    The 2020 Rule is arbitrary, capricious, and an abuse of discretion because the Defendants did not engage in any reasonable, sufficient, or justifiable analysis or inquiry to find this purportedly missing data.

281.    The 2020 Rule is also arbitrary, capricious, and an abuse of discretion because the Department's justifications do not withstand scrutiny—they run counter to the evidence before the Department, rely on interpretations that Congress did not intend and that the Supreme Court did not adopt, and disregard material facts and evidence, including the well-documented and

serious difficulties and traumas experienced by LGBTQ individuals in obtaining health care, and the 2020 Rule's substantial harmful effects on LGBTQ patients' health.  In so doing, Defendants failed to adequately consider the tremendous burdens and costs the 2020 Rule will impose on LGBTQ individuals, including Plaintiffs.

282.    Despite commenters' substantial, detailed evidence of the detrimental impact the 2020 Rule would have on LGBTQ individuals' access to health care, Defendants failed to provide a reasoned explanation for its reversal of the 2016 Rule that was supported by reasoned, deliberate, and substantiated justifications and conclusions.

283.    Defendants claim that the 2020 Rule's "elimination of overbroad provisions related to sex and gender identity" will "restore[] Federalism by leaving to the States decisions properly reserved to them."  85 Fed. Reg. at 37,163 (proposed June 19, 2020).  But in other sections of the 2020 Rule, the Department contradicts itself: "the final rule does **_not_** have Federalism implications."  *Id*. at 37,240 n.382 (emphasis added).  *See also, id*. at 37,240 ("Therefore, the Department has determined that this final rule does **_not_** have sufficient Federalism implications to warrant the preparation of a Federalism summary impact statement under Executive Order 13132[.]") (emphasis added).  No other federalism-related legal authority, theory, or factual basis are offered.

284.    The 2020 Rule's revisionist definition of "on the basis of sex" to specifically exclude a person's transgender status, sexual orientation, or gender identity is unprecedented, confusing, unreasonable, and contrary to the U.S. Constitution and numerous federal laws, including Title X, Title VII, and Sections 1554 and 1557 of the ACA.

285.    The 2020 Rule is also arbitrary, capricious, and an abuse of discretion because the Defendants conducted and relied on a flawed, incomplete, unreasonable, and unsupported cost-

benefit analysis.  Specifically, the Department cited the apparent benefits of the 2020 Rule that include cost saving of over $2 billion; however, this claim was without adequate evidentiary basis and failed to consider the public health consequences and associated costs that the 2020 Rule will impose, including but not limited to the significant costs to Plaintiffs' and other LGBTQ individuals' health and safety, particularly when they delay or even avoid health care until absolutely necessary.

286.    Defendants' claim that the 2020 Rule will lead to cost savings is unjustified and fails to account for the health costs of their policy.  Defendants partly concede as much when they state that for LGBTQ-related changes: "[n]o costs are anticipated for provisions already vacated, and any possible costs for related provisions are not calculable based on available data." 85 Fed. Reg. at 37,163 (proposed June 19, 2020).  Defendants therefore fail to account for a key aspect of this issue and fail to sufficiently justify their action.

287.    Defendants further failed to conduct an adequate regulatory impact analysis reflecting the considerable costs to LGBTQ patients as required by Executive Order 12,866, 58 Fed. Reg. 51,735, and instructions from both the Office of Management and Budget's Circular A-4 on Regulatory Analysis (2003) and HHS's own Guidelines for Regulatory Impact Analysis (2016).

288.    As justification for the 2020 Rule, the Department also improperly relies on *one* Federal District Court opinion—the *Franciscan Alliance* decision discussed above—that is now contrary to the U.S. Supreme Court's decision in *Bostock*.  The Department noted in the 2020 Rule that the District Court in *Franciscan Alliance* issued its final judgment vacating and remanding the unlawful portions of the 2016 Rule," and that "the Department has considered that *vacatur*," to "arrive at this final rule."  85 Fed. Reg. at 37,165 (proposed June 19, 2020).

289.     It is arbitrary, capricious, and an abuse of discretion, however, that the Department manufactured this decision by refusing to appeal it, and now attempts to use it to justify the 2020 Rule.

290.     To justify the 2020 Rule, the Department also invoked "inconsistencies" with "long-standing existing civil rights regulations," and derisively accuses courts of "caus[ing] confusion as to the meaning of sex in civil rights law." 85 Fed. Reg. at 37,180 (proposed June 19, 2020).

291.     This view is arbitrary, capricious, and an abuse of discretion because it is wholly undermined by the Supreme Court's clarity in *Bostock*, which the Department *admitted* in the 2020 Rule "will likely have ramifications for the definition of 'on the basis of sex' under Title IX." 85 Fed. Reg. at 37,168. Further, the mere invocation of "confusion," without more, is insufficient to meet the Department's burden to justify the change in policy in the 2020 Rule.

292.     Additionally, the Department claims that the 2020 Rule will "remove[] unjustified burdens on providers' medical judgment." By riding roughshod over Section 1557's nondiscrimination provisions, a medical provider, in his or her medical judgment (i.e., on the basis of his or her own moral objection) may turn away an LGBTQ's patient in need of medical care. According to the Department, this is justified because "Federal civil rights law should not be used to override providers' medical judgments regarding treatments for gender dysphoria." 85 Fed. Reg. at 37,198 (proposed June 19, 2020).

293.     Unbelievably, the Department even suggests that restricting anti-discrimination protections will somehow serve cisgender women. It hypothesizes that "removing or weakening [] sex-based distinctions could undermine the equality of the sexes by disproportionately

harming women."  85 Fed. Reg. 37,184 (proposed June 19, 2020).  That is nonsensical and the rational itself is a form of impermissible sex-stereotyping.

294.    The 2020 Rule is finally arbitrary, capricious, and an abuse of discretion and not in accordance with the law because it exceeds the Department's rule-making authority.

295.    Congress limited the Department's rule-making authority by prohibiting the Secretary from promulgating "any regulation that," among other things, "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care . . . impedes timely access to health care services or . . . limits the availability of health care treatment for the full duration of a patient's medical needs.  42 U.S.C. § 18114.

296.    For the reasons discussed, the 2020 Rule will impede Plaintiffs' and other LGBTQ individuals' ability to seek and access health care.  It will also limit their ability to get health treatment that may be medically necessary since, under the Rule, providers could deny care *solely* on the basis of gender identity or sexual orientation.  And, at an absolute minimum, it will cause LGBTQ individuals, including Plaintiffs, emotional distress that constitutes an "unreasonable barrier" to their ability to seek appropriate medical care.

297.    Defendants' violations cause ongoing and irreparable harm to Plaintiffs.

## **COUNT FOUR**

### **(Administrative Procedures Act, 5 U.S.C. § 706(2)(B)—Contrary to Constitutional Right: U.S. Constitution, Fifth Amendment, Equal Protection)**

298.    Plaintiffs incorporate by reference the foregoing paragraphs.

299.    The 2020 Rule conflicts with the equal protection guarantee of the Fifth Amendment of the U.S. Constitution, in violation of 5 U.S.C. § 706(2)(B), for the following reasons.

300.     The Fifth Amendment provides, in pertinent part, that "No person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. CONST. amend. V.

301.     Section 706(2)(B) of the APA requires that a reviewing court "hold unlawful and set aside agency action" if that action is "found to be" "contrary to constitutional right, power, privilege, or immunity[.]"

302.     Discrimination based on a person's sex is presumptively unconstitutional and subject to strict scrutiny.  *See, e.g., United States v. Virginia*, 518 U.S. 515 (1996).

303.     The Supreme Court has repeatedly made clear that the "Constitution grants" all persons, regardless of sexual orientation, "equal dignity in the eyes of the law."  *Obergefell v. Hodges*, 135 S. Ct. 2584, 2608 (2015).  *See, e.g.*, *United States v. Windsor*, 570 U.S. 744 (2013); *Lawrence v. Texas*, 539 U.S. 558 (2003); *Romer v. Evans*, 517 U.S. 620 (1996).

304.     Just last week, the Supreme Court unequivocally reiterated the enduring importance of treating LGBTQ persons equally and with dignity, confirming that discriminating against someone for their sexual orientation or gender identity is discriminating against them based on their sex.  *See Bostock*, 2020 WL 3146686, at *7; *see also Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018) ("Our society has come to the recognition that gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth.  For that reason, the laws and the Constitution can, and in some instances must, protect them in the exercise of their civil rights.  The exercise of their freedom on terms equal to others must be given great weight and respect by the courts.").

305.     As reaffirmed by courts in this Circuit too, the Constitution prohibits discrimination based upon sexual orientation.  *See e.g.*, *Windsor v. United States*, 699 F.3d 169,

185 (2d Cir. 2012) (gays and lesbians are a "quasi-suspect" class, and classifications based on sexual orientation are subject to "heightened scrutiny"), *aff'd*, 570 U.S. 744 (2013).

306.    The 2020 Rule lacks even a rationale or legitimate justification—let alone a compelling one—as required by the Constitution.

307.    The 2020 Rule also lacks adequate tailoring under any standard of review.

308.    Instead, the 2020 Rule is rooted in animus, stigma, and inferiority.

309.    Hastily promulgating and finalizing the 2020 Rule amid a deadly pandemic, notwithstanding invitations to revisit or withdraw the 2020 Rule following the anticipated Supreme Court decision in *Bostock*, underscores the irrationality of Defendants' actions here.

310.    Moreover, because the 2020 Rule expressly excludes and treats Plaintiffs differently because of their sex, Defendants knowingly subject Plaintiffs to discrimination in health care—an impact that Defendants tacitly acknowledge but apathetically dismiss. *See, e.g.*, Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. at 37,182 (proposed June 19, 2020) ("[T]o the extent that LGBT individuals suffer future harms, it cannot be attributed to the Department's finalizing this rule, as opposed to other causes.").

311.    Further, Defendants trivialize the well-documented and serious difficulties faced by transgender individuals in obtaining health care, which Defendants breezily cast aside. *See, e.g.*, Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. at 37,191–92 (proposed June 19, 2020) ("Commenters' concern about denial of basic healthcare to transgender individuals appears to be based largely on unsubstantiated hypothetical scenarios.").

312.     Additionally, the Defendants embrace stereotypes about LGBTQ persons, including the stereotype that treating transgender women equally and recognizing them as women would somehow "disproportionately harm[] women."  85 Fed. Reg. at 37,184 (proposed June 19, 2020).

313.     In light of all the ways that the 2020 Rule openly fails to treat Plaintiffs with equal dignity in the eyes of the law, and instead only subordinates LGBTQ persons by removing existing nondiscrimination protections, Defendants have violated Plaintiffs' rights guaranteed by the Fifth Amendment and have stigmatized them as second-class citizens in violation of equal protection.

314.     Defendants' violations cause ongoing and irreparable harm to Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

a)  Issue preliminary and permanent injunctive relief restraining Defendants and all of their officers, employees, and agents, and anyone acting in concert with them from implementing, enforcing, threatening to enforce, or otherwise applying the provisions of the 2020 Rule;

b)  Declare that the 2020 Rule is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A);

c)  Declare that the 2020 Rule is in excess of the Department's statutory jurisdiction, authority, or limitations, or short of statutory right within the meaning of 5 U.S.C. § 706(2)(C);

d)  Find that the 2020 Rule's interpretation of "sex" as excluding protections on the basis of "gender identity" and "sexual orientation" is unlawful within the meaning of 5 U.S.C. § 706(2);

e)  Declare that the 2020 Rule is contrary to the U.S. Constitution's Fifth Amendment guarantee of equal protection under the law within the meaning of 5 U.S.C. § 706(2)(B);

f)  Declare that the 2020 Rule is unconstitutional;

g)  Vacate and set aside the 2020 Rule;

h)  Stay the effective date of the 2020 Rule pursuant to 5 U.S.C. § 705;

i)  Award Plaintiffs their costs and expenses, including reasonable attorney's fees, and any interest allowable by law under 28 U.S.C. § 2412; and

j)  Grant such other relief as the Court deems just and proper.

Dated:         June 26, 2020                      Respectfully submitted,

_____                          _/s/ Edward J. Jacobs_____

Jason E. Starr                                    Edward J. Jacobs
(New York Bar No. 5005194)                        (New York Bar No. 4168126)
*jason.starr@hrc.org*                             *ejacobs@bakerlaw.com*
Sarah Warbelow**                                  Kathryn M. Zunno-Freaney
*sarah.warbelow@hrc.org*                          (New York Bar No. 4572004)
Alphonso B. David                                 *kzunno@bakerlaw.com*
(New York Bar No. 4056230)                        Michael A. Sabella
*alphonso.david@hrc.org*                          (New York Bar No. 4555504)
**THE HUMAN RIGHTS CAMPAIGN**                     *msabella@bakerlaw.com*
1640 Rhode Island Ave, NW                         Audrey van Duyn*
Washington, DC 20036-3278                         (New York Bar No. 5762521)
Telephone: (202) 628-4160                         *avanduyn@bakerlaw.com*
Facsimile: (202) 347-5323                         **BAKER & HOSTETLER LLP**
                                                  45 Rockefeller Plaza
*Counsel for Plaintiffs*                          New York, New York 10111-0100
*Tanya Asapansa-Johnson Walker*                   Telephone: (212) 589-4200
*and Cecilia Gentili*                             Facsimile: (212) 589-4201

                                                  Joshua D. Rovenger**
                                                  *jrovenger@bakerlaw.com*
*\* Application for admission to the U.S. District*  Alyssa M. Daniels**
*Court for the Eastern District of New York*      *adaniels@bakerlaw.com*
*forthcoming*                                     **BAKER & HOSTETLER LLP**
                                                  Key Tower, 127 Public Square, Suite 2000
*\*\* Motion for pro hac vice admission*          Cleveland, OH 44114-1214
*forthcoming*                                     Telephone: (216) 621-0200
                                                  Facsimile: (216) 696-0740

                                                  Katrina M. Quicker**
                                                  *kquicker@bakerlaw.com*
                                                  Ryan E. Harbin**
                                                  *rharbin@bakerlaw.com*
                                                  **BAKER & HOSTETLER LLP**
                                                  1170 Peachtree Street, NE, Suite 2400
                                                  Atlanta, GA 30309-7676
                                                  Telephone: (404) 459-0050
                                                  Facsimile: (404) 459-5734

                                                  *Counsel for Plaintiffs*
                                                  *Tanya Asapansa-Johnson Walker*
                                                  *and Cecilia Gentili*

70