# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **TANYA ASAPANSA-JOHNSON WALKER, and** | |
| **CECILIA GENTILI,** | Civil Action No. 20-cv-02834-FB-SMG |
| *Plaintiffs*, | |
| v. | |
| **ALEX M. AZAR II, in his official capacity as the Secretary of the United States Department of Health and Human Services, and** | |
| **UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,** | |
| *Defendants*. | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' EXPEDITED MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND ............................................................................................................. 4

   I.     PLAINTIFFS ........................................................................................................... 4

   II.    STATUTORY AND REGULATORY BACKGROUND .......................................... 6

     A.   The ACA Broadly Prohibits Discrimination.......................................................... 6

     B.   Consistent with the ACA's Statutory Mandate, the 2016 Rule Broadly Protected the LGBTQ Community From Discrimination in Health Care ....................................... 7

     C.   The 2020 Rule Eviscerates Protections for the LGBTQ Community Against Discrimination in Health Care .............................................................................. 8

     D.   Defendants' Justifications for the 2020 Rule are Unlawful and Pretextual.................. 9

ARGUMENT ................................................................................................................. 10

   III.   THE 2020 RULE CAUSES AND THREATENS IRREPARABLE HARM TO PLAINTIFFS ...................................................................................................... 11

     A.   The 2020 Rule Causes a Threat and High Likelihood of Discrimination Against Plaintiffs in Health Care, and Even the Withholding of Health Care From Plaintiffs 12

     B.   The 2020 Rule Denies Plaintiffs Redress for Discrimination in Health Care or Denial of Health Care on Account of their Gender Identity.................................................. 13

     C.   The 2020 Rule Causes—and Will Continue to Cause—Plaintiffs to Suffer Extreme Anxiety, Humiliation, Emotional Distress, and Stigma............................................. 14

     D.   The 2020 Rule Threatens the Ability of Plaintiffs to Receive Adequate Health Care Because It Causes Plaintiffs and Other LGBTQ Individuals to Delay or Avoid Seeking Health Care ........................................................................................... 15

     E.   The 2020 Rule's Violations of Plaintiffs' Constitutional Rights Constitutes *Per Se* Irreparable Harm ................................................................................................. 16

   IV.   PLAINTIFFS ARE LIKELY TO SUCCEED ON the MERITS BECAUSE THE 2020 RULE IS UNLAWFUL ........................................................................................ 17

     A.   The Supreme Court's *Bostock* Decision Invalidates the 2020 Rule ........................... 17

     B.   The 2020 Rule Should Be Set Aside Because It Is Not in Accordance with Law ..... 19

     C.   The 2020 Rule Should Be Set Aside Because It Exceeds the Department's Statutory Authority ........................................................................................................... 23

     D.   The 2020 Rule Should Be Set Aside Because It Is Arbitrary and Capricious ........... 24

     E.   The 2020 Rule Should Be Set Aside Because It Is Unconstitutional ........................ 27

   V.   THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST WARRANT THE REQUESTED RELIEF ......................................................................................... 30

   VI.   PLAINTIFFS ARE ENTITLED TO A NATIONWIDE INJUNCTION...................... 31

CONCLUSION.............................................................................................................. 31

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adkins v. City of New York*,
143 F. Supp. 3d 134 (S.D.N.Y. 2015) ....................................................................28

*AL by Bauknight v. Leavitt*,
No. 06 C 3520, 2006 WL 8460334 (N.D. Ill. Dec. 8, 2006) ...................................13

*Arnold P'ship v. Dudas*,
362 F.3d 1338 (Fed. Cir. 2014) ..............................................................................23

*Barnes v. City of Cincinnati*,
401 F.3d 729 (6th Cir. 2005) ...............................................................................7, 21

*Basank v. Decker*,
No. 20 Civ. 2518 (AT), 2020 WL 1953847 (S.D.N.Y. Apr. 23, 2020) ...................16

*Batalla Vidal v. Nielsen*,
279 F. Supp. 3d 401 (E.D.N.Y. 2018) .....................................................................31

*Bennett v. Spear*,
520 U.S. 154 (1997) ................................................................................................20

*Bostock v. Clayton County, Georgia*,
140 S. Ct. 1741 (2020) .................................................................................. *passim*

*Boyden v. Conlin*,
341 F. Supp. 3d 979 (W.D. Wisc. 2018) .................................................................22

*Brower v. Evans*,
257 F.3d 1058 (9th Cir. 2001) ................................................................................24

*Butte Cty. v. Hogen*,
613 F.3d 190 (D.C. Cir. 2010) ................................................................................25

*Carcano v. McCrory*,
203 F. Supp. 3d 615 (M.D.N.C. 2016) ...................................................................15

*Centola v. Potter*,
183 F. Supp. 2d 403 (D. Mass. 2002) .......................................................................7

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*,
598 F.3d 30 (2d Cir. 2010) ......................................................................................10

*City & Cty. of San Francisco v. Azar,*
   411 F. Supp. 3d 1001 (N.D. Cal. 2019) .................................................................23

*Collins v. Brewer,*
   727 F. Supp. 2d 797 (D. Ariz. 2010), *aff'd sub nom Diaz v. Brewer,* 656 F.3d
   1008 (9th Cir. 2011) ..............................................................................................16

*Conn. Dep't of Envtl. Prot. v. Occupational Safety and Health Admin.,*
   356 F.3d 226 (2d Cir. 2004) ..................................................................................16

*Cruz v. Zucker,*
   195 F. Supp. 3d 554 (S.D.N.Y. 2016) ..................................................................22

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.,*
   140 S. Ct. 1891 (2020) ....................................................................................26, 27

*Dir., Office of Workers' Comp. Programs Dep't of Labor v. Greenwich Collieries,*
   512 U.S. 267 (1994) ..............................................................................................21

*Dist. of Columbia v. U.S. Dep't of Agric.,*
   No. 20 Civ 119, 2020 WL 1236657 (D.D.C. Mar. 13, 2020) ...............................10

*Encino Motorcars, LLC v. Navarro,*
   136 S. Ct. 2117 (2016) ..........................................................................................25

*Equal Opportunity Emp't Comm'n v. Astra USA, Inc.,*
   94 F.3d 738 (1st Cir. 1996) ...................................................................................14

*Evancho v. Pine-Richland Sch. Dist.,*
   237 F. Supp. 3d 267 (W.D. Pa. 2017) ...................................................................14

*Faiveley Transport Malmo AB v. Wabtec Corp.,*
   559 F.3d 110 (2d Cir. 2009) ..................................................................................11

*Family Planning Ass'n of Maine v. U.S. Dep't of Health and Human Servs.,*
   No. 1:19-CV-00100-LEW, 2020 WL 3064426 (D. Me. June 9, 2020) ..................24

*Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ..............................................................................................25

*Flack v. Wis. Dep't of Health Servs.,*
   395 F. Supp. 3d 1001 (W.D. Wis. 2019) ..............................................................22

*Flack v. Wisc. Dep't of Health Servs.,*
   331 F.R.D. 361 (W.D. Wis. 2019) ........................................................................12

*Franciscan Alliance v. Burwell,*
   227 F. Supp. 3d 660 (N.D. Tex. 2016) ...............................................................9, 13

*Heller v. Columbia Edgewater Country Club,*
    195 F. Supp. 2d 1212 (D. Or. 2002) ..................................................7

*Humane Soc'y of U.S. v. Gutierrez,*
    558 F.3d 896 (9th Cir. 2009) .......................................................10

*Kadel v. Folwell,*
    No. 1:19-cv-00272, 2020 WL 1169271 (M.D.N.C. Mar. 10, 2020).................................17, 22

*Karnoski v. Trump,*
    No. C17-1297-MJP, 2017 WL 6311305 (W.D. Wash. Dec. 11, 2017)..................................14

*King v. Burwell,*
    135 S. Ct. 2480 (2015)..............................................................6

*Lawrence v. Texas,*
    539 U.S. 558 (2003)................................................................28

*Lopez v. River Oaks Imaging & Diagnostic Grp., Inc.,*
    542 F.Supp.2d 653 (S.D. Tex. 2008) ................................................21

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,*
    138 S. Ct. 1719 (2018)............................................................28

*McCarthy v. Cortland Cnty. Cmty. Action Program, Inc.,*
    487 F. Supp. 333 (N.D.N.Y. 1980)..................................................31

*Michigan v. Envtl. Prot. Agency,*
    135 S. Ct. 2699 (2015)............................................................23

*Microsoft Corp. v. i4i Ltd. P'ship,*
    564 U.S. 91 (2011)................................................................21

*Minney v. U.S. Office of Pers. Mgmt.,*
    130 F Supp. 3d 225 (D.D.C. 2015) .................................................31

*Mullins v. City of N.Y.,*
    626 F.3d 47 (2d Cir. 2010)........................................................11

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.,*
    883 F.3d 32 (2d Cir. 2018)........................................................10

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012)...............................................................2

*Neder v. United States,*
    527 U.S. 1 (1999).................................................................21

*New York v. U.S. Dep't of Commerce*,
    351 F. Supp. 3d 502 (S.D.N.Y. 2019) ................................................................30

*New York v. U.S. Dep't of Health and Human Servs.*,
    414 F. Supp. 3d 475 (S.D.N.Y. 2019) ...........................................................25, 27

*New York v. U.S. Dep't of Homeland Sec.*,
    408 F. Supp. 3d 334 (S.D.N.Y. 2019) ...........................................................12, 31

*Norsworthy v. Beard*,
    87 F. Supp. 3d. 1104 (N.D. Cal. 2014) .............................................................28

*Norsworthy v. Beard*,
    87 F. Supp. 3d 1165 (N.D. Cal. 2015) ..............................................................12

*Obergefell v. Hodges*,
    135 S. Ct. 2584 (2015) .....................................................................................28

*Olmstead v. L.C. ex rel. Zimring*,
    527 U.S. 581 (1999) .........................................................................................17

*Prescott v. Rady Children's Hosp.-San Diego*,
    265 F. Supp. 3d 1090 (S.D. Cal. 2017) ............................................................22

*Price Waterhouse v. Hopkins*,
    490 U.S. 228 (1989) ..............................................................................6, 20, 21

*Public Citizen, Inc. v. Mineta*,
    340 F.3d 39 (2d Cir. 2003) ...............................................................................27

*Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
    908 F.3d 476 (9th Cir. 2018) ............................................................................27

*Rodriguez v. DeBuono*,
    175 F.3d 227 (2d Cir. 1999) .............................................................................11

*Roe v. Shanahan*,
    359 F. Supp. 3d 382 (E.D. Va. 2019) ...............................................................14

*Romer v. Evans*,
    517 U.S. 620 (1996) ..............................................................................28, 29, 30

*Rosa v. Park West Bank & Trust Co.*,
    214 F.3d 213 (1st Cir. 2000) ............................................................................21

*Rumble v. Fairview Health Servs.*,
    No. 14-cv-2037, 2015 WL 1197415 (D. Minn. Mar. 16, 2015) .................20, 22

*Saget v. Trump*,
　　375 F. Supp. 3d 280 (E.D.N.Y. 2019) ...........................................................11, 31

*Salinger v. Colting*,
　　607 F.3d 68 (2d Cir. 2010).................................................................................10

*Schroer v. Billington*,
　　577 F. Supp. 2d 293 (D.D.C. 2008) ...............................................................7, 21

*Schwenk v. Hartford*,
　　204 F. 3d 1187 (9th Cir. 2000) ...........................................................................21

*Smith v. City of Salem*,
　　378 F.3d 566 (6th Cir. 2004) ...........................................................................7, 21

*Statharos v. New York City Taxi & Limo. Comm'n*,
　　198 F.3d 317 (2d Cir. 1999)...............................................................................16

*Tronetti v. Healthnet Lakeshore Hosp.*,
　　No. 03–CV–0375E(SC), 2003 WL 22757935 (W.D.N.Y. Sept. 26, 2003).........................7, 8

*United States v. Soler*,
　　759 F.3d 226 (2d Cir. 2014)................................................................................21

*United States v. Windsor*,
　　570 U.S. 744 (2013)...........................................................................................28

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
　　858 F.3d 1034 (7th Cir. 2017) ...............................................................14, 17, 28

*Windsor v. United States*,
　　699 F.3d 169 (2d Cir. 2012), *aff'd*, 570 U.S. 744 (2013) ....................................28

*Yang v. Kellner*,
　　No. 20 Civ. 3325 (AT), 2020 WL 2129597 (S.D.N.Y. May 5, 2020)....................16

**Statutes**

5 U.S.C. § 705.................................................................................................................10

5 U.S.C. § 706 .......................................................................................................... *passim*

29 U.S.C. § 794...............................................................................................................6

20 U.S.C. § 1681.............................................................................................................6

42 U.S.C. § 2000e-2........................................................................................................1

42 U.S.C. § 2000d...........................................................................................................6

vi

42 U.S.C. § 6101 .................................................................................................................6

42 U.S.C. § 18114 ........................................................................................... *passim*

42 U.S.C. § 18116 ........................................................................................... *passim*

**Federal Regulations**

81 Fed. Reg. 31,376 (May 18, 2016) ...........................................................1, 7, 8, 25

84 Fed. Reg. 27,846 (June 14, 2019) ..........................................................................8

85 Fed. Reg. at 31,760 (June 19, 2019) ............................................................ *passim*

**Other Authorities**

*Discrimination Prevents LGBTQ People From Accessing Health Care*, Ctr. for
    Am. Progress (Jan. 18, 2018), https://perma.cc/ZG7E-7WK8 ................................................15

*Human Rights Campaign Comments on Proposed Rule 1557 Re: Public Comment
    in Response to the Notice of Proposed Rulemaking Addressing
    Nondiscrimination in Health Programs and Activities*, 1557 NPRM (RIN
    0945-AA02), at 1 (submitted Nov. 9, 2015),
    http://www.regulations.gov/document?D=HHS-OCR-2015-0006-0830 ..............................16

*Nondiscrimination in Health and Health Education Programs or Activities*
    (submitted Aug. 13, 2019), https://perma.cc/8ZVA-HC96 ......................................................13

*Some Americans are Denied 'Lifesaving' Health Care Because They are
    Transgender*, USA TODAY (Dec. 11, 2018), https://perma.cc/88S8-3VCH ..........................3

*What It's Like Being Transgender in the Emergency Room*, NATIONAL
    GEOGRAPHIC (Mar. 19, 2018), https://perma.cc/CPS4-5DSM..............................................3

Plaintiffs Tanya Asapansa-Johnson Walker and Cecilia Gentili (collectively, "Plaintiffs") ask this Court to issue a preliminary injunction enjoining Defendants from implementing, enforcing, threatening to enforce, or otherwise applying the provisions of Defendant United States Department of Health and Human Services' 2020 rule ("the 2020 Rule") that eliminates protections against discrimination in health care for members of the lesbian, gay, bisexual, transgender, and queer community. 85 Fed. Reg. 37,160 (June 19, 2020). The 2020 Rule re-interprets Section 1557 of the 2010 Patient Protection and Affordable Care Act (the "ACA"); unlawfully redefines "on the basis of sex" to specifically exclude a person's transgender status, sexual orientation, or gender identity; removes prior prohibitions against discrimination in health care; and eliminates remedial procedures to address discrimination by health care professionals. Plaintiffs request that the Court enjoin Defendants from implementing or enforcing the 2020 Rule before its effective date of August 18, 2020.

## PRELIMINARY STATEMENT

The ACA broadly prohibits discrimination on the basis of race, color, national origin, sex, age, or disability in health care. 42 U.S.C. § 18116 ("Section 1557"). Section 1557 was intended to build on the protections afforded under various civil rights laws, including Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 ("Title VII"). In 2016, after an exhaustive notice-and-comment period, and consistent with this intent and prevailing legal interpretations of the statutory language found in these civil rights statutes, the Department of Health and Human Services ("HHS" or the "Department") promulgated a rule (the "2016 Rule") that explicitly interpreted the definition of "discrimination on the basis of sex" to include gender identity and sex stereotyping. 81 Fed. Reg. 31,376, 31,471 (May 18, 2016).

On June 12, 2020, while the United States (and the rest of the World) are in the throes of the COVID-19 pandemic, and four years to the date of the mass shooting at the Pulse night club

in Orlando, Florida, where 49 LGBTQ people were killed, HHS revealed a new rule—the 2020 Rule—that eviscerates the 2016 Rule and contravenes Section 1557 by limiting the prohibitions against discrimination "on the basis of sex" to "binary categories of male and female only" and excluding prohibitions against discrimination on the basis of gender identity and sex stereotyping. 85 Fed. Reg. at 37,179. This action defies Congress' express intent in passing the ACA, which was to increase—not stifle—Americans' access to health care, particularly for those in the most vulnerable communities. *See, e.g., Nat'l Fed'n of Indep. Bus. v. Sebelius,* 567 U.S. 519, 538–39 (2012).

      The Department's stunning reversal of its prior policy is not only cruel and inhumane, but illegal. HHS dismissively states that the "2016 [R]ule may have unreasonably raised expectations about nondiscrimination protections." 85 Fed. Reg. at 31,760, 37,166. Not so. Section 1557 *commands* these protections. In a case that is dispositive of this issue—and just four days before the Department published the 2020 Rule, the Supreme Court in *Bostock v. Clayton County, Georgia,* 140 S. Ct. 1741, 1741 (2020) rejected HHS' narrow interpretation of "on the basis of sex" in the context of Title VII. As the Supreme Court held: "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* Like under Title VII, discrimination "on the basis of sex" in the ACA "involve[s] no more than the straightforward application of legal terms with plain and settled meanings," because for an individual "to discriminate against" another individual "for being homosexual or transgender," they must "discriminate against individual men and women in part because of sex." *Id.* at 1743. The Supreme Court's holding in *Bostock* is also consistent with the prevailing law Congress embraced at the time it passed the ACA, and *Bostock's* holding alone warrants enjoining the 2020 Rule.

The 2020 Rule is not a permissible exercise of rulemaking authority or discretion under the Administrative Procedures Act (the "APA"). The Department promulgated the 2020 Rule without the diligence required by the APA or any constitutionally supportable justification. For example, HHS incorrectly claims, among other things, that there was "no data showing" that its interpretation of "on the basis of sex" in the 2020 Rule "will disproportionately burden individuals on the basis of sexual orientation and/or gender identity," or that otherwise evidenced the impact on public health. 85 Fed. Reg. at 37,160, 37,182. This is false. It is widely documented that LGBTQ individuals face greater risks of discrimination in health care. *See, e.g.,* Susmita Baral, *What It's Like Being Transgender in the Emergency Room*, NATIONAL GEOGRAPHIC (Mar. 19, 2018), https://perma.cc/CPS4-5DSM; Kristin Lam, *Some Americans are Denied 'Lifesaving' Health Care Because They are Transgender*, USA TODAY (Dec. 11, 2018), https://perma.cc/88S8-3VCH; *see also* Compl. ¶¶ 4, 128–41 (referencing comments). The 2020 Rule also violates the APA because it is contrary to law, in excess of statutory authority, arbitrary, capricious, an abuse of discretion, and in violation of the equal protection guarantee of the Fifth Amendment of the United States Constitution. At bottom, the 2020 Rule is another example of the Trump Administration's animus against the LGBTQ community.

The 2020 Rule threatens and has caused and, should it go into effect, will continue to threaten and cause, immediate and irreparable harm to Plaintiffs and the rest of the LGBTQ community. *See* Declaration of Tanya Asapansa-Johnson Walker, attached to the Complaint as Ex. B ("Walker Decl."), at ¶¶ 79–80, 82–90; Declaration of Cecilia Gentili, attached to the Complaint as Ex. C ("Gentili Decl."), at ¶¶ 41, 66–73. For example, the 2020 Rule directly threatens Plaintiffs' ability to access and receive adequate health care because it allows health care providers and insurers to discriminate against Plaintiffs—and even deny them critical care—

solely on the basis of their gender identity. Further, because the 2020 Rule allows discrimination against Plaintiffs, it not only causes and continues to cause Plaintiffs extreme anxiety, emotional distress, and stigma, but causes them to delay or avoid seeking health care altogether. These irreparable harms—any one of which would be sufficient to warrant a preliminary injunction here—are particularly devasting to Plaintiffs now because they each require ongoing treatment for serious medical conditions that render them particularly vulnerable to COVID-19. Accordingly, Plaintiffs have met all required elements for an injunction and this Court must intervene to prevent the irreparable harm that would flow from Defendants' implementation or enforcement of the 2020 Rule.

## BACKGROUND

### I.   PLAINTIFFS

Plaintiffs are both transgender, pansexual, women of color with chronic medical conditions requiring continuous care. *See* Walker Decl. ¶¶ 31, 29–30; *see* Gentili Decl. ¶¶ 1, 3, 45. Plaintiffs both experienced widespread discrimination in seeking health care; Plaintiffs have been denied treatment outright, harassed, shamed, and diminished when receiving treatment, and been provided substandard health care. *See* Walker Decl. ¶¶ 18, 20–21, 37–38, 58–64, 70–73; *see* Gentili Decl. ¶¶ 22, 25, 27, & 57.

For example, in 2017, while Ms. Walker was recovering from her second lung cancer surgery, the nurses assigned to her care subjected her to misgendering, outing, physically abusive treatment, neglect, harassment, and embarrassment. Walker Decl. at ¶¶ 58–66. The nurses caused harm to Ms. Walker's genitals, causing her great pain, blood loss and embarrassment; they negligently left her to lie in her own feces for hours, causing her to push herself, her oxygen tank, and IV pole—all with one arm (her other was immobile due to the location of her lung cancer operation)—to the bathroom to clean herself; they willfully misgendered Ms. Walker,

despite her efforts to correct and educate the staff about her proper pronouns and how to treat members of the transgender, gender nonconforming and gender non-binary community; they withheld some of Ms. Walker's HIV medication; and they deliberately and repeatedly exposed Ms. Walker's genitalia to her roommate. *Id.*

Ms. Gentili's prior experiences in health care are tragically similar to Ms. Walker's. For example, several years ago, Ms. Gentili went to a doctor for routine treatment. Gentili Decl. at ¶ 22. When she disrobed, the doctor responded with shock when he realized she was transgender, used derogatory and offensive language to convey that he did not want to see her body, and refused to treat her. *Id.* Ms. Gentili's past experiences cause her significant anxiety whenever she needs to see a new health care provider. For example, in or around 2018, Ms. Gentili was in physical pain, but refused to seek treatment out of fear for how she would be treated. *Id.* at ¶¶ 37–38. Only after experiencing extreme distress did she go to the emergency room, where her fears were well founded when a triage nurse interrogated her about her gender identity in the waiting room full of people. *Id.* at ¶ 39.

Based upon their past health care experiences, both Ms. Walker and Ms. Gentili often avoid or delay medical treatment for as long as possible out of fear that they will be harassed, harmed, or at risk of death due to discriminatory treatment on account of their gender identity. Walker Decl. ¶¶ 26, 37–38, 50, 80; Gentili Decl. ¶¶ 40, 58, 60–61, 64–65. Both know other transgender individuals that, out of fear of being discriminated and mistreated, avoided medical treatment. Walker Decl. ¶ 41; Gentili Decl. ¶¶ 34–35. For example, a transgender friend of Ms. Gentili's recently got sick and showed symptoms indicative of COVID-19, including a cough and fever. Gentili Decl. at ¶¶ 34–35. Though Ms. Gentili told the friend that she needed to go to the doctor, the friend waited because she was afraid of how she would be treated. *Id.* Because

she did not timely seek care, the friend died from the virus. *Id.* Ms. Walker's and Ms. Gentili's prior experiences suffering serious discrimination in health care on account of their gender identities provide the foundation for why the 2020 Rule causes Plaintiffs irreparable harm, as described below.

## II.     STATUTORY AND REGULATORY BACKGROUND

### A.     The ACA Broadly Prohibits Discrimination

The purpose of the ACA is to increase access to affordable and quality health care. *See King v. Burwell*, 135 S. Ct. 2480 (2015). Section 1557 of the ACA explicitly provides:

> [A]n individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d *et seq.*), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 *et seq.*), the Age Discrimination Act of 1975 (42 U.S.C. 6101 *et seq.*), or section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments).

42 U.S. Code § 18116. More succinctly, and in a comparable manner to Title VII, Section 1557 prohibits discrimination on the basis of race, color, national origin, sex, age, or disability in a wide array of health programs and activities. *See* 85 Fed. Reg. at 37,161 n.3 (noting that the ACA specifically references Title VII); *id.* at 37,168 ("Title VII case law has often informed Title IX case law with respect to the meaning of discrimination "on the basis of sex"); *id.* at 31,469 (reciting prohibited discrimination).

Notably, at the time that Congress enacted this provision, a slew of federal cases— including in the context of Title VII—interpreted "discrimination on the basis of sex" to include discrimination on the basis of gender identity, sex stereotyping, and sexual orientation. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250–52 (1989) (concluding that "sex stereotyping" is sex

discrimination); *see also, e.g., Barnes v. City of Cincinnati*, 401 F.3d 729, 737 (6th Cir. 2005)

("gender identity" covered under Title VII); *Smith v. City of Salem*, 378 F.3d 566, 572 (6th Cir.

2004) (same); *Schroer v. Billington*, 577 F. Supp. 2d 293, 306–08 (D.D.C. 2008) (same);

*Tronetti v. Healthnet Lakeshore Hosp.,* No. 03–CV–0375E(SC), 2003 WL 22757935, *4

(W.D.N.Y. Sept. 26, 2003) (same); *Centola v. Potter,* 183 F. Supp. 2d 403, 410 (D. Mass. 2002)

(finding sexual orientation covered under Title VII); *Heller v. Columbia Edgewater Country

Club*, 195 F. Supp. 2d 1212, 1222–24 (D. Or. 2002) (same).

      **B.**      **Consistent with the ACA's Statutory Mandate, the 2016 Rule Broadly
Protected the LGBTQ Community from Discrimination in Health Care**

On May 11, 2016, HHS issued the 2016 Rule, which reflected "the current state of

nondiscrimination law" and ensured "the most robust set of protections supported by the courts"

to prevent discrimination in the health care context.  81 Fed. Reg. at 31,376, 31,388.  It did so

after receiving approximately 24,875 comments, which detailed the experiences of the LGBTQ

community in seeking health care and insurance coverage and overwhelmingly called for the

need to protect the LGBTQ community fully from all forms of discrimination in health care.  *See

id.* at 31,376.  Based on these comments and well-documented evidence, HHS concluded, for

example, that harassment and discrimination encountered in the health care setting, such as

repeated misgendering of transgender persons, impeded an individual's ability to participate in

and benefit from health care.  *See id.* at 31,405–06.

As a result, and in the interest of ensuring "that health services are available broadly on a

nondiscriminatory basis to individuals throughout the country," *id*. at 31,379, the 2016 Rule

"clarified and codified existing nondiscrimination requirements and set[] forth new standards to

implement Section 1557."  *Id*. at 31,376.  Among other things, it distilled and clarified several

definitions, including "gender identity," "on the basis of sex," and "sex stereotyping," in a way

that broadly protected the LGBTQ community from discrimination. *Id.* at 31,467–68. HHS paired these definitions with a prohibition against discrimination "regardless of sex assigned at birth, gender identity, or recorded gender," *id.* at 31,429, and extended this prohibition to the provision of care and insurance coverage, *id.* at 31,471. HHS also explained that the use of "sex stereotyping" included protections on the basis of sexual orientation: "discrimination on the basis of sex includes, at a minimum, sex discrimination related to an individual's sexual orientation where the evidence establishes that the discrimination is based on gender stereotypes." 81 Fed. Reg. at 31,388–90.

C. **The 2020 Rule Eviscerates Protections for the LGBTQ Community Against Discrimination in Health Care**

Consistent with its overarching antagonism towards the LGBTQ community, *see* Compl. ¶¶ 163–192, HHS issued a Notice of Proposed Rulemaking on June 14, 2019, that sought to destroy the various protections in the 2016 Rule. 84 Fed. Reg. 27,846 (June 14, 2019). Specifically, HHS expressed its intent to remove "gender identity" and "sex stereotyping" from the ambit of protections under the statute and to define "sex" as a "male and female" "in a binary and biological sense" only. *See id.* at 27,857, 27,883–84. It also proposed to remove associated non-discrimination protections and most restrictions on discrimination in the context of insurance. *See id.* at 27,860. HHS received an astounding 198,845 comments, most of which underscored the serious discrimination that the LGBTQ community faces in health care and the devastating effects of removing discrimination protections. 85 Fed. Reg. at 37,164; Compl. ¶¶ 202–05.

Notwithstanding this evidence, the HHS promulgated the 2020 Rule, which removes each critical definition in Section 92.4, including "gender identity" and "sex stereotyping." *Compare* 81 Fed. Reg. at 31,465–67 *with* 85 Fed. Reg. at 37,244. HHS explained that it views "the term

on the basis of . . . sex in section 1557" as limited "to the biological binary of male and female that human beings share with other mammals" and therefore does not prohibit discrimination on the basis of gender identity. 85 Fed. Reg. at 37,178. HHS explicitly interpreted Section 1557 as excluding protections on the basis of gender identity *and* sexual orientation. *See id*. at 37,194. In support, it drew a comparison between discrimination on the basis of gender identity and sexual orientation and discrimination "based solely on [one's] political affiliation." *Id*. at 37,180.

On their own, these changes are devastating. When combined with the removal of the broader non-discrimination protections, the release of insurance providers from the requirements of Section 1557, and the removal of Section 93.302(d) providing parties with a private right of action and a mechanism through which to assert claims of discrimination, 85 Fed. Reg. at 37,203, the 2020 Rule is deadly to the LGBTQ community.

     **D.**     **Defendants' Justifications for the 2020 Rule are Unlawful and Pretextual**

HHS provided several spurious justifications for these changes. It pointed to the decision in *Franciscan Alliance v. Burwell*, 227 F. Supp. 3d 660 (N.D. Tex. 2016). In that case, a court enjoined HHS from enforcing certain parts of the 2016 Rule, including the provisions related to gender identity. 85 Fed. Reg. at 37,162. HHS now claims that the trial court's decision in the case compelled it to re-evaluate the 2016 Rule and "clarify" the apparent confusion about "the meaning of sex in civil rights law." *Id*. at 37,164, 37,180.[1] HHS also asserted that the 2020 Rule would allegedly save $2.9 billion, largely from changes in provisions outside of the issues

---

[1] Curiously, HHS alleges it was obligated to rework the prior regulation because of a Texas district court decision from three years ago, yet it ignored a Supreme Court decision altogether before finalizing the 2020 Rule.

implicated in this litigation.  *Id*. at 37,224.  The Department's justifications are meritless and unlawful under the APA.

## ARGUMENT

The purpose of a preliminary injunction is to maintain the status quo and prevent irreparable harm while a lawsuit remains pending.  *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018).  A party seeking a preliminary injunction must show: "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."  *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).  The Court must also ensure that the preliminary relief is in the public interest.  *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010).  In addition, the APA authorizes courts "to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705.  The standard for a stay under Section 705 is the same as the standard for a preliminary injunction.  *See Humane Soc'y of U.S. v. Gutierrez*, 558 F.3d 896, 896 (9th Cir. 2009); *see also Dist. of Columbia v. U.S. Dep't of Agric.*, No. 20 Civ 119, 2020 WL 1236657, at *34 (D.D.C. Mar. 13, 2020) (noting that Section 705 "plainly and simply 'authorizes court to stay agency rules pending judicial review.'").  Here, a preliminary injunction is justified.

*First*, the 2020 Rule will cause Plaintiffs irreparable harm by exposing them to discrimination in vital medical treatment in the midst of a global pandemic, removing any recourse under federal law for such discrimination, stigmatizing and marginalizing them and others in the LGBTQ community, and instilling fear that will lead them to avoid care altogether. That the 2020 Rule infringes on Plaintiffs' constitutional right to equal protection also constitutes irreparable harm supporting an injunction.

*Second*, the Supreme Court's recent *Bostock* decision alone compels the conclusion that Plaintiffs will succeed on the merits. Even without *Bostock*, Plaintiffs would still succeed on the merits because the 2020 Rule is contrary to law, in excess of statutory authority, arbitrary and capricious, an abuse of discretion, and in violation of the equal protection guarantee of the Constitution—each one of which renders it unlawful under the APA.

*Third*, the requested injunction is in the public interest because of the irreparable harm to the LGBTQ community that results from the 2020 Rule. In contrast, Defendants will suffer no harm through the requested injunction. Further, it is *always* in the public interest for the government to follow the law and abide by the Constitution.

## III. THE 2020 RULE CAUSES AND THREATENS IRREPARABLE HARM TO PLAINTIFFS

The Second Circuit recognized that "a showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citing *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). "The standard for preliminary injunctive relief requires a *threat* of irreparable harm, not that irreparable harm already [has] occurred." *Mullins v. City of N.Y.*, 626 F.3d 47, 55 (2d Cir. 2010) (emphasis in original). Though judicial review of agency action under the APA typically is based on the full administrative record available to the Secretary at the time of the decision to implement the final rule, for purposes of a preliminary injunction motion, the Court may consider evidence outside of the administrative record to determine whether Plaintiffs have established a threat of irreparable harm. *See Saget v. Trump,* 375 F. Supp. 3d 280, 340–44 (E.D.N.Y. 2019).

There is no serious question that the 2020 Rule causes and threatens—and will continue to cause and threaten—irreparable harm to Plaintiffs and others in the LGBTQ community. *See,*

*e.g.*, *New York v. U.S. Dep't of Homeland Sec.*, 408 F. Supp. 3d 334, 350–53 (S.D.N.Y. 2019) (granting preliminary injunction on the basis that "[t]he irreparable injury to Plaintiffs . . . is a direct and inevitable consequence of the impending implementation of the Rule").

By contrast, the Department will suffer no comparable prejudice from an injunction. Rather, an injunction would simply preserve the status quo, under which the ACA and 2016 Rule would continue to apply and provide meaningful protections to Plaintiffs and the rest of the LGBTQ community.

**A.**     **The 2020 Rule Causes a Threat and High Likelihood of Discrimination Against Plaintiffs in Health Care, and Even the Withholding of Health Care from Plaintiffs**

The 2020 Rule jeopardizes the health care needs of an entire class of people, including Plaintiffs, simply because they are members of the LGBTQ community, and exposes them to discriminatory, verbally abusive treatment, sub-standard care, or a denial of coverage for medical treatments just by virtue of their sexual orientation and/or gender identity. And they will be without *any* recourse for such discrimination under federal law. *See Flack v. Wisc. Dep't of Health Servs.*, 331 F.R.D. 361, 373 (W.D. Wis. 2019) (denying coverage for gender-conforming surgeries and treatments are examples of "delayed/denied medical care" that cannot "be prevented or fully rectified by the final judgment after trial"); *Norsworthy v. Beard*, 87 F. Supp. 3d 1165, 1193 (N.D. Cal. 2015) (where the "continuation of suffering" caused by the denial of medically necessary treatment "constitutes irreparable injury, whether this is the first month she has suffered it or the hundredth").

Both Plaintiffs' detailed histories of discrimination in health care, together with the widely documented fact that LGBTQ individuals face greater risks of discrimination in health care, demonstrate a threat and strong likelihood of increased harm if protections are rescinded. *See* Walker Decl. ¶¶ 18, 20–21, 37–38, 58–64, 70–73; *see* Gentili Decl. ¶¶ 22, 25, 27, 57;

Compl. ¶¶ 218–34. This past reveals a future threat; one that is heightened given the on-going global pandemic and Plaintiffs' compromised immune systems. Walker Decl. ¶ 76; Gentili Decl. ¶ 74.

Further, by allowing Plaintiffs to be discriminated against in seeking health care solely on account of their gender identities, the 2020 Rule threatens Plaintiffs' ability to receive the critical health care they currently need. For example, the 2020 Rule allows Plaintiffs' health care providers and insurers to withhold from Plaintiffs the medication and treatment necessary for their ongoing care for serious existing conditions and gender confirmation. *See* Walker Decl. ¶¶ 27, 29, 57, 68–71, 81–83; Gentili Decl. ¶¶ 43–49, 53, 57, 63,

**B.** **The 2020 Rule Denies Plaintiffs Redress for Discrimination in Health Care or Denial of Health Care on Account of their Gender Identity**

Worse, in the event of such discrimination or complete denial of care, Plaintiffs and others in the LGBTQ community will be without federal redress (or, if Plaintiffs are traveling elsewhere in the country, potentially any recourse). The Department describes its actions as "maintain[ing] the status quo" regarding gender identity; not true. 85 Fed. Reg. at 37,238. Since 2016, individuals have had the ability to vindicate their rights under Section 1557 in court and have, in fact, done so. *See* Am. Med. Ass'n, *RE: Docket ID HHS-OCR-2019-0007, RIN 0945-AA11, Nondiscrimination in Health and Health Education Programs or Activities*, at 4 (submitted Aug. 13, 2019), https://perma.cc/8ZVA-HC96 (explaining that the "fears raised by the *Franciscan Alliance v. Burwell* lawsuit are not well-founded," and that "existing enforcement of section 1557 is working well to resolve very real issues of discrimination"). The 2020 Rule eliminates that path or any other viable remedy. *See AL by Bauknight v. Leavitt*, No. 06 C 3520, 2006 WL 8460334, at *5 (N.D. Ill. Dec. 8, 2006) ("The Court found that plaintiffs demonstrated irreparable harm because they would have no redress if their meritorious discrimination claims

13

were erroneously dismissed during the pendency of the litigation as a result of new administrative procedures that were later found to be constitutionally inadequate"); *Equal Opportunity Emp't Comm'n v. Astra USA, Inc.,* 94 F.3d 738, 745 (1st Cir. 1996) (finding the impediment of investigating and enforcing anti-discrimination laws constitutes irreparable harm).

### C. The 2020 Rule Causes—and Will Continue to Cause—Plaintiffs to Suffer Extreme Anxiety, Humiliation, Emotional Distress, and Stigma

In addition to being legally erroneous, the government's interpretation of "sex" stigmatizes and undermines core human dignity by singling out a specific group of people for disparate treatment. The 2020 Rule makes those in the LGBTQ community, including Plaintiffs, feel "marginalized," leading to "genuine distress, anxiety, discomfort and humiliation." *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 294 (W.D. Pa. 2017); *see also Roe v. Shanahan*, 359 F. Supp. 3d 382, 419–20 (E.D. Va. 2019) (finding irreparable harm warranting an injunction in challenge by members of the U.S. Air Force who were diagnosed with HIV and faced imminent separation from the service where, among other things, there was "stigmatic injury caused by defendants' decisions"); *Karnoski v. Trump*, No. C17-1297-MJP, 2017 WL 6311305, at *9 (W.D. Wash. Dec. 11, 2017) (finding that irreparable harm could constitute "denial of career opportunities and transition-related medical care, stigmatic injury, and impairment of self-expression."); *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044–46 (7th Cir. 2017) (finding stigmatization justifies a finding of irreparable harm).

Plaintiffs' declarations illustrate that the 2020 Rule causes marginalization, distress, anxiety, discomfort, and humiliation. *See* Gentili Decl. at ¶ 72 (stating that the 2020 Rule sends "a message to us all that we are 'outsiders' who are not worthy of the same protections afforded to others. This stigma has led to feelings of shame and hopelessness, and negative self-

esteem."); Walker Decl. at ¶ 89 (testifying that the Rule makes her feel like she is "not worthy of the same discrimination-free medical care and treatment as others.").  The type of stigmatic injury that Plaintiffs cite is precisely the type of injury that justifies a preliminary injunction.

D.    **The 2020 Rule Threatens the Ability of Plaintiffs to Receive Adequate Health Care Because It Causes Plaintiffs and Other LGBTQ Individuals to Delay or Avoid Seeking Health Care**

The absence of non-discrimination protections will augment Plaintiffs' emotional distress and their associated fear of discrimination, abuse, or assault, and continue to cause them to avoid or postpone necessary medical care.  *See Carcano v. McCrory*, 203 F. Supp. 3d 615, 650 (M.D.N.C. 2016) (finding that fear of taking certain action because of a well-founded "fear of harassment and violence" constitutes irreparable harm); Shabab Ahmed Mirza & Caitlin Rooney, *Discrimination Prevents LGBTQ People From Accessing Health Care*, Ctr. for Am. Progress (Jan. 18, 2018), https://perma.cc/ZG7E-7WK8 (study found that 25% of transgender patients delayed seeking treatment because of fear of discrimination by health care providers).  Ms. Walker's Declaration is clear that the absence of protections against discrimination in health care make her reluctant to seek health care treatment because of her concerns about the quality of care she will receive, especially in light of the "humiliation, mistreatment, other forms of discrimination, and even mental and physical abuse at the hands of medical professionals" that she experienced in the past.  Walker Decl. at ¶¶ 88–89.  Similarly, Ms. Gentili avoids seeking medical treatment because of her past experiences with discrimination and mistreatment in seeking health care, and is currently "experiencing heightened and extreme anxiety, mental anguish, fear, and emotional distress" over the 2020 Rule, particularly whether she will receive discrimination-free medical care in the future if she needs treatment, especially as she travels for work outside of New York.  Gentili Decl. at ¶¶ 65, 71–72.

15

Nor are Plaintiffs alone. Statistics show that more than half of transgender and gender nonconforming individuals admitted to being fearful of future discriminatory health care experiences. *Human Rights Campaign Comments on Proposed Rule 1557 Re: Public Comment in Response to the Notice of Proposed Rulemaking Addressing Nondiscrimination in Health Programs and Activities, 1557 NPRM* (RIN 0945-AA02), at 1 (submitted Nov. 9, 2015), http://www.regulations.gov/document? D=HHS-OCR-2015-0006-0830. The 2020 Rule will exacerbate these serious concerns, inevitably leading others in the LGBTQ community to avoid or postpone medically necessary treatment.

      **E.**      <u>**The 2020 Rule's Violations of Plaintiffs' Constitutional Rights Constitutes**</u> <u>***Per Se* Irreparable Harm**</u>

As discussed further below, the 2020 Rule violates Plaintiffs' right to equal protection under the law because it removes regulatory nondiscrimination protections in health care by deleting transgender status, gender identity, and sexual orientation from the definition of sex. In this Circuit, a deprivation of a constitutional right, alone, "triggers a finding of irreparable injury." *Conn. Dep't of Envtl. Prot. v. Occupational Safety and Health Admin.*, 356 F.3d 226, 231 (2d Cir. 2004) (internal citations omitted); *Statharos v. New York City Taxi & Limo. Comm'n*, 198 F.3d 317. 322 (2d Cir. 1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary."); *Yang v. Kellner*, No. 20 Civ. 3325 (AT), 2020 WL 2129597, at *7 (S.D.N.Y. May 5, 2020) (explaining that "[i]n the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm"); *Basank v. Decker*, No. 20 Civ. 2518 (AT), 2020 WL 1953847, at *8 (S.D.N.Y. Apr. 23, 2020) (finding that a violation of a constitutional right constitutes irreparable harm for purposes of the preliminary injunction analysis). *See also Collins v. Brewer,* 727 F. Supp. 2d 797, 813 (D. Ariz. 2010) (finding that by being denied equal health care benefit, the

law violated Plaintiffs' equal protection guarantees and thus established irreparable harm), *aff'd sub nom Diaz v. Brewer,* 656 F.3d 1008 (9th Cir. 2011)).

## IV. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS BECAUSE THE 2020 RULE IS UNLAWFUL

Plaintiffs are likely to prevail on the merits of their Complaint.  Mere days before Defendants issued the 2020 Rule, the Supreme Court decided *Bostock*, which explained that Title VII's prohibition against discrimination "on the basis of sex" necessarily prohibits discrimination on the basis of one's transgender status, gender identity, or sexual orientation.  *See Bostock*, 140 S. Ct. at 1741 ("it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual on the basis of sex").  Plaintiffs submit that *Bostock* begins and ends the analysis of the constitutionality of the 2020 Rule because the Department's re-interpretation of "sex" to mean only a biological binary of male and female— and to expressly exclude transgender, gender identity, and sexual orientation—violates Supreme Court precedent.

Nevertheless, Plaintiffs are still likely to succeed on the merits because the 2020 Rule violates several provisions of the APA.  Specifically, the 2020 Rule: (a) is not in accordance with the law; (b) exceeds Defendants' statutory authority; (c) is arbitrary and capricious; and (d) is contrary to Plaintiffs' Constitutional rights.  *See* 5. U.S.C. § 706(2).

### A. The Supreme Court's *Bostock* Decision Invalidates the 2020 Rule

Courts consistently look to other legislation when deciding issues of interpretation.  *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 616 n.1 (1999) ("This Court has also looked to its Title VII interpretations of discrimination in illuminating Title IX.") (Thomas, J., dissenting); *Whitaker*, 858 F.3d at 1047–49 (examining Title VII and equal protection cases to decide question under Title IX); *Kadel v. Folwell*, No. 1:19-cv-00272, 2020 WL 1169271, at *6

(M.D.N.C. Mar. 10, 2020) (explaining that courts often look at Title VII cases when construing similar terms in Title IX). In *Bostock* (and the two other cases consolidated with it), the Supreme Court considered whether "discrimination because of sex" in the context of Title VII barred discrimination on the basis of sexual orientation and gender identity. The Government in *Bostock*, just as HHS articulated in promulgating the 2020 Rule, argued that "[t]he ordinary meaning of 'sex' is biologically male or female." Br. for the United States as Amicus Curiae Supporting Affirmance in No. 17-1618 and Reversal in No. 17-1623, 2019 WL 4014070, at *9 (Aug. 23, 2019). And so, its argument went, discrimination on the basis of "sex" did not include discrimination on the basis of sexual orientation or gender identity. *See id*. at 12–14. The Supreme Court disagreed.

Justice Gorsuch, writing for a 6-3 majority of the Court, put it plainly: "[I]t is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock*, 140 S. Ct. at 1741. The Court explained:

> Consider, for example, an employer with two employees, both of whom are attracted to men. The two individuals are, to the employer's mind, materially identical in all respects, except that one is a man and the other a woman. If the employer fires the male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague. . . . Or take an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth. Again, the individual employee's sex plays an unmistakable and impermissible role in the discharge decision.

*Id*. at 1741–42. The Court summarized: "At bottom, these cases involve no more than the straightforward application of legal terms with plain and settled meanings. For an employer to discriminate against employees for being homosexual or transgender, the employer must

intentionally discriminate against individual men and women in part because of sex."  *Id*. at 1743.

That analysis applies with full force here and equally guts the Government's identical interpretation of "sex."  The 2020 Rule implicitly makes this argument because HHS stated that it:

> continues to expect that a holding by the U.S. Supreme Court on the meaning of "on the basis of sex" under Title VII will likely have ramifications for the definition of "on the basis of sex" under Title IX. Title VII case law has often informed Title IX case law with respect to the meaning of discrimination "on the basis of sex."

85 Fed. Reg. at 37,168.  This "expect[ation]" is curious because the Department published the Rule four days *after* the Supreme Court's decision in *Bostock*.

As with Title VII, the ACA prohibits any discrimination on the basis of sex.  So, if a medical provider refuses to treat a male patient "for no other reason than the fact he is attracted to men," the provider "discriminates against him for traits or actions it tolerates in his female" patients.  *Bostock*, 140 S. Ct. at 1741.  Similarly, if a provider refuses to treat "a transgender person who was identified as a male at birth but who now identifies as a female . . . [it] intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in a [patient] identified as female at birth."  *Id*.  The result in this context is the same: "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second."  *Id*. at 1747.

**B.**    **The 2020 Rule Should Be Set Aside Because It Is Not in Accordance with Law**

The APA requires a court to set aside any final agency action that is "not in accordance with law."  5 U.S.C. § 706(2)(A).  There should be no legitimate dispute that the 2020 Rule is a final agency action because the 2020 Rule: (1) marks the "consummation" of the Department's

decision-making process, and (2) is one "by which rights or obligations have been determined, or from which legal consequences will flow." *See*, *e.g.*, *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal punctuation omitted). Plaintiffs will also show there is also no legitimate dispute that, even without the finality of the *Bostock* decision, the 2020 Rule is not in accordance with the language and intent of the ACA.

According to Section 1554 of the ACA, the Secretary of HHS is explicitly prohibited from promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care," "impedes timely access to health care services," "interferes with communications regarding a full range of treatment options between the patient and the provider," or "limits the availability of health care treatment for the full duration of a patient's medical needs." 42 U.S.C. § 18114. Moreover, Section 1557 further provides a private right of action for patients who experience discrimination as articulated in "title VI, title IX, section 794, or such Age Discrimination Act." 42 U.S.C. § 18116(a). Because of "the four civil rights statutes" that Congress "referenced and incorporated into Section 1557[,]" "Congress intended to create a new, health-specific, anti-discrimination cause of action that is subject to a singular standard, regardless of a plaintiff's protected class status." *Rumble v. Fairview Health Servs.*, No. 14-cv-2037, 2015 WL 1197415, at *7 n.3, 10 (D. Minn. Mar. 16, 2015).

When Congress enacted the ACA in 2010, the prevailing view of the federal judiciary was that discrimination on the basis of "sex" prohibited discrimination based on "gender identity" and "sexual orientation" under relevant statutory regimes that were incorporated by reference into Section 1557. The Supreme Court's decision in *Price Waterhouse* was the anchor of that common law. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989). There, the Court

held that discrimination on the basis of sex prohibited discrimination by an employer on the basis of sex stereotypes. *Id.*

Before Congress enacted Section 1557, courts applied *Price Waterhouse* to hold that discrimination on the basis of gender identity and sexual orientation implicated sex stereotyping and constituted discrimination on the basis of sex. *See, e.g.*, *Schwenk v. Hartford*, 204 F. 3d 1187, 1198–1203 (9th Cir. 2000) (gender identity covered under the GMVA); *Rosa v. Park West Bank & Trust Co.*, 214 F.3d 213, 215–16 (1st Cir. 2000) (gender identity covered under the Equal Credit Opportunities Act); *Smith*, 378 F.3d at 574 (gender identity covered under Title VII); *Barnes*, 401 F.3d at 741 (same); *Schroer v. Billington*, 577 F. Supp. 2d 293, 306–08 (D.D.C. 2008) (same); *Lopez v. River Oaks Imaging & Diagnostic Grp., Inc.*, 542 F.Supp.2d 653, 660–61 (S.D. Tex. 2008) (same).

All of this means that even in a world without *Bostock*, a basic principle of statutory interpretation compels the same result: Congress legislates with knowledge of then-existing common law and intends its terms to have "the meaning generally accepted in the legal community at the time of enactment." *Dir., Office of Workers' Comp. Programs Dep't of Labor v. Greenwich Collieries*, 512 U.S. 267, 275 (1994); *see Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 101 (2011) ("But where Congress uses a common law term in a statute, we assume the 'term . . . comes with a common law meaning, absent anything pointing another way.'") (internal citation and quotations omitted); *Neder v. United States*, 527 U.S. 1, 21 (1999) ("[A] court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.") (internal citation and quotations omitted); *United States v. Soler*, 759 F.3d 226, 233 (2d Cir. 2014) ("It is a settled principle of interpretation that, absent other

indication, 'Congress intends to incorporate the well-settled meaning of the common-law terms it uses.'") (internal citation omitted).

In fact, even before *Bostock,* numerous federal courts had applied the same straightforward analysis governing the *Bostock* holding to the context of Section 1557, recognizing the unremarkable proposition that "[b]ecause the term 'transgender' describes people whose gender expression differs from their assigned sex at birth, discrimination based on an individual's transgender status constitutes discrimination based on gender stereotyping." *Rumble v. Fairview Health*, No. 14-cv-2037, 2015 WL 1197415, at *2 (D. Minn. Mar. 16, 2015); *see also Boyden v. Conlin,* 341 F. Supp. 3d 979, 997 (W.D. Wisc. 2018) ("Whether because of differential treatment based on natal sex, or because of a form of sex stereotyping where an individual is required effectively to maintain his or her natal sex characteristics, the Exclusion on its face treats transgender individuals differently on the basis of sex, thus triggering the protections of Title VII and the ACA's anti-discrimination provision."); *Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1099 (S.D. Cal. 2017) (finding that Section 1557 covered discrimination based on gender identity); *Cruz v. Zucker*, 195 F. Supp. 3d 554, 580 (S.D.N.Y. 2016) (agreeing that sex discrimination comprised discrimination on the basis of gender identity); *Kadel*, 2020 WL 1169271, at *10  ("The characteristics of sex and gender are directly implicated . . . the diagnosis at issue—gender dysphoria—only results form a discrepancy between assigned *sex* and *gender* identity.") (emphasis in original); *Flack v. Wis. Dep't of Health Servs.*, 395 F. Supp. 3d 1001, 1014–15 (W.D. Wis. 2019) (holding that Section 1557 barred discrimination based on gender identity).

At bottom, the Department's 2020 Rule is irreconcilable with how Congress understood the term "sex" at the time it adopted Section 1557 in 2010.  The very cases animating Congress'

conduct, and the logic and legal principles that follow, preclude the Department's limited understanding of "discrimination on the basis of sex."  Because the Department cannot adopt an interpretation at odds with the plain text of the statute, the Court must set it aside.  *See City & Cty. of San Francisco v. Azar*, 411 F. Supp. 3d 1001, 1011 (N.D. Cal. 2019) ("The guiding principle, therefore, is that no interpretation, not even an agency interpretation, can add or subtract from what the statute itself specifies."); *Arnold P'ship v. Dudas*, 362 F.3d 1338, 1340 (Fed. Cir. 2014) ("An abuse of discretion occurs if a decision is based on an erroneous interpretation of law."); *see also Michigan v. Envtl. Prot. Agency*, 135 S. Ct. 2699, 2708 (2015) (explaining that an agency may not interpret a statute to "throw[] away parts it does not" like).

### C.    The 2020 Rule Should Be Set Aside Because It Exceeds the Department's Statutory Authority

The APA also requires any decision be set aside that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C § 706(2)(C).  Plaintiffs will show that Defendants exceeded their regulatory authority in enacting the 2020 Rule because it contradicts Section 1557's prohibition on sex-based discrimination and will impose unnecessary barriers to LGBTQ individuals seeking medical treatment.

Section 1557 permits the Department to "promulgate regulations to implement" the ACA's non-discrimination provision.  42 U.S.C. § 18116(c).  Instead, the 2020 Rule eliminates important nondiscrimination provisions based on sex and interprets "sex" to be solely "biological sex" (i.e., based on a person's genetic sex at birth).  *See* 85 Fed. Reg. at 37,168, 37,177–79, 37,189.  These actions are directly inconsistent with the statutory provisions that Defendants purport to be construing, as well as the plain, accepted meanings of the term "sex."  The 2020 Rule thus exceeds the Department's statutory jurisdiction because the ACA did not delegate

authority to HHS to promulgate force of law regulations that rewrite the ACA's text to eliminate the protections against discrimination on the basis of sex, gender identity, and association.

Additionally, because the 2020 Rule will have a devastating impact on public health, the Department exceeded its own authority to promulgate regulations under the ACA. Specifically, Congress limited the Department's rule-making authority by prohibiting it from promulgating "any regulation that," among other things, "(1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care;" "(2) impedes timely access to health care services;" or "(6) limits the availability of health care treatment for the full duration of a patient's medical needs." 42 U.S.C. § 18114. The Department violates this provision, and therefore violates the APA, when it "impose[s] an obstacle in the path of a patient pursuing medical care." *Family Planning Ass'n of Maine v. U.S. Dep't of Health and Human Servs.*, No. 1:19-CV-00100-LEW, 2020 WL 3064426, at *8 (D. Me. June 9, 2020). As explained, the Department's rule imposes serious barriers for LGBTQ individuals seeking health care and removes protections to prevent them from being denied care or coverage *solely* because of their gender identity or sexual orientation. Therefore the 2020 Rule exceeded the Department's regulatory authority and is unlawful.

### D. The 2020 Rule Should Be Set Aside Because It Is Arbitrary and Capricious

Plaintiffs will also show the 2020 Rule violates the APA's prohibition on rule-making that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). To this end, the APA requires courts to set aside agency action if the agency "fail[s] to consider an important aspect of the problem" or "offer[s] an explanation for its decision that runs counter to the evidence before the agency." *Brower v. Evans*, 257 F.3d 1058, 1065 (9th Cir. 2001) (internal citation omitted). Said differently, an "agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning" of Section 706 of the APA.

*Butte Cty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010). When an agency changes its policy, as here, the Department must also offer "good reasons" for the shift, *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), and must consider the "serious reliance interests" that may have developed based on longstanding policies, *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016); *see also New York v. U.S. Dep't of Health and Human Servs.*, 414 F. Supp. 3d 475, 547 (S.D.N.Y. 2019) (explaining that a "more detailed justification than would suffice for a new policy created on a blank slate" is needed when "the new policy rests upon factual findings that contradict those which underlay its prior policy") (internal quotation and citation omitted). The Department failed to do so.

The 2016 Rule was grounded in concrete evidence of the need for broad anti-discrimination protections. *See* Compl. ¶¶ 126–42. HHS scrutinized this evidence in 2016 and determined that, among other things, "[d]iscrimination in the health care context can often lead to poor and inadequate health care or health insurance or other coverage for individuals and exacerbate existing health disparities in underserved communities." 81 Fed. Reg. at 31,444.

Despite that evidence, the Department now says it cannot meaningfully take public health considerations into account because it knows "of no data showing that" the 2020 Rule will "disproportionately burden individuals on the basis of sexual orientation and/or gender identity." 85 Fed. Reg. at 37,182. It adds that it purportedly "lack[ed] the data necessary to estimate the number of individuals who currently benefit from covered entities' policies governing discrimination on the basis of gender identity who would no longer receive those benefits after publication of this rule—nor data to estimate how many of those individuals may experience the workplace and health-related negative consequences" from that rule. 85 Fed. Reg. at 37,225. HHS further claims to lack the data "to estimate what greater public health costs, cost-shifting,

and expenses may result from entities changing their nondiscrimination policies and procedures after promulgation of this rule." *Id.*

The truth is that the Department received nearly 200,000 comments in response to its 2019 notice of proposed rulemaking that preceded the 2020 Rule. Commenters extensively informed HHS that its proposed rule (which would become the 2020 Rule) would increase the likelihood of unlawful discrimination, would have a devastating effect on LGBTQ individuals, and would increase the cost to the U.S. economy arising from health inequality. Compl. ¶¶ 202–05. In the face of this evidence, Defendants pressed on and issued the 2020 Rule. For a Department whose sole purpose is to "enhance the health and well-being of all Americans, by providing for effective health and human services and by fostering sound, sustained advances in the sciences underlying medicine, public health, and social services," this is unforgivable and unlawful. *See Dep't of Homeland Sec. v. Regents of Univ. of Cal.,* 140 S. Ct. 1891, 1913-15 (2020) (explaining that the Department's complete failure to consider reliance interests and integral evidence was arbitrary and capricious).

The Department's 2020 Rule is also arbitrary and capricious because its purported justifications do not support the changes it seeks to make. For example, the Department vaguely invokes "inconsistencies" with "long-standing existing civil rights regulations," and impudently accuses courts of "caus[ing] confusion as to the meaning of sex in civil rights law." 85 Fed. Reg. at 37,180. This justification falters, most obviously, because it seeks to implement a view that the Supreme Court rejected in *Bostock.* But even before *Bostock*, this justification fails because: (i) as Plaintiffs point out above, the other cases *overwhelmingly* go against the Department; (ii) even if there were some inconsistencies in the case law, relying on incorrect and outdated decisions is not supportable simply to avoid "confusion;" and (iii) pointing to purported

inconsistencies does not, without more, justify invoking one interpretation any more than another. This invocation of "confusion" is a "terse explanation" for justifying a rule change and gets HHS nowhere. *See New York v. HHS*, 414 F. Supp. 3d at 548.

The Department relies on fuzzy math, at best, in asserting that the 2020 Rule will save over $2 billion. Those savings are tied to repealing the 2016 Rule's provisions related to certain mandatory notices, mandatory OCR reviews of language access plans, and duplicative existing regulatory grievance procedure requirements as to grievance procedures. However, these asserted cost-savings do not stem from the specific provisions at issue here (that is, their interpretation of "sex"), and thus cannot be relied upon to support this specific change. *Cf. Dep't of Homeland Sec.*, 140 S. Ct. at 1911-12 (observing that an explanation for altering one part of a policy is not sufficient to "cast doubt" on other parts of the policy). The Department cannot point to an absence of evidence and just move on. Instead, it needed to consider the data before it—or engage in further fact-finding—and then balance those harms with these purported savings. *See Public Citizen, Inc. v. Mineta*, 340 F.3d 39, 58 (2d Cir. 2003) (explaining that an agency must, among other things, "explain why the costs saved were worth the benefits sacrificed"). The Department did not do so.

The 2020 Rule is additionally rife with inconsistencies and weak justifications, which show that the law is on Plaintiffs' side and they are likely to prevail. Compl. ¶¶ 286–93. Because "an agency's action must be upheld, if at all, on the basis articulated by the agency itself," *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 505 (9th Cir. 2018) (internal quotation and citation omitted), the Court must set it aside.

### E. The 2020 Rule Should Be Set Aside Because It Is Unconstitutional

Finally, the 2020 Rule's open assault on the LGBTQ community is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). The Fifth

Amendment equal protection guarantees prevent the government from denying medical treatment to LGBTQ persons out of its desire to discriminate on the basis of sex.  *See, e.g., Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015); *Norsworthy v. Beard,* 87 F. Supp. 3d. 1104, 1119 (N.D. Cal. 2014) ("discrimination based on transgender status independently qualifies as a suspect classification").

The Department's animus-driven targeting of LGBTQ persons violates the Constitution's guarantee that all persons, regardless of sexual orientation and gender identity, are entitled to "equal dignity in the eyes of the law." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2608 (2015).  This basic precept undergirds every major Supreme Court decision over the last-quarter century regarding LGBTQ rights.  *See, e.g., Lawrence v. Texas*, 539 U.S. 558, 578 (2003) (striking down state laws criminalizing same-sex sexual behavior); *Romer v. Evans,* 517 U.S. 620, 635–36 (1996) (striking down a Colorado statute that prohibited local non-discrimination ordinances); *United States v. Windsor*, 570 U.S. 744, 769–74 (2013) (holding the Defense of Marriage Act unlawful); *see also Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018) (stating that "gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth.  For that reason, the laws and the Constitution can, and in some instances must, protect them in the exercise of their civil rights.").

Because the 2020 Rule facially discriminates on the basis of a suspect classification—a minority group whose members have suffered a history of irrational discrimination—it triggers strict scrutiny.  *See e.g., Windsor v. United States*, 699 F.3d 169, 185 (2d Cir. 2012) (stating that gays and lesbians are a "quasi-suspect" class, and classifications based on sexual orientation are subject to "heightened scrutiny"), *aff'd*, 570 U.S. 744 (2013); *Whitaker*, 858 F.3d at 1051–52 (holding that heightened scrutiny applied for review of equal protection claim brought by

transgender individual).  That is, the government may only limit the rights of LGBTQ

individuals when it has a compelling interest and when it acts in a manner that is narrowly

tailored to achieve that interest.  While the Department's conduct falls well short of that

heightened standard, this Court need not even rely on this enhanced level of scrutiny.  Instead,

the Supreme Court's decision in *Romer v. Evans* resolves this constitutional claim.

In *Romer*, the Supreme Court addressed the constitutionality of a Colorado referendum

that prohibited state or local governments from enacting non-discrimination provisions.  *Romer*,

517 U.S. at 623–24.  The Supreme Court held that this was unconstitutional even under the

Court's "rational basis" framework because the conduct did not "bear[] a rational relation to

some legitimate end," since state action that singles out and subordinates people on the basis of

sexual orientation "lacks a rational relationship to legitimate state interests."  *Id.* at 631–32.  The

Court further held that a "general announcement that gays and lesbians shall not have any

particular protections from the law," "raise[d] the inevitable inference that the disadvantage

imposed is born of animosity toward the class of persons affected."  *Id.* at 634–35.

The Department hastily promulgated the 2020 Rule amid a deadly and historic pandemic

and ignored invitations to revisit its decision in light of *Bostock.*  While the Department

acknowledges the impact of the 2020 Rule on LGBTQ individuals, it shrugs its shoulders saying,

"to the extent that LGBT individuals suffer future harms, it cannot be attributed to the

Department's finalizing this rule, as opposed to other causes."  85 Fed. Reg. 37,182 (finalized

June 19, 2020) (to be codified at 45 C.F.R. pts. 438, 440, 460, 86, 92, 147,155, 156).  Nor does

the Court even have to infer the animus since the architect of the Rule, Roger Serevino, the head

of HHS' Office of Civil Rights, has made his disdain for the LGBTQ community well-known.

*See* Compl. ¶¶ 170–71.

Ultimately, the 2020 Rule is nothing more than a "general announcement" that LGBTQ persons shall no longer "have any particular protections" under the ACA. *Romer*, 517 U.S. at 631–32. The 2020 Rule and its flimsy justifications, coupled with the Administration's long-standing animus towards the LGBTQ community "raise[s] the inevitable inference that the disadvantage is born of animosity." *Id*. at 634–35. Under any level of scrutiny, the 2020 Rule is unconstitutional and therefore violates the APA.

In sum, the Department has gone down a path that is contrary to the Supreme Court's decision in *Bostock*, ignores Congress' use of the term "sex," and contravenes the basic requirements of agency action. Plaintiffs are therefore likely to succeed on the merits, justifying this preliminary relief.

## V.      THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST WARRANT THE REQUESTED RELIEF

When the Government is the defendant, courts consider the balance of equities and the public interest in tandem because "the government's interest *is* the public interest." *New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 673 (S.D.N.Y. 2019), *aff'd in part, rev'd in part and remanded sub nom.*, 139 S. Ct. 2551 (2019), *and appeal dismissed*, No. 19-212, 2019 WL 7668098 (2d Cir. Aug. 7, 2019) (emphasis in original) (citations omitted). The harms of the 2020 Rule to Plaintiffs and the LGBTQ community will be substantial.

As noted above, statistics clearly establish that the LGBTQ community, and specifically the transgender, gender nonconforming and gender non-binary community, are at a heightened risk of discrimination in health care and are in fear of seeking treatment for that reason. Compl. ¶¶ 133–141. At a time in which there is an ongoing global pandemic, the 2020 Rule will impede LGBTQ individuals equal access to necessary, quality health care, in contravention of the public

interest.  *Cf. McCarthy v. Cortland Cnty. Cmty. Action Program, Inc.*, 487 F. Supp. 333, 344 n.9 (N.D.N.Y. 1980) (noting that it is in the public interest to eliminate discrimination).

In sharp contrast, Defendants face no articulable harm from halting the enforcement of the 2020 Rule.  There are *zero* burdens to Defendants if the Court enjoins the 2020 Rule.  Further, it is always in the public interest "when government agencies act lawfully," and the "public interest is harmed when the Government ham-handedly exercises its responsibilities." *Minney v. U.S. Office of Pers. Mgmt.*, 130 F Supp. 3d 225, 236 (D.D.C. 2015) (explaining that it is in the public interest to issue an injunction to force the government to comply with the law and constitution).  These factors weigh in favor of an injunction.

## VI.      **PLAINTIFFS ARE ENTITLED TO A NATIONWIDE INJUNCTION**

Because Plaintiffs will succeed on the merits, their requested relief—an injunction prohibiting Defendants from enforcing the 2020 Rule—is appropriate.  The APA requires a court to vacate and set aside rules in their full application, particularly where, as here, the impact of the rule on the specific Plaintiffs is national in scope.  *See, e.g. New York v. DHS*, 408 F. Supp. 3d, at 351–53 (relying on Supreme Court precedent to note that the scope of an injunction is "dictated by the extent of the violation established") (citation and quotation omitted); *Saget v. Trump*, 375 F. Supp. 3d 280, 378–79 (E.D.N.Y. 2019) (granting nationwide injunction in action challenging decision to terminate Haiti's Temporary Protected Status under the APA because limiting a preliminary injunction to the parties would not adequately protect the interests of all stakeholders); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 438 (E.D.N.Y. 2018) (issuing nationwide injunction).  Thus, it is submitted that any injunction should apply nationwide.

## CONCLUSION

The Administration's animus against the LGBTQ community is seen yet again in its issuance of the 2020 Rule in disregard of existing law establishing Plaintiffs' (and all LGBTQ

persons') rights to seek medical care without discrimination on the basis of sex—not to mention its duties under the APA to promulgate rules that are not arbitrary and capricious, in excess of their authority, and contrary to law. Defendants' Rule is still particularly pernicious because it will prevent individuals, including Plaintiffs, from getting the critical medical care that they need. At a time when the nation is facing an urgent and ongoing health crisis, this is cruel, inhumane, and unlawful. Plaintiffs have established all elements for a preliminary injunction and the Court should grant their motion.

Dated: July 13, 2020                                      Respectfully submitted,


*/s/ Jason E. Starr*
Jason E. Starr
(New York Bar No. 5005194)
*jason.starr@hrc.org*
Sarah Warbelow**
*sarah.warbelow@hrc.org*
Alphonso B. David
(New York Bar No. 4056230)
*alphonso.david@hrc.org*
**THE HUMAN RIGHTS CAMPAIGN**
1640 Rhode Island Ave, NW
Washington, DC 20036-3278
Telephone: (202) 628-4160
Facsimile: (202) 347-5323

*Counsel for Plaintiffs*
*Tanya Asapansa-Johnson Walker*
*and Cecilia Gentili*


*\* Application for admission to the U.S. District*
*Court for the Eastern District of New York*
*forthcoming*

*\*\* Motion for pro hac vice admission*
*forthcoming*

Edward J. Jacobs
(New York Bar No. 4168126)
*ejacobs@bakerlaw.com*
Kathryn M. Zunno-Freaney
(New York Bar No. 4572004)
*kzunno@bakerlaw.com*
Michael A. Sabella
(New York Bar No. 4555504)
*msabella@bakerlaw.com*
Audrey van Duyn*
(New York Bar No. 5762521)
*avanduyn@bakerlaw.com*
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111-0100
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

Joshua D. Rovenger**
*jrovenger@bakerlaw.com*
Alyssa M. Daniels**
*adaniels@bakerlaw.com*
**BAKER & HOSTETLER LLP**
Key Tower, 127 Public Square,
Suite 2000
Cleveland, OH 44114-1214
Telephone: (216) 621-0200
Facsimile: (216) 696-0740

Katrina M. Quicker**
*kquicker@bakerlaw.com*
Ryan E. Harbin**
*rharbin@bakerlaw.com*
**BAKER & HOSTETLER LLP**
1170 Peachtree Street, NE, Suite 2400
Atlanta, GA 30309-7676
Telephone: (404) 459-0050
Facsimile: (404) 459-5734

*Counsel for Plaintiffs Tanya Asapansa-Johnson Walker and Cecilia Gentili*