# BakerHostetler

Baker&Hostetler LLP

Key Tower
127 Public Square, Suite 2000
Cleveland, OH  44114-1214

T  216.621.0200
F  216.696.0740
www.bakerlaw.com

Joshua D. Rovenger
direct dial: 216.861.7182

August 12, 2020

**VIA ECF**

Honorable Frederic Block
United States District Judge
United States Courthouse
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

*Re: Tanya Asapansa-Johnson Walker, et al. v. Alex M. Azar II, et al.*
    *Civil Action No. 1:20-cv-02834-FB-SMG*

Dear Judge Block:

    During today's oral argument in the above-referenced matter, the Court inquired about the status of the pending motion for a preliminary injunction in *Translatin Coalition v. U.S. Dep't of Health & Human Servs.*, No. 20-1630-JEB (D.D.C. 2020).

    Enclosed kindly find a transcript from the *Translatin Coalition* preliminary injunction hearing held on August 3, 2020.  We direct the Court's attention to Judge Boasberg's statement that he will "give [the government] one week to submit further reply or technically a surreply just on the issues of standing and irreparable harm . . . [t]hat would be due August 10" and that "[he] can't guarantee, People, that [he] will have an opinion out before August 18th, given what [he] thinks is only fair to give the government to give them some more time to respond." Transcript at 48:24–49:11.

*Atlanta    Chicago    Cincinnati    Cleveland    Columbus    Costa Mesa    Denver    Houston*
*Los Angeles    New York    Orlando    Philadelphia    San Francisco    Seattle    Washington, DC*

August 12, 2020
Page 2


Sincerely,

*/s Joshua D. Rovenger*

Joshua D. Rovenger
Associate


cc: Jordan Von Boken, Esq.
    William Kerwin Lane, III, Esq.
    Douglas Neal Letter, Esq.
    Kathryn M. Zunno, Esq.
    Michael A. Sabella, Esq.
    Edward J. Jacobs, Esq.
    Ryan Harbin, Esq.
    Katrina M. Quicker, Esq.
    Jason Starr, Esq.
    Sarah Warbelow, Esq.

    *Via ECF*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

----------------------------X

TRANSLATIN COALITION, et al,

                    Plaintiffs,

          v.              Civil Action 20-1630-JEB

U.S. DEPT. OF HEALTH AND
HUMAN SERVICES, et al,

                    Defendants

----------------------------X

                    Washington, D.C
                    Monday, August 3, 2020
                              2:00 p.m.


     TRANSCRIPT OF TELEPHONIC PRELIMINARY INJUNCTION
        BEFORE THE HONORABLE JAMES E. BOASBERG
             UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs: Omar Francisco Gonzalez-Pagan, Esq.
                    LAMBDA LEGAL DEFENSE
                    AND EDUCATION FUND, INC.
                    120 Wall Street, 19th Floor
                    New York, NY 10005
                    (212) 809-8585

                    Laura Joy Edelstein, Esq.
                    STEPTOE & JOHNSON LLP
                    One Market Plaza
                    Spear Tower, Suite 3900
                    San Francisco, CA 94105
                    (415) 365-6770

For the Defendants: William Kerwin Lane, III
                    U.S. DEPT. OF JUSTICE
                    950 Pennsylvania Avenue, NW
                    Washington, DC 20530
                    (202)305-7920


Court Reporter:     Lisa Walker Griffith, RPR
                    U.S. District Courthouse
                    Room 6507
                    Washington, D.C.  20001
                    (202) 354-3247

```
 1                      P R O C E E D I N G S

 2              THE COURTROOM DEPUTY:  Good afternoon, everyone.

 3     We are here for a preliminary injunction hearing in 20-1630.

 4     TransLatin Coalition et.al versus the United States

 5     Department of Health and Human Services, et.al.

 6              Counsel for plaintiffs, identify yourselves for

 7     record please.

 8              MR. GONZALEZ-PAGAN:  Good afternoon, Your Honor.

 9     this is Omar Francisco Gonzalez-Pagan for plaintiffs.  I am

10     joined by Laura Edelstein of Steptoe and Johnson also for

11     plaintiffs.

12              THE COURT:  Okay. Welcome to both of you.

13              THE COURTROOM DEPUTY:  And for the defense please.

14              MR. LANE:  Good afternoon, Your Honor, William

15     Lane of Department of Justice on behalf of the defendants.

16              THE COURT:  Okay.  Good afternoon, Mr. Lane.

17              I think that plaintiffs called chambers and

18     indicated they wanted to split their time.  So

19     Mr. Gonzalez-Pagan, how do you propose to do that?

20              MR. GONZALEZ-PAGAN:  Yes, Your Honor.  We

21     indicated that we would be splitting the time.  Essentially,

22     I will be handling the arguments related to standing and

23     irreparable harm as relates to the constitutional claims.

24     Ms. Edelstein will be handing the arguments as to likelihood

25     of success on the merits, the APA claim, arbitrary and
```

```
 1   capricious and contrary to law.

 2              THE COURT:  All right.  Why don't we start with

 3   you, Mr. Gonzalez-Pagan.

 4              MR. GONZALEZ-PAGAN:  Thank you, Your Honor.  If I

 5   may, Your Honor, I would like to start with the question of

 6   standing since that was raised in the defendants'

 7   opposition.

 8              There are a number of ways in which each of

 9   plaintiffs assert standing.  I would note that the

10   requirement (unintelligible) of the assertion for standing.

11   Essentially --

12              THE COURT:  So I'll tell you this.  Why don't we

13   go through them provision by provision because I'll admit I

14   was a little surprised not to see any discussion whatsoever

15   in your opening brief on a topic that is really complicated

16   and difficult and close.

17              And then, even in the reply, you had subsections

18   about why each plaintiff had standing; but, as you well

19   know, you only need standing for one plaintiff.  What I

20   wanted to see is why anybody had standing as to each

21   particular provision.  That's how I feel that it could have

22   been a little more helpful in that regard.

23              But why don't we go through each provision.  Then

24   you can tell me (A) why there is standing and (B,)  why

25   there is irreparable harm on that.  So starting with --
```

```
 1              MR. GONZALEZ-PAGAN:  Yes, Your Honor.

 2              THE COURT:  So starting first about declining to

 3    define discrimination on the basis of sex, including

 4    discrimination on the basis of gender identity.

 5              MR. GONZALEZ-PAGAN:  Absolutely, Your Honor.  I

 6    will start provision by provision.  There are a number of

 7    plaintiffs that will be able to assert standing as to each

 8    of these provisions.

 9              Also, if it may help the Court, we did include a

10    small section addressing this particular portion,

11    specifically on page six of our reply, Your Honor, we

12    delineate where specific declarations there is standing

13    asserted as to each provision of the revised rule.

14              Going part by part, the elimination of the

15    definition of "on the basis of sex".  And then the later

16    elimination of other provisions pertaining to

17    gender-affirming care for prohibiting mistreatment when it

18    comes to transgender individuals on the provision of health

19    care.

20              Each of the plaintiffs have standing to challenge

21    the elimination of that definition that they have relied

22    upon.  Specifically, Your Honor, the healthcare provider

23    plaintiff asserts standing that on (unintelligible)

24    regulated entity but also based on the direct harms that

25    they would suffer as a result of the elimination of that
```

1    definition and the elimination of the provision on the

2    categorical exclusions of Congress for gender-affirming

3    care.

4             First and foremost, the revised rule, by

5    eliminating that definition as far as those provisions, will

6    cause and has caused a fear of discrimination in healthcare

7    by LGBTQ, in particular transgender people.  That is fear is

8    already documented in the declarations of several of the

9    declarants, including the declarations of the healthcare

10   providers, but those of Ms. Saucedo, Ms. Lint, who are

11   individual members of the TransLatin Coalition, and who have

12   heard of members and people that their organization serves

13   about their fear that they experience.

14            We have declarations from suicide hotlines, like

15   the Trevor Project and the Trans Lifeline that have already

16   received a number of calls from LGBTQ, transgender people in

17   response to the revised rule and the fear that they

18   experience.  That fear will result in the following.

19            THE COURT:  Hold on a second.  I apologize in

20   advance.  When we have oral argument in person, I know

21   counsel can see when the Court wants to interrupt.  So I

22   apologize that it is going to sound a little rude each time

23   I interrupt all of you because you don't know whether I want

24   to ask a question.

25            So you are talking about third party standing now

1  as opposed to organizational or associational standing,

2  right?

3            MR. GONZALEZ-PAGAN:  That is part of the basis for

4  third party standing, correct, Your Honor.  But that very

5  fear also causes the following direct harm.  The cost of

6  patient to delay care.  The healthcare providers do not have

7  all of the specialties in the home nor do the inpatient

8  facilities.  The delay of care by their patients because of

9  fear of discrimination will result in people going to them

10 with more acute and difficult to treat conditions.

11           THE COURT:  And I buy that.  That seems to me,

12 that you have organizational standing in terms of

13 organizational injury.

14           Let me ask you a question that is particular to

15 this provision.  Why isn't there a redressability problem?

16 And what I mean is this:  If I give you an injunction that

17 vacates the 2020 rule, then you go back to the 2016 rule.

18 Right?

19           MR. GONZALEZ-PAGAN:  Yes, Your Honor.

20           THE COURT:  Okay.  But the 2016 rules for this

21 provision in the 2016 rule was vacated by Franciscan

22 Alliance.  So this doesn't exist.  So how, even if I enjoin

23 this provision to the 2020 rule, that doesn't help you, does

24 it?

25           MR. GONZALEZ-PAGAN:  It does, Your Honor, for a

1    couple of reasons.  The vacatur, the temporary -- what we

2    would argue is the temporary vacatur in Franciscan Alliance

3    was very limited.  It only vacated specifically the

4    definition of  "on the basis of sex."  And it then remanded

5    to the agency for it to issue a new regulation

6    (unintelligible) with the opinion.

7            In between the issuance of that regulation, while

8    (unintelligible) the reasoning of the Franciscan Alliance

9    was completely repudiated by Bostock, and we would argue

10   that Bostock abrogated that position.  Separate and apart

11   from that, a number of the other specific provisions on

12   which we rely, on which we deal specifically with

13   discrimination against transgender individuals, were never

14   vacated.

15           THE COURT:  No, no, I understand.  I understand

16   that.  I'm only asking about this provision.  I agree with

17   you, this is the only provision that was vacated.  But it

18   seems to me a different question, that your arguments on the

19   merits, which is that it was arbitrary and capricious and/or

20   not according to law, for the government not to consider

21   Bostock in issuing the new regulation.

22           But on the more technical question of, you think

23   -- and maybe you are right -- that the reasoning in Bostock

24   would be applicable to Franciscan Alliance, would be

25   applicable to Title IX.  But as a procedural matter, if I

1    enjoin the 2020 rule, you don't have a 2016 provision on

2    gender identity.

3            MR. GONZALEZ-PAGAN:  Your Honor, we would argue

4    that it would still have to (unintelligible) that they never

5    issued the new regulation until June 19th, postdating

6    Bostock and that the decision in Franciscan Alliance was

7    abrogated.  I don't believe the Court needs to reach as far

8    back as saying that the vacatur is invalid, but certainly we

9    would argue that in effect it is a legal nullity.

10           We know, and there is testimony of reliance upon

11   the 2016 rule by several of our plaintiffs.  For example, we

12   know that the Bradbury-Sullivan specifically has relied on

13   the 2016 final rule in advocating for its patrons.  So have

14   the Whitman-Walker Health Providers as well as the L.A. LGBT

15   Center providers.

16           THE COURT:  But let me transition to irreparable

17   harm here.  So I completely understand your argument, and I

18   think I agree with it, that increased demand -- that, if

19   LGBTQ patients can't go elsewhere, don't feel comfortable

20   going elsewhere, then you are going to have increased

21   demands at your plaintiff clinics.

22           But how is that irreparable harm if they have to

23   see more patients and they see more patients in more acute

24   circumstances and more patients, that's going to put a drain

25   on your resources and cause harder work for the clinics.

1   But how is that irreparable?

2           MR. GONZALEZ-PAGAN:  Your Honor, I would posit two

3   things.  First and foremost, certainly the denial of care

4   and the removal of protections will be irreparable for the

5   patients for which the providers have third party standing.

6           In addition, the initial additional resources and

7   the diversion of resources that is necessary as a result of

8   the rule will not, those monies will not by recoverable

9   given the sovereign immunity.

10          But more than that, the diversion of resources

11  must be take into account in light of the context in which

12  we live in.  We have several assertions from the points of

13  noting how they're already incredibly strained in trying to

14  stem the COVID-19 pandemic.

15          Requiring them take on even more patients as well

16  as, not even meet that demand, or be unlikely to meet that

17  increased the demand, not only puts a strain on their

18  resources while trying to combat the COVID-19 pandemic, but

19  also it actually causes harm to the general public at large

20  and endangers public health.

21          THE COURT:  But again, is that -- but endangering

22  public health, is that irreparable harm if it's irreparable

23  to someone who is not a plaintiff, and is not even arguably

24  a patient?

25          MR. GONZALEZ-PAGAN:  Your Honor, I have noted, for

1    example, the declaration of Dr. Henn speaks of how LGBTQ

2    people are particularly vulnerable to the COVID-19 pandemic

3    according to a particular study.  And that working

4    disproportionately in industry (unintelligible) during

5    pandemic, we have a declaration of Ms. Saucedo, which notes

6    that, due to the fear of this discrimination that she would

7    face in healthcare, Ms. Lorena Boarhead, an individual

8    member of the TransLatin Coalition, delayed obtaining care

9    in the middle of the pandemic and ultimately fell ill as a

10   result of COVID-19.  And that led to her death.

11          Your Honor, it cannot be underestimated that the

12   fear of discrimination is one that has been heavily

13   documented in the studies, and that the studies clearly

14   demonstrate lead to a delay of medical care endangers, not

15   just the public health at large, but individual members of

16   the organization, the TransLatin Coalition, and the patients

17   of healthcare plaintiffs for which they assert third party

18   standing.

19          THE COURT:  All right.  Let's move a little more

20   -- we're not going to spend as much time on each but I would

21   like to move quickly.

22          The next one is eliminating the prohibition of the

23   categorical coverage exclusion of gender-affirming care.  So

24   what is the irreparable harm there?

25          MR. GONZALEZ-PAGAN:  Your Honor, for one, it would

1    cause some patients to not be able to obtain that care at

2    all and then to the extent that those prohibitions are being

3    instituted.  And for the healthcare provider plaintiff, it

4    would also cause the healthcare provider plaintiffs, who

5    have a mission at federally-qualified health centers to

6    serve the community, to shift their finances in order to

7    cover the services for these individuals and use their own

8    resources to supplement for -- try to cover services that

9    are not provided coverage for by insurance.

10            THE COURT:  I agree that is organizational injury.

11   But how is that organizational irreparable harm?

12            MR. GONZALEZ-PAGAN:  Your Honor, again I would

13   note that the expenditure of additional resources to

14   supplement that coverage is not recoverable by the

15   healthcare providers given sovereign immunity.  But separate

16   and apart from that, the patients would not be able to

17   obtain care, medically necessary care in facilities outside

18   of the healthcare provider plaintiffs for specialties that

19   they do not have in-house.  That delay of care is itself

20   irreparable.  And the members of the Franciscan Coalition,

21   for example, will face the same type of harm, being denied

22   the ability to obtain that care, or having to substantially

23   delay care, which would be considered -- that delay of care

24   would be considered irreparable.

25            THE COURT:  All right.  Let's move on to the

1    eliminating notice tag line and LAP requirement.  I'm a

2    little bit unclear as to what you are exactly challenging.

3    Can you point me to the precise provisions in the 2020 rule

4    where the precise repeal provisions that you are

5    challenging?  A little bit of your briefing wasn't clear.

6              MR. GONZALEZ-PAGAN:  Yes, Your Honor, if I may,

7    the 2020 rule eliminates the need for a non discrimination

8    notice to be issued on their 1557.  And the 2020 revised

9    rule, what it does rely upon is the issuance of notice of

10   non discrimination under the underlying statute.

11             But the department doesn't explain in any way,

12   shape or form, one, how patients will be informed of their

13   discrimination rights under the ACA as opposed to other

14   underlying statutes, nor do they say or explain how an

15   entity that is not covered by underlying statutes per se

16   would then issue that notice for purposes of 1557.

17             For example, a teaching hospital may be subject to

18   Title IX, but a non-teaching hospital may not.  That last

19   notice will then affect the ability of the patient to know

20   their rights.

21             THE COURT:  I assume then the irreparable harm is

22   to patients here.  You are not telling me that your

23   organizations would suffer irreparable harm in that.

24             MR. GONZALEZ-PAGAN:  Irreparable harm would be to

25   the patients.  Then the organizations would be faced with

1  patients who either come to them with more acute conditions

2  because the lack of appropriate action or delayed care.

3       THE COURT:  So essentially, so you are arguing

4  that the harm is on most of these is the same for to the

5  entity; and that, even if these were not harms that would

6  cause you to go out of business or to be threatened with

7  ruin, you are saying that -- you are relying on the

8  distinction between recoverable and non recoverable economic

9  loss.

10       MR. GONZALEZ-PAGAN:  Absolutely, Your Honor.  And

11  if I may, I believe this makes references to one of the

12  cases cited by opposing counsel.  That being National

13  Mining Association v. Jackson from the D.C. District Court

14  in 2011.  That case does not stand for the proposition that

15  a regulated entity, regulated entity's very existence must

16  be threatened in order for it to show irreparable harm.

17       There, the plaintiff was arguing that the

18  existence of its members was threatened by an EPA

19  regulation.  The plaintiff could not explain how the

20  regulation threatened their existence.  It was a lack of

21  explanation for that allegation.

22       In its analysis, the Court actually noted,

23  according to Brendsel v. Office of Federal Housing, 339

24  Federal Supplement 2d. 52, a 2004 case, that, quote, If a

25  movant seeking a preliminary injunction will be unable to

1  suitably cover any monetary damages against the government

2  agency in the future because if, among other things,

3  sovereign immunity, financial loss can constitute

4  irreparable injury, closed quote, Your Honor.

5          THE COURT:  Do you have a circuit opinion that

6  stands for that?

7          MR. GONZALEZ-PAGAN:  Not off the top of my head,

8  Your Honor.

9          THE COURT:  All right.   I only saw District Court

10 on the first look anyway.

11         So moving along to the claim, that provision that

12 narrows entities covered under Section 1557.  Are you saying

13 the same injury and harm?

14         MR. GONZALEZ-PAGAN:  Well certainly, Your Honor,

15 it would actually mean that they would not even be covered

16 by any discrimination protection.  So patients would not,

17 from the  (unintelligible) plaintiffs or members of the

18 (unintelligible) plaintiffs would not be able to have any

19 redress against entities under 1557 if the department were

20 to be sustained.

21         This would include, not only health insurance

22 companies (unintelligible) appropriately are no longer

23 healthcare entities, healthcare programs or activities, but

24 it would also include a number of entities that are covered

25 right now, including programs that are covered by the --

1   that are administered by the agencies themselves, for

2   example, the Indian Health Service being one of those,

3   Medicaid being another.  The declarations of Ms. Lint and

4   Ms. Saucedo note their reliance on Medicaid, for example, on

5   some of these programs by their members.

6         Amicus AARP has noted, for example, the reliance

7   on the Pace Program and other programs that would no longer

8   be covered by their members and older LGBT adults. There is

9   the declaration of Dr. Deborah Fabian, orthopedic surgeon in

10  an Indian Health Service administered hospital in New Mexico

11  who would no longer be working under the protections of 1557

12  as they apply to that facility, nor would it cover her

13  patients.

14        THE COURT:  The religious -- incorporate a

15  religious exemption, why is there irreparable harm if

16  patients can say, look, I'm not going to go seek treatment

17  at this religiously-affiliated institution?  In other words,

18  why isn't it something they would know right off the bat

19  before even going in and dealing with providers?

20        MR. GONZALEZ-PAGAN:  Your Honor, a couple of

21  reasons.  First and foremost, not every hospital announces

22  that they are affiliated with a religious entity, and that

23  therefore, they wouldn't be covered.  That is actually

24  something that has been critiqued by a number of entities.

25  And I would note, for example, a study cited in the

1  declaration of Naseema Shafi, the CEO of Whitman-Walker,

2  that speaks to this point.

3       And in addition, we must seek consideration of the

4  conflict in which this is occurring.  The reality is that

5  over one in six hospital beds in the United States are

6  deemed Catholic-affiliated hospitals.  It would essentially

7  mean that over one in six hospitals would become unavailable

8  to LGBTQ people when seeking (unintelligible) care.  And

9  that doesn't even take into account those who live in rural

10  areas for which a number providers are even more limited.

11  The only hospital provider that may be close to them may be

12  religiously-affiliated.  And I believe the declaration of

13  Adrian Shanker of the Bradbury-Sullivan Center actually

14  speaks to that point very precisely.

15       THE COURT:  Okay.  I appreciate that.  We have a

16  couple more.  So on the claim that the rule violates Section

17  1554, prohibition on creating unreasonable barriers or

18  impugning timely access to care, is your argument the same

19  on that?

20       MR. GONZALEZ-PAGAN:  Well, Your Honor, we would

21  argue that every single one of these provisions creates a

22  problem with erecting a barrier for administering

23  healthcare.  My cocounsel, Ms. Edelstein, will actually get

24  into that a little bit more on the merits.  But it's a flaw

25  that permeates through the entirety of this 2020 revised

1    rule.

2            THE COURT:  How about the last one, again, is

3    eliminating uniform standard for assessing discrimination

4    claims.  Isn't that pretty speculative.?  What is your

5    actual injury there?

6            MR. GONZALEZ-PAGAN:  Again, Your Honor, that is an

7    area that we would argue is contrary to law the way that the

8    revised rule has been proposed and promulgated.  We

9    certainly have supported declarations explaining why the

10   availability of community care standard is an important

11   necessity.

12           Therefore, plaintiffs, the declarations of Ms.

13   Saucedo and Ms. Henn speak to that, for example.  Noting,

14   taking into account the sexual nature of the identities of

15   their membership, TransLatin individuals members

16   particularly.

17           I believe the AARP amicus brief also speaks to

18   that intersexual discrimination being faced by older adults,

19   particularly when it comes to their sexual orientation

20   gender identity at their age.  They're making it harder for

21   them seek redress on account of intersexual identity and the

22   elimination of accountability and protection, if it sought

23   the removal of protections that would constitute irreparable

24   harm, Your Honor.

25           THE COURT:  All right.  Thank you very much,

```
 1   Mr. Gonzalez-Pagan.

 2            Let's move briefly to Ms. Edelstein before we go

 3   back to Mr. Lane.  So thank you for those issues.

 4            So Ms. Edelstein, you are up.  I think I'd start

 5   with the central question regarding the first provision,

 6   which is the one that we've talked about the most,

 7   discrimination on the basis of sex, including discrimination

 8   on the basis of gender identity and sex stereotyping.

 9            Why should the defendants have to do anything more

10   than simply reproduce the statutory text in Section 1557 in

11   the regulation?  In other words, they're not saying in the

12   regulation that you can discriminate on the basis of sex.

13   They're just not saying anything about it.  When I say sex,

14   I mean on gender identity.

15            MS. EDELSTEIN:  Yes, Your Honor.  Here, there are

16   a couple of responses.  One, even though the government is

17   taking the position now that they're merely hewing to the

18   statutory text, that is not what they did in the process of

19   the rule-making.  And I think the preamble shows that, that

20   the rule is not merely hewing to the statutory text, but

21   rather HHS has applied its own definition in the context of

22   the preamble, which the Court can look at in assessing the

23   reasonableness of HHS' action here.

24            Also the context here is important in that, in

25   this case, you had the rule in place, the 2020 final rule,
```

1    which provided specific guidance to healthcare providers and

2    to patients regarding the scope of discrimination under

3    1557.

4           And HHS also specifically explained why it was

5    including the definition.  It was including the definition

6    to provide guidance and clarity and to mitigate the ongoing

7    discrimination that was still occurring.

8           That rule was promulgated.  Now what you have is a

9    repeal of that definition.  And in repealing that

10   definition, HHS didn't just merely hew to the text, it takes

11   the affirmative position in the preamble that Section 1557

12   does not encompass discrimination on the basis of gender

13   identity. There are a multiple statements throughout the

14   preamble that makes that clear.

15          THE COURT:  But I'm sorry, again, I apologize

16   again for the interruption issue.

17          But could you come in here and say, look, there is

18   no regulation regarding race discrimination that says, when

19   we say race, we mean race.  If you are someone who is black

20   and you are discriminated against in favor of someone who is

21   white or if you are discriminated against because you are

22   black, that means discrimination.  In other words, there is

23   nothing that says that in the regulation.  So, why is it --

24   and could you come forward and challenge the reg on that

25   basis?

1          MS. EDELSTEIN:  We agree.  HHS didn't need to

2    promulgate the regulation in the first instance.  But it did

3    back in 2016.  And now you're having a change, a change in

4    the policy.  Under those circumstances, as the recent docket

5    case indicates, you have to provide a reasonable explanation

6    for the change in policy, particularly taking into account

7    the Alliance's interest here.

8          And in this particular instance, not only do you

9    have a repeal, an elimination definition in its entirety,

10   but in examining the reasons for that elimination, the

11   government takes the position, HHS takes the position on the

12   government's litigation position in Bostock. That was its

13   reasoning here for eliminating the definition, was that

14   Title VII and Title IX do not encompass discrimination on

15   the basis of gender identity or sexual orientation.  The

16   revised rule makes that clear at page 37,138.  And now we

17   have--

18         THE COURT:  I'm sorry, go ahead.

19         MS. EDELSTEIN:  No, go ahead.

20         THE COURT:  So you would agree that, if there were

21   no 2016 rule, you couldn't come in here and say, Hey,

22   government, you need a reg on gender identity because you

23   need to be more explicit about what sex -- "on the basis of

24   sex" means.  Your point is that it's a change in policy and

25   that must be sufficiently explained.

1          MS. EDELSTEIN:  That is correct.  Especially here

2   where the change in policy rested on the government's

3   litigation position in Bostock that the Supreme Court then

4   repudiated before the revised rule was published.

5          And even more than that, the revised rule

6   indicates, it states that they acknowledge that the decision

7   of Bostock would likely have ramifications to the definition

8   of "on the basis of sex" under Title IX.  And HHS went ahead

9   and published the rule anyway, without acknowledging the

10  decision in Bostock.

11         So I think what we argue is you need to look at

12  the process, you need to look at the reasons why the agency

13  did what it did, which it lays out in the preamble.

14         THE COURT:  On the ancillary point on this, what

15  standard are you challenging the decision to remove the sex

16  stereotyping language in the 2016 rule?  In other words,

17  your main issue obviously is gender identity, and we don't

18  hear much about the sex stereotyping issue in your briefs.

19  Tell me, are you --

20         MS. EDELSTEIN:  I think--

21         THE COURT:  Go ahead.

22         MS. EDELSTEIN:  We would say the same arguments

23  apply there as well.

24         THE COURT:  So, if you lost on gender identity,

25  you would be out of luck on sex stereotyping as well?

1          MS. EDELSTEIN:  I would say the same reasoning

2     applies.

3          THE COURT:  Can you move to the tag line and LAT

4     challenge that I talked to Mr. Gonzalez-Pagan about?  Can

5     you talk a little bit about the contours of your precise

6     challenge there?

7          MS. EDELSTEIN:  Yes.  Our main challenge is to the

8     repeal of the notice and tag line provision in their

9     entirety.  So that's why it's a little difficult to point

10    to where it is in the revised rule because the revised rule

11    in the text of the rule itself.  Will not even (audio gap)

12         THE COURT:  I lost you there, for a minute,

13    Ms. Edelstein.  You were saying because of the text of the

14    rule --

15         MS. EDELSTEIN:  It repeals Section 92.8 entirely

16    so that revised rule doesn't include a section on notices.

17    The discussion --

18         THE COURT:  But it's the repeal of 45 CFR 92.8

19    that you are challenging?

20         MS. EDELSTEIN:  Yes.

21         THE COURT:  Is there anything else?  I'm trying to

22    get, as I said, a handle on the exact contours of that

23    claim.

24         MS. EDELSTEIN:  Yes, we appreciate that.  We

25    discuss 92.7 which was also repealed in its entirety, which

1    addresses the -- having a grievance procedure and someone

2    who is being charged with grievances.  That was also

3    repealed in its entirety.

4               THE COURT:  So that is part of your challenge as

5    well?

6               MS. EDELSTEIN:  Yes.  We do, in our complaint,

7    raise a number of other issues.  But for the focus of

8    preliminary injunction, it's really the notice and repeal of

9    the notice and tag line provision.

10              THE COURT:  Okay.  So going back again, I talked

11   to Mr. Gonzalez-Pagan about the Franciscan Alliance issue.

12   It wasn't clear to me from your opening briefs that -- it

13   seemed to me that you were saying how dare the government

14   rely on this one District Court case, they shouldn't have

15   followed that.

16              But they had no choice in vacating the gender

17   identity provision.  I mean, that's what the Court held,

18   right?  Even though, you might not have agreed with it --

19   because the government didn't agree with it, they had to

20   vacate that provision, right?

21              MS. EDELSTEIN:  I think as Mr. Gonzalez-Pagan

22   explained, at the time of the issuance of the proposed rule

23   back in 2016 and then throughout, the provision was only

24   vacated in October or November, that the modified judgment

25   of 2019, it was enjoined and enforced, HHS was enjoined from

1    enforcing it.

2              Again, it was one District Court opinion that went

3    against the fairly uniformed body of case law that existed

4    in terms of interpretation of "on the basis of sex" in Title

5    IX as well as in Title VII.

6              THE COURT:  What is the government supposed to do?

7    What if I were District Court who said you are enjoining it

8    and you came back and said well, come on, you just won the

9    minor District Court somewhere.  In other words, aren't you

10   complaining about their acting when their hands were tied?

11             MS. EDELSTEIN:  I think at the time, not only I

12   don't believe that their hands were necessarily tied.  I

13   mean, as we lay out in our brief, the government then took

14   that position.  I mean, initially, actually the government

15   was on the other side of the case in Franciscan Alliance.

16   It was actually defending the 2016 final rule.  It defended

17   the rule during the motion for preliminary injunction.  It

18   was only after the change in administration that they

19   changed sides and decided not to defend the rule. So in

20   effect, predetermining the outcome there.

21             THE COURT:  I agree that -- you've put your finger

22   on what is sort of an odd procedural mission, which is that,

23   after administration changes, they're happy with the

24   decision.  So, of course they're not going to go back to

25   court to either appeal it or try to get it overruled or

1    vacated because they like it.  That, you would think if you

2    didn't like it, as soon as Bostock comes out or even before,

3    you'd seek to vacate that decision.  But here, they like it.

4            So why does that change what they're obligated to

5    do?

6            MS. EDELSTEIN:  I think now we also have to sort

7    of  fast forward to where we are today.  And that in the

8    interim, even between the time when HHS issues the rule on

9    June 12 and June 19 when you have the final rule published,

10   HHS appears to still continue to rely on Franciscan Alliance

11   without acknowledging in any way whatsoever the effect of

12   Bostock on the Franciscan Alliance decision.

13           As I said before, the government is very clear in

14   the preamble at page 37,168, that it agreed with the ruling

15   in the Franciscan Alliance.  It said that the issuance of

16   the revised rule and the repeal of the elimination of the

17   definition of  "on the basis of sex" was based on its best

18   understanding of the law at the time, which was government's

19   litigation decision in the Bostock case and other relevant

20   litigation that discrimination on the basis of sex in Title

21   VII and Title IX does not encompass discrimination on the

22   basis of sexual orientation or gender identity.

23           There is no question that Bostock repudiated that

24   position.  So I think we have to look at where we are today,

25   which also goes to the redressability issue I think that you

```
 1    raised earlier today.

 2              We can argue about the legal and the technical

 3    issues with respect to the Franciscan Alliance, you know,

 4    vacatur, and you know, we consider it to be really a legal

 5    nullity at this point, given that the reasoning has been

 6    repudiated by the Supreme Court.

 7              But what we had, and why we're asking for this

 8    revised rule to be enjoined is, you have a governmental

 9    message being sent that gender identity and sexual

10    orientation are not covered under Section 1557 based on the

11    reasoning that has now been repudiated.

12              And we believe that is sending a message to

13    people, that it will chill those claims of discrimination

14    that will be brought into court, but even -- perhaps in this

15    case, it will also effectively foreclose the avenues for

16    administrative relief here.

17              OCR has taken the position in the revised rule

18    that it's not going to enforce claims of discrimination on

19    the basis of gender identity.  They've been very specific

20    about it.

21              THE COURT:  Let's say we agree that the Supreme

22    Court would apply Bostock's reasoning to Title IX.  And

23    that, even the lower courts, if you ask them to vacate, even

24    the Franciscan Alliance Court and the 5th Circuit, if you

25    ask them to vacate that ruling in light of Bostock, let's
```

1    say they would agree with you.

2            But don't you have to wait until that happens?   In

3    other words, Bostock -- I understand that you think the

4    reasoning implicitly overrules Franciscan Alliance, but it

5    is a different statute.   And don't I have to wait and you

6    have to wait and HHS have to wait for a Court to say that?

7            MS. EDELSTEIN:   We don't believe so, not in this

8    context.   Really what we are challenging is the

9    reasonableness of the decision-making process here and the

10   decision to move forward with this rule in light of the

11   Bostock decision, which is giving rise to confusion, and

12   will continue to give rise to confusion, as to why exactly

13   is the scope under 1557, particularly in light of the

14   explicit statements in the preamble that Title VII and Title

15   IX in Section 1557 don't cover claims of discrimination on

16   the basis of gender identity or sexual orientation.

17           And that's one of our concerns is the confusion

18   that we now have.   We submitted the declaration of the

19   Trevor Project and the Trans Lifeline showing increased

20   calls to these hotlines and crisis and suicide prevention

21   hotlines from LGBTQ people, expressing concern and fear.

22   And there's confusion now.   You had a 2016 rule that

23   provided specific guidance.   You then have the Bostock

24   decision; and then you have a revised rule that takes a

25   contrary position.

1          THE COURT:  I agree with you.  It's confusing all

2     around.  But the question is how does that still affect

3     actual redressability, which I think is a hard question.

4          Okay.  Thank you, Ms. Edelstein.

5          Let's move to the government now and Mr. Lane.

6          MR. GONZALEZ-PAGAN:  Your Honor, if I may, I just

7     wanted to provide the court with a cite (unintelligible)

8     irreparable harm.

9          THE COURT:  Yes.

10          MR. GONZALEZ-PAGAN:  This is another Direct Court

11     cite from the D.C. District Court.  It's the District of

12     Columbia versus the UMBA, it's a case that we cited in our

13     papers from this year.  It is still not published on the

14     Register so the cite would be 2020 Westlaw 1236657.  And in

15     terms of a circuit court authority, we cite the D.C.

16     Circuit, the East Saint Sanctuary Covenant versus Barr is a

17     decision by the 9th Circuit from July 6, 2010.  And I quote:

18     In the APA context, economic harm may be irreparable because

19     plaintiffs are otherwise unable to recover monetary damages.

20     Closed quote.  And that's 964 F3d 832.

21          THE COURT:  Thank you very much.

22          Mr. Lane, I'm going start with you.  I'm inclined

23     to give you a little more time to potentially brief the

24     standing on irreparable harm, just because I know the

25     plaintiffs didn't raise it in the earlier briefing and would

1    give you a chance to actually rebut what their arguments are

2    in reply.

3            But to the extent that I want to ask you questions

4    about that now, first of all, why are plaintiffs wrong, or

5    do you contend they are wrong in arguing that, as I consider

6    irreparable harm, I may consider third party standing, in

7    other words, injuries to the organization members, which

8    could be individual patients.

9            MR. LANE:  Yes, Your Honor.  So William Lane here,

10   Department of Justice.

11           The irreparable harm standard has always been, and

12   continues to be harm to the actual parties arguing.  I'm not

13   aware of a case that stands for the proposition that you can

14   cite irreparable harm to third parties not before the Court,

15   and then consider that your own for purposes of irreparable

16   harm.

17           And in that way, it is similar.  I know they don't

18   always match exactly to each other.  But in that way, it is

19   very similar to the injury inquiry for standing purposes.

20   They mirror each other in that respect, Your Honor.

21           THE COURT:  How about any of the abortion cases?

22   I just actually -- I can't remember if that arose in the PI

23   context.  But in any abortion case that arises in a PI

24   context, in order to look at undue burden, we have to look

25   at the injury to the third party pregnant women, not just to

1    doctors and the medical facilities, right?

2         MR. LANE:  I would say in that context, in the

3    abortion context, one, the first point is there is a very

4    specific body of case law that I think beyond even just the

5    third party standing case law that specifically focuses on

6    abortion, which may vary slightly.

7         But two, and more importantly, the point of that

8    is that the parties in those cases are permitted, because

9    they have established third party standing, to point to

10   irreparable harm on behalf of the members because they're in

11   effect representing those individuals, they're third party

12   patients.

13        And they haven't established this here, Your

14   Honor.  Plaintiffs have not been able to show that, they

15   haven't satisfied the three points of power to establish

16   third party standing because they haven't done that.  They

17   can't cite irreparable harm to third parties when they have

18   not satisfied that standard.

19        THE COURT:  But why don't you think they have

20   satisfied Powers?  In other words, to take sort of a number

21   of the issues, the essential argument is that the plaintiffs

22   are going to have to spend more money to treat patients who

23   can't go elsewhere or who are turned away elsewhere; so the

24   plaintiff clinics will have to spend more money dealing with

25   more patients who have more acute presentation.  Why isn't

```
 1   that a clear injury?
 2           MR. LANE:  Well, Your Honor, three things here.
 3   First, with referencing the first factor, which is the harm
 4   itself.  And this is the discussion you were just having
 5   with my friends on the other side about the injury.
 6           As far as financial injury goes, I know we've
 7   going back and forward with these cases, but the case we
 8   cite in our brief, again from DDC, not from D.C. Circuit,
 9   but from DDC, stands for the proposition that it has to be
10   significant.
11           I haven't looked at the case that plaintiffs just
12   cited, the East Bay case.  But even what plaintiffs' counsel
13   was quoting in that case, it was not that simple financial
14   loss alone established.  I think he said may establish
15   irreparable harm.  So--
16           THE COURT:  But I'm sorry.  Hold on a second,
17   Mr. Lane.  I think we're conflating two issues.  The first
18   is just whether there is standing to the organization
19   itself.  And the cases that Mr. Gonzalez-Pagan was talking
20   about at the end were irreparable injury to organizations.
21           So just for standing, my question to you is why
22   don't they clearly meet that, based on the fact that they've
23   got to see more patients in more acute circumstances?
24           MR. LANE:  Your Honor, I understand the
25   distinction.  I thank you for clearing that up.
```

1              It still has to satisfy the basic requirements of

2       standing that's been outlined by the Supreme Court in cases

3       like Luhan (ph) and Clapper.  Clapper, in particular, is the

4       standard that it needs to be certainly intending.

5              I would submit, Your Honor, plaintiffs, they do

6       talk about financial loss, and I'll grant to them that that

7       does come up in the declarations and in their briefing.  But

8       they don't put a number on that.  And I understand it would

9       be unreasonable to say, you know -- because it is

10      predictive, obviously, in preliminary injunction for

11      establishing standing.

12             But they don't even attempt to quantify it.  It's

13      discussed in pretty broad terms -- but this is likely to

14      happen, we're going to incur more costs.  Your Honor, the

15      conditions that they have not specified exactly what that is

16      going to be or even close to that.  There is no financial

17      estimate as far as how the damage is going to occur, what

18      sort of clinics aren't going to be providing people

19      treatment that is going to -- it's a number of steps that

20      need to happen before you can even get to the financial

21      damage that they're suggesting.

22             So Your Honor, it would be that it's not specific,

23      they have not identified it as certainly intending.  And

24      that would be their lack of standing as far as the

25      organization themselves as far as the first prong.

```
 1              THE COURT:  But let's say I find that -- and I see

 2      that point.  But let's say I find that it is sufficiently

 3      clear and intending to satisfy the certainty piece.  But

 4      wouldn't you agree that the potential injury to their client

 5      that they talk about would be irreparable?  I'm sorry, to

 6      the patient themselves.

 7              MR. LANE:  Your Honor, are you saying if the

 8      organizations themselves satisfy the standing requirement

 9      for them to represent, to articulate claims on behalf of the

10      patient?

11              THE COURT:  Right.  Exactly.

12              MR. LANE:  So Your Honor, we would say no, because

13      they still have to satisfy the two other factors of Powers.

14      The first is the close relationship.  And I don't think

15      anyone would question that a doctor in one of these clinics

16      or healthcare provider has a close relationship with a

17      patient.  We're not saying that that is not the case, that

18      typically is the case.

19              The problem is what patients are they talking

20      about.  They're talking about patients in other clinics, not

21      their patients.  They're saying those patients may

22      eventually become their patients.  But those are not their

23      patients at the time.  They, by definition, don't have a

24      close relationship.  So that would be the second--

25              THE COURT:  But hold on.  But they're not even --
```

1    they wouldn't have any injury until they become their

2    patient.  So this assumes that some of these people are

3    going to become their patients.  Otherwise, they wouldn't

4    even meet prong one.

5             MR. LANE:  Yes, Your Honor.  I think if we would

6    go back to the abortion context here, it's usually -- it's

7    typically abortion providers saying my patients are being

8    injured because I can't provide X or Y service, or there is

9    this burden that the government is imposing on me is too

10   heavy.  So I'm having to diminish services that I'm able to

11   provide to my patients.

12            This is meaningfully different because it isn't

13   their patients.  I understand the argument that my friend is

14   articulating, that these patients will eventually become

15   their patients.  But that's different than the typical third

16   party standing argument, where you already have a close

17   relationship and you are advancing the claims.

18            And it's for good reason, too, Your Honor.  Who

19   knows whether patient who is not even their patient may

20   want, you know, agree with a particular right that

21   plaintiffs are trying to advance.  So I think there is a big

22   difference there.

23            THE COURT:  But in the abortion context, you don't

24   know -- they're not saying that patient A, B and C.  It's

25   that there will be patients who are pregnant coming in,

1   seeking to terminate their pregnancy.  So I don't understand

2   the distinction between what you seem to be saying are

3   certainly identifiable patients in the abortion context and

4   not identifiable here.

5          MR. LANE:  Your Honor, I don't think it's a matter

6   of naming their particular patients or even saying that

7   they're particularly identifiable.  It's saying that they're

8   my current patients.

9          And the cases I've seen, Your Honor, in the

10  abortion context, it's typically -- perhaps hypothetical but

11  current patients, not patients who are seeing other

12  healthcare providers.  I think that aspect changes things.

13         THE COURT:  It seems to me -- and I have not

14  looked at this specifically.  But it seems to me that there

15  are people who will become pregnant and will come to me,

16  just as there are people who will be turned away or will

17  decide not to go other places because of these provisions

18  and will come to me also.  But all right.

19         We'll move on from there.  It seems to me that

20  essentially, at the end of the day, that plaintiffs'

21  arguments on standing and irreparable harm for each of the

22  provisions are largely the same.  And am I hearing that your

23  objection is largely the same or will you have a separate

24  standing of irreparable harm argument as to the other

25  provision that they challenge?

1              MR. LANE:  Your Honor, there are different, slight

2     aspects for each.  If I could just to note, Your Honor,

3     before moving on, we also say that the third party standing,

4     they haven't satisfied the third prong, which is hinderance

5     to plaintiffs, individual plaintiffs being able to advance

6     their own claims.

7              We've see that claims have been filed to challenge

8     this exact regulation in the Eastern District of New York,

9     so people are able to file complaints.  Even in this case,

10    the argument from plaintiffs is that there might be some

11    reason that individual patients are concerned or don't want

12    to speak up.  That in some ways is understandable except

13    that plaintiffs have actually claimed, at least, to have

14    identified individual patients in some of their

15    declarations.  So anyway, Your Honor, we would say that they

16    haven't satisfied the third prong.

17             But as far as your question on standing that

18    applies to the other provisions, we would say across the

19    board, there is an issue with the fact that this is third

20    party action.  The Simon case here stands on all fours.

21    It's suspect when you are trying to suggest standing when

22    your complaint is against the conduct of a third party not

23    before the court.

24             And the plaintiffs pointed out correctly that that

25    is not a (unintelligible) there can be situations where the

1    government takes X action, and that makes it -- makes a

2    third party take certain action, and that claim is

3    cognizable against the government.  That, in theory, can't

4    happen.  The Supreme Court has made clear that is suspect

5    going back to (unintelligible), then you have the Simon

6    case.

7            So Your Honor, that is one thing that cuts across,

8    all that a state requires third party to take action that

9    isn't necessarily going to be the case with -- plaintiffs

10   cannot be sure that a particular third party because the

11   regulation has been made less restrictive, is now going to

12   take some action they find objectionable.  So that's one.

13           The other big thing, Your Honor, coming across the

14   board here is redressability.  I guess this is most

15   pronounced with the "on the basis of sex" definition.

16           THE COURT:  Yes, I'm interested -- that was going

17   to be my next question.  Walk me through it and tell me if

18   you agree with the way I've teed it up for the plaintiffs or

19   if you have another reason why you think it's not

20   redressable.

21           MR. LANE:  On the basis of sex, Your Honor?

22           THE COURT:  Yes.

23           MR. LANE:  I agree complete, Your Honor.

24   Regardless of how plaintiffs feel about the decision in

25   Franciscan Alliance, and frankly, regardless of how the

1  Department of Health and Human Service feels about it, that

2  provision of rule has been vacated.  Plaintiffs have

3  suggested that litigation wasn't somehow valid because the

4  department may be eventually agreed with the position in

5  some respects of plaintiffs in that case.

6       But I would point out that, at least up to the

7  preliminary injunction phase, it was vigorously the position

8  of the Department of Health and Human Services that the old

9  rule, the 2016 rule was correct in that regard.  And even

10 after that, Your Honor, although the department did agree

11 that the definition was not correct and should have been

12 changed, the department did not -- did oppose vacatur.  And

13 the position of the department was look, we're going to be

14 working on a new rule.  There's no reason to vacate this

15 because the department has -- and the Department of Justice

16 as well, didn't typically take the position that we want,

17 you know, extra decision binding the executive's ability to

18 act.

19      So the department did not push for vacatur.  It

20 actually opposed it.  Nevertheless, it was entered.  But

21 once it was entered, that's the decision of the Court.

22      Now plaintiffs contend that the Bostock decision --

23 well, obviously their position is that the interpretation of

24 Title VII and Bostock will subsequently be applied to Title

25 IX, which in turn, will then applied to 1557, which renders

1    Franciscan Alliance suspect.

2            Now, that could be the case down the road, Your

3    Honor, if Bostock was decided last month.  We don't really

4    have a whole lot of precedent of applying Bostock.  And until

5    that happens, the rule has been vacated.

6            Even, Your Honor, even if we did have decisions

7    since Bostock, interpreting that decision and applying it to

8    Title IX, or even going so far as applying it to 1557, even

9    if that were the case, Your Honor, I'm not aware of

10   procedurally a way to resurrect a vacated rule that has not

11   been appealed, when a decision has not been appealed.  That

12   part of the rule has been vacated.  You know, you can take

13   issue with the reasoning of Franciscan Alliance.  You can say

14   that it came out wrong but that's been vacated.  And there is

15   not really a way to have that come back.

16           Now the agency could, of course, issue a rule that

17   was something that plaintiffs prefer.  But that is not

18   something the Court can order.  The Court can't order

19   specific outcome in a rule.  It can only vacate and enjoin a

20   rule.  I agree that the old definition is gone.  We can't go

21   back to that.

22           THE COURT:  So, I've been trying to wrestle with

23   this question, which is an interesting procedural,

24   jurisdictional one.  What would you say the plaintiffs have

25   to do in order to have standing to challenge the 2020

1   provision on gender identity?

2          MR. LANE:  So Your Honor, I see -- as far as that

3   specific portion of the rule, I think it would be hard to

4   actually conceive of a way it could have standing because of

5   the redressability.  Now, if there were something in the

6   language that departed from the text of the statute, if

7   there were something -- if the department actually did have

8   a definition that adds a little bit more or supposed the

9   department had a definition that said certain categories

10  within the rules are exempt and are not protected classes or

11  something like that, then they might at least have standing.

12  But the rule doesn't even have a definition.  It just says

13  "see statute" essentially.

14          So, I have not seen exactly their vision of how

15  their harm in this regard will be redressed because again if

16  the rule is vacated, if Your Honor enjoined this, then we're

17  not even going back to 2016 rule, we're just going back to

18  the statute.  And that's exactly what they have right now.

19          THE COURT:  Some let's say that HHS had a change

20  of heart and decided it would like to repromulgate --

21  promulgate 2016 rule that was vacated.  I guess you could

22  say that, because Franciscan Alliance vacated, you could

23  come up with a new one that was similar and that that would

24  be okay.  But in terms of procedurally, what do you think

25  you would need to do, if anything, in Texas, in the 5th

1    Circuit to get that ruling vacated?

2         MR. LANE:  Your Honor, because it has not been

3    appealed, that's done.   I should note that there is still

4    pending litigation in Franciscan Alliance.  It is not about

5    the vacatur.  It's actually about the lack of a nationwide

6    injunction, which the government opposed.

7         So the bottom line of that case, Your Honor, is

8    there no more procedural, as for as I can tell, no more

9    procedural mechanism to resurrect a vacated rule because it

10   has not been appealed.

11        THE COURT:  All right.  Let's go to merits issue.

12   Again, assuming standing for the moment, why aren't the

13   plaintiffs right on the "on the basis of sex" issue that a

14   clear policy change that does not explain, and given

15   Bostock, can't be explained satisfactorily or at least

16   didn't even try to explain satisfactorily given Bostock.

17   Doesn't the fact that that case came down, the timing of it

18   essentially blow a hole through your position on that?

19        MR. LANE:  No, Your Honor.  Again, assuming

20   standing, I think we have an issue with dates here,

21   chronology that we need to clear up.  The first is just when

22   the rule came out.  The way plaintiffs intended to frame is,

23   the agency is sitting there, devising the new rule, Bostock

24   comes out and the agency says, oh well, we're going to move

25   forward anyway.

1          And that's not really what the case was here.

2    Your Honor, if you look at the date of May 20th, and the

3    rule was actually published on HHS' website on June 12th, it

4    published the rule.  It was also on that same day submitted

5    to the Federal Register.  If you see the docket entry, it's

6    on June 12 at 4:15 P.M.  So HHS had finished off the rule,

7    submitted it for a publication.  Bostock was handed down on

8    June 15, which three days later.  Then the Federal Register

9    gets around to publishing the final rule on June 19.

10          So it is an issue of when you would consider it

11   final agency action, which -- I mean, the rule was

12   effectively completed and released to the public before

13   Bostock.  So I think that that doesn't change the case, that

14   doesn't either way necessarily change things, Your Honor.

15   But I think that is really important to keep in mind.  It is

16   not that Bostock was just ignored.  It's just the fact that

17   Bostock was not even really issued as the rule was being

18   issued.

19          THE COURT:  I understand your position, that you

20   are not saying, look, we were intentionally trying to

21   violate Bostock.  But the way the law works, once Bostock is

22   issued, don't you have to say, look, all right, we have to

23   put everything on hold here and take this to the Supreme

24   Court to take this into consideration?

25          MR. LANE:  No, Your Honor.  Because for some of

1   the reasons you point out earlier, Bostock has not been

2   applied really at all to this point.  So, what I was just

3   trying to it get at, Your Honor, is the final agency action

4   occurred before Bostock.  What plaintiffs are really asking

5   for is additional agency action, they're wanting further

6   action to go back and either rescind the rule or edit the

7   rule.

8          What I would submit, Your Honor, is what we need

9   to do is look at the rule at the time HHS completed it,

10  which is before Bostock, and see if the rule can stand on

11  its reasoning there.

12         Now, obviously one could look at how the rule is

13  applied moving forward.  And I think that's really what this

14  case is about.  Plaintiffs are assuming a position based on

15  the preamble and some of the wording and some of the

16  positions that HHS took in the preamble, that HHS is going

17  to have a particular policy moving forward with the rule.

18  That is what plaintiffs are really objecting to.

19         But Your Honor, that has not happened yet because

20  the rule has not gone into effect.  So, I would submit that

21  plaintiffs' case is not ripe yet.  What plaintiffs need to

22  do is wait and see how HHS applies the rule.  Then if HHS

23  applies the rule in a way that a Court determines is not in

24  line with Bostock, then there is actually a case of

25  controversy at that point.

1            THE COURT:  Why not now?  Again, as you said, it

2    has not been an issue yet.  But why isn't it a better course

3    to say, we're going to not, we're not going to -- we're

4    going to stay an effective date and consider how Bostock

5    affects the rule.  Why aren't you willing to do that here?

6            MR. LANE:  Your Honor, I think the agency

7    obviously if it wanted to come out with another rule

8    tomorrow, could come out with three rules this month if it

9    wanted.  It's a matter of what the agency has chosen to do

10   and whether the rule issued is defensible on its face and on

11   the reasoning the agency applied.

12            Your Honor, I think that what is really key here

13   is what the agency -- part of what the agency did say in the

14   preamble.  Now, my understanding, and plaintiffs can correct

15   me if I'm wrong, but based on what they told you previously

16   today, is that they really have no issue with the text of

17   the rule itself or, to put it more accurately, the lack of

18   text because we don't have a definition.

19            I think plaintiffs' position now is that the rule

20   on its face, at least this portion of it, is not

21   objectionable because it just merely replicates the statute.

22   So plaintiffs seem what their real issue is is with the

23   preamble.

24            Now the reason the preamble here is not an issue,

25   one, is because it is not the rule itself.   But two, you

1    have to look at what is in the preamble, Your Honor.  They

2    focus on HHS' discussion on its position that in healthcare

3    context, biological sex may matter in circumstances.  And

4    obviously, medication interacts with individuals, et cetera,

5    there is some discussion of that in the preamble, Your

6    Honor.

7            But what plaintiffs don't mention is key that's in

8    the preamble.  And this line, HHS included a statement that

9    said, Moreover, to the extent that a Supreme Court decision

10   is applicable in interpreting the meaning of a statutory

11   term, the elimination of a regulation definition of such

12   term would not preclude application of the Court's

13   instruction.

14           So in clear and simple terms, Your Honor, HHS

15   anticipated that Bostock may be coming out.  HHS was

16   thinking, you know, wasn't sure of exactly how it would come

17   out and said, You know what, it if comes out in such a way

18   that Title IX includes gender identity and sexual

19   orientation, we drafted the rule in such a way that it can

20   be applied that way, there is no issue with it.

21           THE COURT:  But I'll clarify that with plaintiffs

22   quickly when we're done here.  But I assume, at least

23   according to Ms. Edelstein, that their complaint is with

24   more than the preamble because if their argument is the

25   government is shifting its position without adequate

1    consideration, then just the removal of a rule is enough to

2    constitute a shift in position.  But I'll check with them.

3              But let me go back to the Bostock question.  If a

4    Bostock had said -- did a Title IX case, not a Title VII

5    case.  And you had said to me, well, look, we really drafted

6    the whole rule before Bostock came out, so what are we

7    supposed to do.  Clearly, if Bostock had essentially

8    repudiated the basis for your decision, you would hold the

9    rule.

10             And so are you simply claiming that, because

11   Bostock isn't exactly on point, it's only mostly on point,

12   that you didn't have to?

13             MR. LANE:  No, Your Honor, not at all.  The

14   position is that HHS made -- it specifically anticipated

15   Bostock and noted it, said, you know, this case is coming

16   down the line.  We're drafting this rule in a way that can

17   survive which ever way Bostock comes out.  It's not entering

18   the fray, it's just saying let's go with the statute and let

19   the cards fall where they may.

20             And when it comes time for us to apply the rule,

21   we're going to look at what the case law is, we're going to

22   look at what Courts have decided, how they've implemented

23   Bostock or, Your Honor, in your hypothetical, if Bostock is

24   (unintelligible) itself, you know, they may have said we're

25   going to look at Bostock.

1          But either way, because the rule is drafted in a

2     neutral manner, it was meant to be able to survive Bostock,

3     however Bostock came out.  And HHS made that position clear

4     in the preamble.

5          THE COURT:  Okay.  I am going to come back to you

6     in just one minute, Mr. Lane, just on the last issue.

7          But let me just hear Ms. Edelstein, you or

8     Mr. Gonzalez-Pagan, just clarifying.  Are you in fact

9     challenging the omission of the rule or are you only

10    challenging the preamble?

11         MS. EDELSTEIN:  We're challenging the omission and

12    the repeal of the definition.  So we disagree with the

13    statement that we have no real issue with the text.  We do

14    have an issue with the text of the rule because it

15    eliminates the definition which had provided clear guidance.

16         And the Court, under State Farm, under Encino

17    Motorcars, under the recent docket decisions, under the

18    divisions of this Court itself needs to look at the reasons,

19    the underlying rule, to determine whether or not the rule

20    itself is arbitrary and capricious.  And here, the HHS took

21    the position that gender identity and sex stereotyping does

22    not encompass.  And that was the basis for this rule which

23    is what renders it arbitrary and capricious, that position

24    has been repudiated.

25         I would also add that -- I mean, I think Mr. Lane

1   himself said it would have to be defensible on the reason

2   being supplied, we would argue it's indefensible here.

3            On the point about Bostock as well, we -- there

4   are two points.  HHS, in the preamble at 37,168,

5   acknowledged that Bostock would likely have ramifications

6   for the definition of "on the basis of sex" under Title IX.

7   They acknowledged that but went ahead and issued the new

8   rule and then published it without waiting for Bostock

9   initially when it issued it.  Then it went ahead even after

10  Bostock was issued.  We would argue that also shows the lack

11  of recent decision-making here.

12           In terms of just saying well we left, we drafted

13  the rule so that it could be applied in multiple situations,

14  again, we think -- I mean, that's the position now that the

15  government is taking.  However, in the preamble, the

16  government actually takes the position on what the scope of

17  1557 is and what is covered and what is not and really

18  states out an enforcement policy here in the preamble.

19           And we think that, which is now contrary to

20  Bostock and the definition of  "on the basis of sex" and we

21  think actually that also is what leads to harm here.  And

22  can be retracted by the enjoining of the rule.

23           THE COURT:  Okay.  Thank you very much.

24           What I am going to let you do, Mr. Lane, if you

25  want, I'll give you one week to submit further reply or

1   technically a surreply just on the issues of standing and

2   irreparable harm.  So do you want that or you don't need it?

3          MR. LANE:  Yes, Your Honor, we will take advantage

4   of that opportunity.  Thank you.

5          THE COURT:  That would be due August 10.  I can't

6   guarantee, People, that I will have an opinion out before

7   August 18th, given what I think is only fair to the

8   government to give them some more time to respond.  Again, I

9   will attempt to have it out within two weeks of the

10  government's final brief and try to address these.  But

11  there are a lot of tough issues, as everyone is aware.

12         We didn't even get into the constitutional one,

13  obviously standing and is a threshold jurisdictional issue.

14  Irreparable harm is a critical question.  Those two are

15  linked, as Mr. Gonzalez-Pagan notes.  But I need to have

16  some time to figure all of that out.

17         In any event, I will try to get an opinion out

18  within a couple of weeks of the government's final brief.

19  Then we'll go from there.

20         All right.  Thank you, everyone, for your

21  preparation, for your argument and your thoughts today.  I

22  appreciate it.

23         MR. GONZALEZ-PAGAN:  Thank you, Your Honor.  I

24  wanted to address a brief point.  This came up with regard

25  to --

1        THE COURT:  I let you interrupt at the end before

2   the government spoke.  So you had a reply, as did Ms.

3   Edelstein.

4        Okay.  Thank you very much.

5        (Whereupon, at 3:19 p.m., the hearing concluded.)

6

7                          oo0oo

8

9                   CERTIFICATE OF REPORTER

10                     I, Lisa Walker Griffith, certify that

11  the foregoing is a correct transcript from the record of

12  the remotely reported proceedings in the above-entitled

13  matter.

14                     Please Note: This hearing was held in

15  compliance with the COVID-19 pandemic and the standing orders

16  of this court, and is therefore subject to the

17  technological limitations of court reporting remotely,

18  including static, signal interference and other restrictions.

19

20

21

22  _____  8-7-2020
    Lisa Walker Griffith, RPR                  Date

23

24

25