UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------x
TANYA ASAPANSA-JOHNSON
WALKER and CECILIA GENTILI,

               Plaintiffs,

     -against-

AZAR M. AZAR II, in his official
capacity as the Secretary of the United
States Department of Health and Human
Services, and UNITED STATES
DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

               Defendants.
-----------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. 20-CV-2834 (FB) (SMG)

*Appearances:*
*For the Plaintiffs:*
EDWARD J. JACOBS
KATHRYN M. ZUNNO-FREANEY
MICHAEL A. SABELLA
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10110-0100

JOSHUA D. ROVENGER
Baker & Hostetler LLP
127 Public Square, Suite 2000
Cleveland, Ohio 44114-1214

KATRINA M. QUICKER
RYAN E. HARBIN
Baker & Hostetler LLP
1170 Peachtree Street, NE, Suite 2400
Atlanta, Georgia 30309-7676

*For the Defendants:*
WILLIAM K. LANE III
JORDAN L. VON BOKERN
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530

*For Amicus Curiae:*
DOUGLAS N. LETTER
Office of General Counsel
U.S. House of Representatives
219 Cannon House Office Building
Washington, DC 20515

**BLOCK, Senior District Judge:**

Some two months ago, the Supreme Court held that discrimination based on sex encompassed discrimination based on both sexual orientation and gender identity. *See Bostock v. Clayton Cnty, Ga.*, 140 S. Ct. 1731 (2020). It concluded that such discrimination "has always been prohibited by Title VII's plain terms," and that "that should be the end of the analysis." *Id.* at 1743.

In this case, the Court is tasked with having to decide if a proposed set of rules by the Department of Health and Human Services ("HHS") is contrary to the Supreme Court's pronouncement in *Bostock* or if the agency acted arbitrarily or capriciously in enacting the rules.

For the reasons that follow, the Court concludes that the proposed rules are, indeed, contrary to *Bostock* and, in addition, that HHS did act arbitrarily and capriciously in enacting them. Therefore, it grants plaintiffs' application for a stay and preliminary injunction to preclude the rules from becoming operative.

# I

In 2010 President Barack Obama signed into law the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119, commonly known as the Affordable Care Act ("ACA") or Obamacare.   Section 1557 of the ACA (codified at 42 U.S.C. § 18116) prohibits various forms of discrimination in "any health program or activity" that either receives federal financial assistance or is administered by a federal agency.   42 U.S.C. § 18116(a).   Rather than list the prohibited grounds, § 1557 incorporates forms of discrimination prohibited by other statutes, including Title IX of the Education Amendments of 1972, which makes it unlawful to discriminate "on the basis of sex." 20 U.S.C. § 1681(a).   In addition, § 1557 incorporates the "enforcement mechanisms provided for and available under" Title IX (and other statutes).   42 U.S.C. § 18116(a).   Finally, § 1557 states that the Secretary of Health and Human Services ("HHS") "may promulgate regulations to implement this section."   *Id.* § 18116(c).

Acting on that authority, HHS proposed a series of rules ("the 2016 Rules") in September 2015.   *See* Nondiscrimination in Health Programs and Activities, 80 Fed. Reg. 54,172 (Sept. 8, 2015).   One proposed rule restated, in simpler language, the statutory nondiscrimination provision: "[A]n individual shall not, on the basis of race, color, national origin, sex, age, or disability, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any

3

health program or activity to which this part applies."  80 Fed. Reg. at 54,218 (to be codified at 45 C.F.R. § 92.101(a)).  Another defined discrimination "on the basis of sex" to include discrimination "on the basis of pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, childbirth or related medical conditions, sex stereotyping, or gender identity."  *Id.* at 54,216 (codified at 45 C.F.R. § 92.4).  It then defined "sex stereotypes" as "stereotypical notions of gender, including expectations of how an individual represents or communicates gender to others, such as behavior, clothing, hairstyles, activities, voice, mannerisms, or body characteristics," *id.* at 54,216-17, and "gender identity" as "an individual's internal sense of gender, which may be different from that individual's sex assigned at birth," *id.* at 54,216.  The proposed rules were finalized in May 2016 and took effect on July 18, 2016.  *See* Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,375, 31,376 (May 18, 2016).

The stated purpose of the 2016 Rules was to "reflect the current state of nondiscrimination law," *id.* at 31,388, and HHS concluded that its definition of "on the basis of sex" was consistent with "existing regulation and previous Federal agencies' and courts' interpretations that discrimination on the basis of sex includes discrimination on the basis of gender identity and sex stereotyping," *id.*

But not everyone agreed that HHS's interpretation was legally correct.  A month after the 2016 Rules took effect, a coalition of states and healthcare providers

4

filed suit in the Northern District of Texas to enjoin their enforcement.   *See Franciscan Alliance, Inc. v. Burwell*, No. 7:16-CV-00108 (N.D. Tex. filed Aug. 23, 2016).   They argued that HHS exceeded its authority under § 1557 by defining discrimination on the basis of sex to include discrimination based on gender identity.

The district court agreed and enjoined enforcement of that portion of the 2016 Rules.   *See Franciscan Alliance, Inc. v. Burwell*, 227 F. Supp. 3d 660 (N.D. Tex. 2016).[1]   It held that HHS's regulatory definition was not entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), because "[t]he text of Section 1557 is neither silent nor ambiguous as to its interpretation of sex discrimination."   *Franciscan Alliance*, 227 F. Supp. 3d at 687. Noting that § 1557 incorporated Title IX, the district court believed that it was "clear from Title IX's text, structure, and purpose that Congress intended to prohibit sex discrimination on the basis of the biological differences between males and females."   *Id.*   That conception of sex discrimination, it held, necessarily excluded discrimination based on gender identity.   *See id.* at 689 ("Prior to the passage of the ACA in 2010 and for more than forty years after the passage of Title IX in 1972, no federal court or agency had concluded sex should be defined to include gender identity.").   "Accordingly," the district court concluded, "HHS's expanded

---

[1] The plaintiffs also challenged the inclusion of discrimination based on pregnancy termination.   That aspect of *Franciscan Alliance* is omitted from the discussion because it is not at issue in this case.

definition of sex discrimination exceeds the grounds incorporated by Section 1557."

*Id.*

Timing, the saying goes, is everything. The district court issued its injunction on December 31, 2016. Three weeks later, a new Administration took office. As a result, HHS did not appeal the district court's preliminary injunction, which was later converted into an outright vacatur, with remand for "further consideration." *See Franciscan Alliance, Inc. v. Azar*, 414 F. Supp. 3d 928, 947 (N.D. Tex. 2019).

The district court did not delineate what "further consideration" should entail. But even before the district court's remand, HHS had begun the process of dismantling the 2016 Rules. On June 14, 2019, it gave notice of a proposal "to repeal the novel definition of 'sex' in the Section 1557 regulation in order to make the Department's regulations implementing Title IX through the Section 1557 Regulation more consistent with the Title IX regulations of other Federal agencies." Nondiscrimination in Health and Health Education Programs or Activities, 84 Fed. Reg. 27,846, 27,856 (June 14, 2019). In addition, HHS proposed replacing the list of prohibited grounds of nondiscrimination with a reference to the statutes incorporated by § 1557, including Title IX. *See* 85 Fed. Reg. at 27,861 (to be codified at 45 C.F.R. § 92.2). Despite significant opposition, the agency finalized the proposal ("the 2020 Rules") a year later. *See* Nondiscrimination in Health and

6

Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37,160 (June 19, 2020).   Among many other things, HHS "finalize[d] its repeal of § 92.4 of the 2016 Rule without change."  *Id.* at 37,167.[2]   Cognizant that *Bostock* was on the horizon, however, it recognized the obvious: "[T]o the extent that a Supreme Court decision is applicable in interpreting the meaning of a statutory term, the elimination of a regulatory definition of such term would not preclude application of the Court's construction."  *Id.* at 37,168.

HHS's rationale for the 2020 Rules is set forth in what the parties refer to as a "preamble."[3]   Many parts of the preamble evince an interpretation of § 1557 that is fundamentally at odds with the interpretation embraced by the previous Administration:

- "The Department enforces statutory prohibitions on discrimination on the basis of race, color, national origin, age, disability, and sex discrimination because they are set forth in the text of statutes incorporated into Section 1557, and gender identity is not set forth as a protected category in those statutes." 85 Fed. Reg. at 37,175.

---

[2]Although there is no question that the 2020 Rules repeal the 2016 definition of discrimination on the basis of sex, the repeal is implicit.   Rather than stating "45 C.F.R. § 92.4 is hereby repealed" or something similar, the repeal is effected by simply omitting that section from the proposed rules and renumbering the subsequent rules accordingly.

[3]The term, though widely used, is perhaps misleading if it implies a short statement of purpose.   The preamble to many regulations contains thousands of words, and the 2020 Rules are no exception.   The preamble to the Constitution, by contrast, contains only 52.

- "'Sex' according to its original and ordinary public meaning refers to the biological binary of male and female that human beings share with other mammals." *Id.* at 37,178.

- "Title IX, along with its implementing regulations, consistently understands 'sex' to refer to the biological binary categories of male and female only." *Id.* at 37,179.

- "The Department disagrees with commenters who contend that Section 1557 or Title IX encompass gender identity discrimination within their prohibition on sex discrimination." *Id.* at 37,183.

- "The Department believes that, unlike stereotypes, reasonable distinctions on the basis of sex, as the biological binary of male and female, may, and often must, play a part in the decision-making process— especially in the field of health services." *Id.* at 37,185 (internal quotation marks omitted).

- "The Department declines to interfere in these [medical] practices, and repeals a mandate that was, at least, ambiguous and confusing." *Id.* at 37,187.

- "The 2016 Rule's definition of gender identity does not turn on any biological or external indicia of sex, and explicitly disavows any such reliance.   Under the 2016 Rule, one can identify as 'male, female, neither, or a combination of male and female.'   A person's gender identity under the 2016 Rule is determined ultimately by what a person says his or her gender identity is, and a covered entity is bound to treat all individuals 'consistent with their gender identity' the moment it becomes aware of such a declaration (which must be allowed to change under the 2016 Rule).   No other Federal statute, agency rule, or guidance has ever gone so far on this question." *Id.* at 37,189.

In sum, the 2020 Rules take the position that "[t]he plain meaning of 'sex' under Title IX encompasses neither sexual orientation nor gender identity." *Id.* at 37,194.

In addition, HHS noted the effect of pending litigation on its rulemaking.   It proposed the 2020 Rules in part "to address the overbroad interpretations, adopted in the current rule, of Section 1557 that were identified by the court [in *Franciscan*

8

*Alliance*] and other Federal precedents." 84 Fed. Reg. at 27,849; *see also id.* ("The existence of lawsuits and court orders blocking enforcement of significant parts of the [2016 Rule] for over two years indicates that changes in the proposed rule may minimize litigation risk."). But its decision was not based merely on deference to a court order; as stated in the preamble to the final rules, HHS "also *agrees* with the *Franciscan Alliance* ruling, according to which the 2016 Rule's extension of sex-discrimination protections to encompass gender identity was contrary to the text of Title IX and hence not entitled to *Chevron* deference." 85 Fed. Reg. at 37,168 (emphasis added).

Indeed, the 2020 Rules embodied the new Administration's position on the issue: "The U.S. government has taken the position in *Harris* and other relevant litigation that discrimination 'on the basis of sex' in Title VII and Title IX does not encompass discrimination on the basis of sexual orientation or gender identity." *Id.* "*Harris*" referred to *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, in which the Sixth Circuit held that Title VII prohibited discrimination based on both sex stereotyping and transgender status. 884 F.3d 560, 574-75 (6th Cir. 2018). The Supreme Court granted certiorari, *see* 139 S. Ct. 1599 (2019), and consolidated *Harris* with *Bostock*, in which the Eleventh Circuit had reached a contrary result, *see* 723 F. App'x 964, 965 (11th Cir. 2018), *cert. granted*, 139 S. Ct. 1559 (2019).

HHS proposed the 2020 Rules some two months after the Supreme Court

granted certiorari in *Bostock* and, as reflected in the preamble, the agency was well aware of the case and its potential impact.   It noted that some of those commenting on the proposed rules had "urged the Department to wait until the Supreme Court decides *Harris Funeral Homes* before publishing a rule that deals with the same subject matter, or allow for commenters to comment again once the case has been decided."   85 Fed. Reg. at 37,168.   HHS demurred, reasoning that it was "permitted to issue regulations on the basis of the statutory text and its best understanding of the law and need not delay a rule based on speculation as to what the Supreme Court might say about a case dealing with related issues."   *Id.*   It acknowledged the significance of the case, however, though it stopped short of conceding that the Supreme Court's decision would be dispositive:

> The Department continues to expect that a holding by the U.S. Supreme Court on the meaning of "on the basis of sex" under Title VII will likely have ramifications for the definition of "on the basis of sex" under Title IX.   Title VII case law has often informed Title IX case law with respect to the meaning of discrimination "on the basis of sex[.]"   At the same time, . . . the binary biological character of sex (which is ultimately grounded in genetics) takes on special importance in the health context.   Those implications might not be fully addressed by future Title VII rulings even if courts were to deem the categories of sexual orientation or gender identity to be encompassed by the prohibition on sex discrimination in Title VII.

*Id.*   Thus, HHS concluded, "to the extent that a Supreme Court decision is applicable in interpreting the meaning of a statutory term, the elimination of a regulatory definition of such term would not preclude application of the Court's

construction." *Id.*

HHS was apparently confident that the Supreme Court would endorse the Administration's interpretation of sex discrimination. *See id.* ("[T]he reasons why 'on the basis of sex' (or 'because of sex,' as used in Title VII) *does not* encompass sexual orientation or gender identity under Title VII have similar force for the interpretation of Title IX." (emphasis added)). Its confidence was misplaced.

The Supreme Court issued its decision in *Bostock* on June 15, 2020. Justice Gorsuch, writing for a six-member majority, accepted, for the sake of argument, that "sex" referred "only to biological distinctions between male and female." 140 S. Ct. at 1739. He nevertheless held that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 1741.

The final 2020 Rules are dated May 20, 2020, and were filed on June 12, 2020, three days before the Supreme Court's decision; they were published on June 15, 2020, four days after the decision. *See* 85 Fed. Reg. at 37,248. Perhaps unsurprisingly given the timing, the decision is not mentioned once in the 2020 Rules or their preamble, which span 88 pages of the Federal Register.[4]

---

[4]Courts, on the other hand, have already started sorting out the implications of *Bostock*. On August 7, 2020, the Eleventh Circuit held that Supreme Court's interpretation of Title VII applies with equal force to Title IX. *See Adams v. Sch. Bd. of St. Johns Cnty.*, ___ F.3d ___, 2020 WL 4561817, at *11 (11th Cir. Aug. 7,

## II

The 2020 Rules are slated to take effect on August 18, 2020. *See id.* at

37,160. On June 26, 2020, two transgender women, Tanya Asapansa-Johnson

Walker and Cecilia Gentili, filed this lawsuit.[5] Both plaintiffs have serious medical

conditions that require ongoing care. Specifically, Walker requires treatment

related to her prior lung cancer and her HIV-positive status, while Gentili requires

treatment for chronic obstructive pulmonary disease and emphysema. *See* Walker

Decl. ¶ 30; Gentili Decl. ¶¶ 44-45.

Both plaintiffs have experienced discrimination based on their transgender

status. Walker has been mocked by medical office staff and refused treatment by

healthcare professionals. *See* Walker Decl. ¶¶ 47-49. During her lung cancer

treatment, Walker was required to answer invasive questions about her genitals

before being given necessary care. *Id.* ¶ 54. Throughout her treatment, Walker

was subjected to misgendering, the exposing of her genitals, physical abuse, and

refusals to provide medication. *Id.* ¶¶ 58-62. Currently, Walker is seeking gender

---

2020).

[5]Theirs is not the only suit. A coalition of healthcare providers and LGBTQ organizations have filed a similar suit in the District of Columbia. *See Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 1:20-CV-1630 (D.D.C. filed June 22, 2020). Meanwhile, twenty-two states and the District of Columbia have filed suit in the Southern District of New York. *See N.Y. v. U.S. Dep't of Health & Human Servs.*, 1:20-CV-5583 (S.D.N.Y. filed July 20, 2020).

confirmation surgery but, because she is a veteran, she needs a letter from Veterans Affairs ("VA") stating why the surgery is medically necessary.   *Id.* ¶¶ 68-71.   VA therapists have repeatedly refused to write this letter.   *Id.*

Gentili has faced similar discrimination.   During routine doctor's visits, doctors have mocked Gentili's body, refused to treat her, and used offensive language towards her after realizing she is transgender.   Gentili Decl. ¶¶ 22, 27. Further, doctors have tried to "treat" Gentili's gender identity against her wishes and have refused to prescribe her necessary hormones.   *Id*. ¶¶ 27, 56.

Both Walker and Gentili state that their past experience will lead them to avoid necessary medical care out of fear of further discrimination.   They ultimately seek a declaration that the 2020 Rules are invalid under the Administrative Procedure Act ("APA") and a concomitant vacatur of the rules.   In the meantime, they ask the Court to stay the rules' effective date and to preliminarily enjoin HHS from enforcing them.

In addition to defending the rules on the merits, HHS argues that the plaintiffs lack standing to sue.   "It is well established . . . that before a federal court can consider the merits of a legal claim, the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue."   *Ross ex rel. Dunham v. Lantz*, 408 F.3d 121, 123 (2d Cir. 2005) (quoting, with alteration, *Whitmore v. Ark.,* 495 U.S. 149, 154 (1990)).

## A.   Standing

To establish standing, plaintiffs must show "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likel[ihood] that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (internal quotation marks omitted).   Each of these elements must be demonstrated "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).   "When a preliminary injunction is sought, a plaintiff's burden to demonstrate standing will normally be no less than that required on a motion for summary judgment." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (internal quotation marks omitted)).   "Accordingly, to establish standing for a preliminary injunction, a plaintiff . . . must set forth by affidavit or other evidence specific facts, which for purposes of the . . . motion will be taken to be true." *Id*. (internal quotation marks omitted).

Fortunately, the relevant allegations of the plaintiffs' complaint are supported by declarations.   While HHS challenges the legal adequacy of the averments, it does not dispute their veracity.

### 1.  Injury in Fact

As set forth above, both plaintiffs attest that they have, based on their transgender status, suffered past discrimination in receiving healthcare.   That alone

constitutes an injury in fact:

> [D]iscrimination itself, by perpetuating archaic and stereotypic notions or by stigmatizing members of the disfavored group as innately inferior and therefore as less worthy participants in the political community, can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group.

*Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984) (internal citations and quotation marks omitted).   In addition, both plaintiffs state that the threat of future discrimination will lead them to avoid seeking treatment for extant medical conditions, with possibly life-threatening consequences.   This, too, is an injury in fact.   *Cf. Baur v. Veneman*, 352 F.3d 625, 631-34 (2d Cir. 2003) (increased risk of contracting food-borne illness constitutes injury in fact).

HHS does not seriously contend that illness and death are not injuries in fact. Rather, it argues that the risk that the plaintiffs will experience those outcomes are speculative.   To be sure, a plaintiff seeking injunctive relief must show "a sufficient likelihood that he [or she] will again be wronged in a similar way."   *Marcavage v. N.Y.C.*, 689 F.3d 98, 103 (2d Cir. 2012) (quoting, with alteration, *L.A. v. Lyons*, 461 U.S. 95, 111 (1983)).   But "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury."   *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974).   Plaintiffs have experienced discrimination from healthcare providers in the past, and their medical conditions will require them either to interact with at

least some of those same medical providers in the future, or to delay or forego treatment. The Court concludes that this "Catch-22" is sufficiently concrete to constitute an injury in fact.

### 2. *Causation*

The causation element of standing "requires the injury to be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court[.]'" *Citizens for Responsibility & Ethics in Wash. v. Trump*, 953 F.3d 178, 189 (2d Cir. 2019) (quoting *Lujan*, 504 U.S. at 560). HHS argues that whatever discrimination plaintiffs may experience in the future is traceable to healthcare providers and other third parties, not to the 2020 Rules.

The Court disagrees. An injury is traceable to government action if it results from "the predictable effect of Government action on the decisions of third parties." *Dep't of Commerce v. N.Y.*, 139 S.Ct. 2551, 2566 (2019). This is true even if the third parties act unreasonably or unlawfully. *See id.* ("Respondents have met their burden of showing that third parties will likely react in predictable ways to the citizenship question, even if they do so unlawfully and despite the requirement that the Government keep individual answers confidential.").

One of HHS's rationales for repealing the 2016 Rule's definition of sex discrimination was that it "imposed new requirements for care related to gender [that] prevented covered entities from drawing reasonable and/or medically

16

indicated distinctions on the basis of sex."   85 Fed. Reg. at 37,162.   "As a result," it reasoned, "those provisions would have imposed confusing or contradictory demands on providers, interfered inappropriately with their medical judgment, and potentially burdened their consciences."   *Id.*   It also agreed with the assessment of the plaintiffs in *Franciscan Alliance* that the 2016 Rules "has created a massive new liability for thousands of healthcare professionals unless they cast aside their medical judgment and perform controversial and even harmful medical transition procedures."   84 Fed. Reg. at 27,848 (quoting the complaint).   The agency undoubtedly intended the repeal to remove those perceived burdens on healthcare providers, stating that some would "revert to the policies and practices they had in place before the agency actions that created confusion regarding Title IX's definition of discrimination on the basis of sex."   *Id*. at 27,876.   If even HHS understood that some providers would refuse treatments to transgender patients following the repeal, then its effect on those third parties was predictable.

### 3. *Redressability*

The third component of standing—redressability—requires the plaintiff to show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."   *Lujan*, 504 U.S. at 560 (internal quotation marks omitted).   In this case, redressability follows from traceability: If it is predictable that some healthcare providers might "revert" to prior practices if the

2016 Rules are repealed, then it is predicable that they will not do so if those rules remain in effect.

HHS responds that the plaintiff's requested remedy cannot revive the "gender identity" portion of the 2016 definition vacated by the district court in *Franciscan Alliance*.  Although the Court predicts that either the district court or some higher authority will revisit the vacatur in light of *Bostock*, it agrees that it has no power to revive a rule vacated by another district court.

Nevertheless, *Franciscan Alliance* did not address the concept of "sex stereotyping" embodied in the 2016 Rule.  In *Harris Funeral Homes*, the Sixth Circuit held that "discrimination against transgender persons necessarily implicates Title VII's proscriptions against sex stereotyping."  884 F.3d at 576.  Because a transgender person is "inherently 'gender non-conforming,'" it reasoned, "an employer cannot discriminate on the basis of transgender status without imposing its stereotypical notions of how sexual organs and gender identity ought to align." *Id.*  The Court finds that reasoning persuasive and, therefore, disagrees with HHS's assertion that "the sex stereotyping provision ha[s] no real-world effect after the [*Franciscan Alliance*] decision."  85 Fed. Reg. at 37,236.

In sum, the Court concludes that plaintiffs have standing to seek a stay and a preliminary injunction.

**B. The Merits**

Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."   5 U.S.C. § 702.   The agency action must be "final."   *Id.* § 704.   No one disputes that the 2020 Rules satisfy that requirement.

In addition to authorizing judicial review, the APA empowers a reviewing court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."   *Id.* § 705.   Plaintiffs seek such a stay; they also ask the Court to preliminarily enjoin the defendants from enforcing the 2020 Rules.

Those two remedies embody distinct concepts.   A stay "halt[s] or postpon[es] some portion of the proceeding, or . . . temporarily divest[s] an order of enforceability."   *Nken v. Holder*, 556 U.S. 418, 428 (2009).   "[A]n injunction is a judicial process or mandate operating *in personam*"; that is, it is "directed at someone, and governs that party's conduct."   *Id.*   But "[b]oth can have the practical effect of preventing some action before the legality of that action has been conclusively determined."   *Id.*   This similarity is reflected in the legal standards for each remedy:   In deciding whether to issue a stay pursuant to § 705, courts have borrowed the standards for preliminary injunctive relief.   *See, e.g.*, *Nat. Res. Def.*

*Council v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 149 (S.D.N.Y. 2019) (citing

*Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 30 (D.D.C. 2012)).

As the Second Circuit has recently reiterated, the standard for a preliminary

injunction comprises four factors:

> A plaintiff seeking a preliminary injunction must establish that he is
> likely to succeed on the merits, that he is likely to suffer irreparable
> harm in the absence of preliminary relief, that the balance of equities
> tips in his favor, and that an injunction is in the public interest.

*N.Y. v. U.S. Dep't of Homeland Sec.*, ___ F.3d ___, 2020 WL 4457951, at *8 (2d

Cir. Aug. 4, 2020) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)).

When the party to be enjoined is the government, "the final two factors merge." *Id.*

(citing *Nken*, 556 U.S. at 435).

The Court has already addressed the harm to the plaintiffs in connection with

standing. *See id.* at *30 (noting that the same injuries can "establish standing and

irreparable harm"). And it easily concludes that the harm would be irreparable—

that is, not able to be "remedied by an award of monetary damages." *Id.* (internal

quotation marks omitted). Though such damages are possible, they could hardly

compensate plaintiffs for the detrimental effect of discrimination on their health and,

perhaps, their lives. The same can be said for the balance of equities and the public

interest. While HHS surely has an interest in its preferred policy, *cf. id.*, that interest

cannot outweigh the harm to the many non-gender conforming members of the

20

public for whom discrimination imposes a very concrete cost, *see id.* at *31 (preliminary injunction justified by "worse health outcomes").

And so we come to the crux of the matter—whether the plaintiffs have established a likelihood of success of the merits.   Under the APA, a reviewing court may set aside an agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."   5 U.S.C. § 706(2)(a).

HHS argues that its proposed rules cannot be legally incorrect because they simply restate the statutory language and acknowledge (as they must) that an interpretation of that language by the Supreme Court is authoritative.   Thus, it argues that the repeal of the 2016 Rule is inconsequential and therefore plaintiffs fail to establish a likelihood of success on the merits. As it states in its memorandum of law:

> Because the 2020 Rule tracks the text of Section 1557 with respect to the definition of "on the basis of sex," plaintiffs cannot show that it is legally invalid. Nor can plaintiffs demonstrate that HHS acted arbitrarily and capriciously in issuing the Rule, given the thorough reasoning the Agency provided to support its decision.

Defs.' Mem. of Law 1-2.

The agency's contention that the 2020 Rules are legally valid is disingenuous. Moreover, the reasoning that the agency provided to support its decision compels the conclusion—contrary to the Agency's contention—that HHS did indeed act arbitrarily and capriciously in enacting the Rule:

21

### 1. *The 2020 Rules are Contrary to Law.*

In one sense, the Court agrees with HHS's description of the legal import of the 2020 Rules; if they merely restate the statutory bases for prohibited discrimination, then how could they be contrary to law? Certainly, as HHS points out, the rules themselves do not explicitly state that discrimination based on gender identity is permissible.

But regulations must have a preamble. *See* 5 U.S.C. § 553(c). And "[w]hile language in the preamble of a regulation is not controlling over the regulation itself, we have often recognized that the preamble to a regulation is evidence of an agency's contemporaneous understanding of its proposed rules." *Halo v. Yale Health Plan*, 819 F.3d 42, 52-52 (2d Cir. 2016) (quoting *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999)). It is clear from the preamble to the 2020 Rules that a central reason for HHS's action was a fundamental disagreement as to whether Title IX—and, by implication, § 1557—prohibited discrimination based on gender identity and sex stereotyping. HHS took a position on that issue, as it was entitled to do, but that position was effectively rejected by the Supreme Court. To be sure, *Bostock* interpreted Title VII, but HHS itself recognized that the case would have "ramifications" because "Title VII case law has often informed Title IX case law with respect to the meaning of discrimination "on the basis of sex[.]" 85 Fed. Reg. 37,168.

Of course, it is more typical to say that a rule is contrary to law because an agency has attempted to promulgate a rule that countermands a higher authority, such as Congress or the Constitution.   No one would argue that the EEOC could promulgate a rule that employers could discriminate on the basis of gender identity in light of *Bostock*'s interpretation of Title VII.   But the notion that motivation informs the inquiry is hardly unprecedented.   *See, e.g.*, *Romer v. Evans*, 517 U.S. 620, 632 (1996) (holding that state constitutional amendment violated Equal Protection Clause because "its sheer breadth is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects").

Had the agency correctly predicted the outcome in *Bostock*, it may well have taken a different path.   Instead, it continued on the same path even after *Bostock* was decided.   This satisfies the Court that the premise of the repeal was a disagreement with a concept of sex discrimination later embraced by the Supreme Court.   Therefore, the repeal was contrary to law.

### 2.  In any Event, the Agency Acted Arbitrarily and Capriciously.

HHS contends that its thorough reasoning for its proposed rules shows that it did not act arbitrarily or capriciously.   Nothing could be further from the truth.   As the preamble makes perfectly clear, its reasoning was based upon its pre-*Bostock* understanding and contention that "reasonable distinctions on the basis of sex, as the

biological binary of male and female, may, and often must, play a part in the decision-making process—especially in the field of health services."   85 Fed. Reg. at 37,185 (internal quotation marks omitted).

An agency action can be "arbitrary and capricious" for many reasons, but one is that the agency has "entirely failed to consider an important aspect of the problem."   *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).   And a reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given."   *Id*. (internal quotations omitted).

Again, the unmistakable basis for HHS's action was a rejection of the position taken in the 2016 Rules that sex discrimination includes discrimination based on gender identity and sex stereotyping.   Whether or not it is dispositive of that issue with respect to Title IX and § 1557, *Bostock* is at least "an important aspect of the problem," *State Farm*, 463 U.S. at 43.   By its own admission, HHS knew that the case was pending and would have "ramifications"; it must also have known that a decision would be handed down before the end of the Supreme Court's term.   It then had an (admittedly brief) opportunity to re-evaluate its proposed rules after the case was decided contrary to its expectations.

Instead, it did nothing.   The timing might even suggest to a cynic that the agency pushed ahead specifically to avoid having to address an adverse decision.

24

But whether by design or bureaucratic inertia, the fact remains that HHS finalized the 2020 Rules without addressing the impact of the Supreme Court's decision in *Bostock*.   This makes it likely that plaintiff will succeed on their claim that the rules are arbitrary and capricious.

### III

For the foregoing reasons, the Court concludes that plaintiffs have standing to sue and that they have met the legal requirements for preliminary injunctive relief. The Court reiterates the same practical concern it raised at oral argument: When the Supreme Court announces a major decision, it seems a sensible thing to pause and reflect on the decision's impact.  *See* Tr. of Aug. 12, 2020 at 21 ("[I]t may be a simple thing for the agency to maybe reconsider the Rule, in light of *Bostock*, and come out with something that's simple and that just goes right to the heart of it and eliminates all this obvious confusion that we're having throughout this country right now about this issue.").   Since HHS has been unwilling to take that path voluntarily, the Court now imposes it.

Accordingly, the Court stays the repeal of the 2016 definition of discrimination on the basis of sex.   As a result, the definitions of "on the basis of sex," "gender identity," and "sex stereotyping" currently set forth in 45 C.F.R. § 92.4 will remain in effect.   In addition, the Court preliminarily enjoins the defendants

from enforcing the repeal.   Both the stay and the injunction shall remain in effect

pending further order of this Court.

 **SO ORDERED.**


 _/S/ Frederic Block_____
 FREDERIC BLOCK
 Senior United States District Judge

Brooklyn, New York
August 17, 2020