**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TANYA ASAPANSA-JOHNSON WALKER, <br><br><br><br> *Plaintiff,* <br><br> v. <br><br><br> ROBERT F. KENNEDY, JR., in his official capacity as the Secretary of the United States Department of Health and Human Services, and <br><br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br><br> *Defendants*. | Civil Action No. 20-cv-02834-FB-SMG |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT

**HUMAN RIGHTS
CAMPAIGN FOUNDATION**

Cynthia C. Weaver
1640 Rhode Island Ave, NW
Washington, DC 20036-3278
Telephone: (202) 527-3669
Facsimile: (202) 347-5323
*cynthia.weaver@hrc.org*

*Counsel for Plaintiff
Tanya Asapansa-Johnson Walker*

**BAKER & HOSTETLER LLP**

Edward J. Jacobs
Kathryn M. Zunno-Freaney
Michael A. Sabella
45 Rockefeller Plaza
New York, New York 10111-0100
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
*ejacobs@bakerlaw.com
kzunno@bakerlaw.com
msabella@bakerlaw.com*

Saidah A. Grimes**
One North Wacker Drive
Suite 3700
Chicago, Illinois 60606-2841
Telephone: (312) 416-6200
Facsimile: (312) 416-6201
*sgrimes@bakerlaw.com*

Gregory A. Tanner**
1170 Peachtree Street, NE, Suite 2400
Atlanta, Georgia 30309-7676
Telephone: (404) 459-0050
Facsimile: (404) 459-5734
*gtanner@bakerlaw.com*

*Counsel for Plaintiff*
*Tanya Asapansa-Johnson Walker*

***Motion for pro hac vice admission pending*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 3

APPLICABLE LEGAL STANDARD ................................................................................. 7

ARGUMENT ...................................................................................................................... 8

    I.     The 2020 Rule Exceeds HHS' Statutory Authority.................................................. 9

    II.    The 2020 Rule is Not In Accordance with the Law. ......................................... 12

        A.   HHS Ignored Well-Established, Pre-*Bostock* Case Law That Includes Gender Identity-Based Discrimination within Sex Discrimination.................................................. 13

        B.   The 2020 Rule Contradicts Supreme Court Precedent in *Bostock*. ............................ 15

        C.   The 2020 Rule is Contrary to Law and Motivated by Animus Toward the LGBTQ Community.................................................. 16

    III.   The 2020 Rule is Arbitrary and Capricious and an Abuse of Discretion...................... 18

        A.   HHS Misinterpreted the Administrative Record and Failed to Consider or Meaningfully Address Evidence of Severe Harms Caused by the 2020 Rule...................... 18

        B.   HHS' Justifications for the 2020 Rule Cannot Withstand Scrutiny. ............................ 20

        C.   The 2020 Rule is Unconstitutional. ......................................................................... 22

CONCLUSION................................................................................................................... 23

**TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Adkins v. City of New York*, 143 F. Supp. 3d 134 (S.D.N.Y. 2015) .................................................. 22

*Am. Steamship Owners Manual Prot. & Indem. Assoc., Inc. v. United States*, 489 F. Supp. 3d 106 (E.D.N.Y. 2020) ............................................................................................................................. 7

*Barnes v. City of Cincinnati*, 401 F.3d 729 (6th Cir. 2005) ......................................................... 4, 14

*Bennett v. Spear*, 520 U.S. 154 (1997) ............................................................................................ 7

*Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020) ...................................................... passim

*Boyden v. Conlin*, 341 F. Supp. 3d 979 (W.D. Wisc. 2018) ......................................................... 14

*Centola v. Potter,* 183 F. Supp. 2d 403 (D. Mass. 2002) ................................................................ 5

*City of Arlington v. FCC*, 569 U.S. 290 (2013) .......................................................................... 8, 12

*Connecticut v. U.S. Dep't of Com.*, No. 04 Civ. 1271 (SRU), 2007 WL 2349894 (D. Conn. Aug. 15, 2007) ........................................................................................................................................ 7

*Cruz v. Zucker*, 195 F. Supp. 3d 554 (S.D.N.Y. 2016) ................................................................. 14

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172 (9th Cir. 2008) ..................................................................................................................................................... 20

*Defs. of Wildlife v. Babbitt*, 958 F. Supp. 670 (D.D.C. 1997) ...................................................... 20

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) .......................... 20, 21

*Douglas v. INS*, 28 f.3D 241 (2d Cir. 1994) .................................................................................... 8

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ............................................................ 20

*Fam. Plan. Ass'n of Maine v. United States Dep't of Health & Hum. Servs.*, 466 F. Supp. 3d 259 (D. Me. 2020) ................................................................................................................................... 9

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ............................................. 12

*Flack v. Wis. Dep't of Health Servs.*, 395 F. Supp. 3d 1001 (W.D. Wis. 2019) ............................ 14

*Florida v. U.S. Dep't of Health & Hum. Servs.*, No. 8:24-cv-01080-WFJ-TGW (M.D. Fla. July 3, 2024) .............................................................................................................................................. 7

*Franciscan Alliance v. Burwell*, 227 F. Supp. 3d 660 (N.D. Tex. 2016) ........................................ 6

*Georgia River Network v. U.S. Army Corps of Eng'rs*, 517 F. App'x 699 (11th Cir. 2013) ......... 20

*Heller v. Columbia Edgewater Country Club*, 195 F. Supp. 2d 1212 (D. Or. 2002) ...................... 5

*Kadel v. Folwell,* 446 F. Supp. 3d 1 (M.D.N.C. 2020) ................................................................. 14

*Kastl. v. Maricopa Cnty. Cmty. Coll. Dist.*, No. 02-cv-1531 (PHX/SRB), 2004 WL 2008954 (D. Ariz. June 3, 2004) .................................................................................................................. 13

*King v. Burwell*, 570 U.S. 473 (2015) ...................................................................................... 4

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ...................................................... 12

*Lopez v. River Oaks Imaging & Diagnostic Grp., Inc.*, 542 F.Supp.2d 653 (S.D. Tex. 2008) ..... 14

*McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182 (D.C. Cir. 2004) ........ 21

*Miles v. New York University*, 979 F. Supp. 248 (S.D.N.Y. 1997) .......................................... 13

*Miller v. United Welfare Fund*, 72 F.3d 1066 (2d Cir. 1995) ................................................. 7

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) 8, 18

*Nat. Res. Def. Council v. EPA*, 658 F.3d 200 (2d Cir. 2011) ................................................. 8

*Nat. Res. Def. Council, Inc. v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95 (2d Cir. 2013) . 8

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ................................................ 2

*New York v. U.S. Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475 (S.D.N.Y. 2019) ......... 20

*Norsworthy v. Beard*, 87 F. Supp. 3d. 1104 (N.D. Cal. 2014) ............................................... 22

*Obergefell v. Hodges*, 576 U.S. 644 (2015) ..................................................................... 8, 22

*Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090 (S.D. Cal. 2017) .............. 14

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) .............................................................. 4

*Public Citizen, Inc. v. Mineta*, 340 F.3d 39 (2d Cir. 2003) ................................................ 21

*Romer v. Evans*, 517 U.S. 620 (1996) ................................................................................ 23

*Rosa v. Park West Bank & Trust Co.*, 214 F.3d 213 (1st Cir. 2000) ....................................... 14

*Rubin v. Miller*, 478 F. Supp. 3d 499 (S.D.N.Y. 2020) ......................................................... 8

*Rumble v. Fairview Health Servs.*, No. 14-cv-2037, 2015 WL 1197415 (D. Minn. Mar. 16, 2015) ......................................................................................................................... 13, 14

*Schroer v. Billington*, 577 F. Supp. 2d 293 (D.D.C. 2008) ................................................... 4

*Schwenk v. Hartford*, 204 F. 3d 1187 (9th Cir. 2000) .......................................................... 13

*See Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1 (2020) .............................. 19

*Sierra Club v. Pruitt*, 293 F. Supp. 3d 1050 (N.D. Cal. 2018) .............................................. 12

*Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004) ...................................................... 4, 14

*Tennessee v. Becerra*, No. 1:24-cv-00161-LG-BWR, 2024 WL 3283887 (S.D. Miss. July 3, 2024) ........................................................................................................................... 7

*Texas v. Becerra*, No. 6:24-cv-00211-JDK, 2024 WL 3297147 (E.D. Tex. July 3, 2024) ............. 7

*Tronetti v. Healthnet Lakeshore Hosp.,* No. 03–CV–0375E (SC), 2003 WL 22757935 (W.D.N.Y. Sept. 26, 2003) ............................................................................................................... 5

*Windsor v. United States*, 699 F.3d 169 (2d Cir. 2012), aff'd, 570 U.S. 744 (2013) .................... 22

*Zhao v. U.S. Dep't of Justice*, 265 F.3d 83 (2d Cir. 2001) ................................................................ 8

**STATUTES**

20 U.S.C. § 1681 ................................................................................................................................ 5

29 U.S.C. § 794 ................................................................................................................................. 5

42 U.S.C. § 18114 ...................................................................................................................... 10, 14

42 U.S.C. § 2000d ............................................................................................................................. 5

42 U.S.C. § 2000e-2 ................................................................................................................... 2, 3, 5

42 U.S.C. § 6101 ............................................................................................................................... 5

5 U.S.C. § 706(2) ..................................................................................................................... passim

**OTHER AUTHORITIES**

2010 Patient Protection and Affordable Care Act .................................................................... 2, 4, 5

42 U.S.C. § 18116 ................................................................................................................ 2, 5, 10, 14

Administrative Procedures Act ........................................................................................................ 3

Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) ......................................................... 18

Exec. Order No. 14201, 90 Fed. Reg. 9279 (Feb. 5, 2025) .......................................................... 18

**RULES**

81 Fed. Reg. 31,376 (May 18, 2016) ..................................................................................... 3, 6, 15, 19

89 Fed. Reg. 37,522 (May 6, 2024) ................................................................................................. 7

85 Fed. Reg. 37,160 (June 19, 2020) ...................................................................................... passim

Plaintiff Tanya Asapansa-Johnson Walker, by and through her undersigned attorneys, respectfully requests that this Court grant her motion for summary judgment, find that there is no genuine issue of fact, and determine that she is entitled to judgment as a matter of law because Defendants United States Department of Health and Human Services ("HHS" or the "Department") and the Secretary of HHS' regulation, *Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority*, 85 Fed. Reg. 37,160 (June 19, 2020) (the "2020 Rule"), exceeds statutory authority, is contrary to law, and is arbitrary and capricious.

## PRELIMINARY STATEMENT

This is a case concerning HHS' disregard of the fundamental rights of members of the lesbian, gay, bisexual, transgender, and queer ("LGBTQ") community to seek health care free from discrimination as originally contemplated under the 2010 Patient Protection and Affordable Care Act (the "ACA"). The 2020 Rule unlawfully (i) defines discrimination "on the basis of sex" to specifically exclude a person's transgender status, sexual orientation, and/or gender identity; (ii) removes prior prohibitions against discrimination in health care for members of the LGBTQ community; and (iii) eliminates remedial procedures to address discrimination against this community by health care professionals. It did so in violation of the Constitution, certain civil rights statutes, and controlling United States Supreme Court ("Supreme Court") precedent.

The ACA broadly prohibits discrimination on the basis of race, color, national origin, sex, age, or disability in health care. 42 U.S.C. § 18116 ("Section 1557"). Congress intended for Section 1557 to build on protections afforded under several civil rights laws, including Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 ("Title VII"). *See* 42 U.S.C. § 18116(a). After an exhaustive notice-and-comment period, and consistent with legal precedent and prevailing interpretations of the statutory language found in these civil rights statutes, HHS promulgated a

rule in 2016 (the "2016 Rule") that explicitly interpreted the definition of discrimination "on the basis of sex" to be inclusive of identity and sex stereotyping-based discrimination. 81 Fed. Reg. 31,376, 31,471-31,468 (May 18, 2016).

However, on June 12, 2020, HHS promulgated the 2020 Rule, which reversed the 2016 Rule and limited prohibitions against discrimination "on the basis of sex" to "binary categories of male and female only" and excluded prohibitions against discrimination on the basis of gender identity and sex stereotyping. 85 Fed. Reg. at 37,179. In doing so, HHS defied Congress' express intent to increase Americans' access to health care and ensure such access was free from discrimination, particularly for those in the most vulnerable communities, such as people who are LGBTQ. *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538–39 (2012).

Incredibly, the 2020 Rule was promulgated mere days after the Supreme Court issued its decision in *Bostock v. Clayton County, Georgia*, 590 U.S. 644, 660 (2020) ("*Bostock*"), which held it unlawful under Title VII to fire a transgender employee based on gender stereotypes, settling once and for all that discrimination "on the basis of sex" included gender identity, gender expression, and gender-based stereotypes.

In addition to being contrary to law, the 2020 Rule is not a permissible exercise of rulemaking authority or discretion under the Administrative Procedure Act (the "APA"). HHS hastily promulgated the 2020 Rule without the diligence required by the APA and with no constitutionally supportable justification. HHS ignored the thousands of comments and pleas from concerned Americans describing the detrimental impact the 2020 Rule would have in stripping them of protections against discrimination in seeking their health care, causing extreme anxiety, emotional distress, stigma, and delays in seeking health care or avoiding health care altogether.

The only paltry justification offered by HHS in support of the 2020 Rule is that it will save on administrative costs. However, the Administrative Record is *void* of any facts or evidence in support of this. Rather, the 2020 Rule appears—on its face—to be founded upon a foundation of animus toward the LGBTQ community which is further evidenced by the Trump Administration's recent executive orders attacking gender identity, illustrating that the purported "cost savings" from the 2020 Rule was a pretextual excuse. The 2020 Rule is therefore also contrary to law, in excess of statutory authority, arbitrary, capricious, an abuse of discretion, and in violation of the equal protection guarantee of the Fifth Amendment of the United States Constitution.

At bottom, the 2020 Rule ignores the profound impact of discrimination in health care experienced by members of the LGBTQ community and strips the community of their access to anti-discrimination protections under the ACA. Accordingly, Plaintiff is entitled to summary judgment.

## STATEMENT OF FACTS

Plaintiff is a transgender woman and veteran with chronic medical conditions requiring continuous care. *See* Walker Decl. ¶¶ 29-31, ECF No. 1. She has been denied treatment, harassed, shamed, diminished when receiving treatment, and forced to accept substandard health care on account of her identity as a trans woman. *See id.* at ¶¶ 18, 20-21, 37-38, 58-64, 70-73. While Plaintiff was recovering from her second lung cancer surgery she was misgendered, physically abused, harassed, negligently left to lie in her own feces for hours, and had to push herself, her oxygen tank and IV pole—all with one arm (as her other was immobile due to the lung cancer surgery)—to the bathroom to clean herself. *Id.* at ¶¶ 58-66. Sadly, Plaintiff's experience is a common one for many in the LGBTQ community. These experiences, and stories of these

experiences, result in members of the LGBTQ community suffering from inadequate health care, not receiving health care, or avoiding health care treatments altogether.

Congress sought to improve access to quality, affordable health care when it enacted the ACA. *See King v. Burwell*, 570 U.S. 473, 478-80 (2015). The ACA explicitly protects individuals from discrimination in health care:

> [A]n individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq.*), title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 *et seq.*), the Age Discrimination Act of 1975 (42 U.S.C. § 6101 *et seq.*), or section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments).

42 U.S.C. § 18116.

Like Title VII, Section 1557 prohibits discrimination on the basis of race, color, national origin, sex, age, or disability in health care programs and activities. *See* 85 Fed. Reg. at 37,161 n.3 (referencing Title VII in the ACA); *see also id.* at 37,168 ("Title VII case law has often informed Title IX case law with respect to the meaning of discrimination "on the basis of sex"); *id.* at 31,469 (reciting prohibited discrimination). At the time Congress enacted the ACA, a slew of federal cases, including in the context of Title VII, had interpreted "discrimination on the basis of sex" to include discrimination on the basis of gender identity, sex stereotyping, and sexual orientation. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250–52 (1989) (concluding that "sex stereotyping" is sex discrimination); *see also, e.g., Barnes v. City of Cincinnati*, 401 F.3d 729, 737 (6th Cir. 2005) ("gender identity" covered under Title VII); *Smith v. City of Salem*, 378 F.3d 566, 572 (6th Cir. 2004) (same); *Schroer v. Billington*, 577 F. Supp. 2d 293, 306–08 (D.D.C. 2008) (same); *Tronetti*

4

*v. Healthnet Lakeshore Hosp.,* No. 03–CV–0375E (SC), 2003 WL 22757935, at \*4 (W.D.N.Y. Sept. 26, 2003) (same); *Centola v. Potter,* 183 F. Supp. 2d 403, 410 (D. Mass. 2002) (finding sexual orientation covered under Title VII); *Heller v. Columbia Edgewater Country Club*, 195 F. Supp. 2d 1212, 1222–24 (D. Or. 2002) (same).

Consistently, and after careful review of evidence and an ample notice and comment period—having received almost 25,000 comments that detailed the harrowing experiences of the LGBTQ community in seeking health care—HHS promulgated the 2016 Rule, which reflected "the current state of nondiscrimination law" and ensured "the most robust set of protections supported by the courts" to prevent discrimination in the health care context. 81 Fed. Reg. at 31,376, 31,388; *see also id.* at 31,405-06 (concluding that, for example, harassment and discrimination in the health care setting impeded an individual's ability to participate in and benefit from health care). As a result, the 2016 Rule "clarified and codified existing nondiscrimination requirements and set[] forth new standards to implement Section 1557." *Id.* at 31,376. Among other things, it distilled and clarified several definitions, including "gender identity," "on the basis of sex," and "sex stereotyping," in a way that provided broad protections against discrimination for the LGBTQ community. *Id.* at 31,467–68. HHS made clear that these definitions protecting individuals from discrimination applied "regardless of sex assigned at birth, gender identity, or recorded gender," *id.* at 31,429, and HHS extended this prohibition to the provision of care and insurance coverage, *id.* at 31,471. HHS also explained that the use of "sex stereotyping" included protections on the basis of sexual orientation: "discrimination on the basis of sex includes, at a minimum, sex discrimination related to an individual's sexual orientation where the evidence establishes that the discrimination is based on gender stereotypes." 81 Fed. Reg. at 31,388–90.

Yet the later-enacted 2020 Rule eviscerated protections for the LGBTQ community by removing "gender identity" and "sex stereotyping" from the ambit of protections under the statute and redefining "sex" as a "male and female" "in a binary and biological sense" only. *See id.* at 27,857, 27,883–84. The at-the-time proposed 2020 Rule purported to remove associated non-discrimination protections and most restrictions on discrimination in the context of insurance. *See id.* at 27,860. In response to the proposed 2020 Rule, HHS received nearly 200,000 comments underscoring the serious discrimination faced by the LGBTQ community when accessing health care and the potential for the devastating effects of removing discrimination protections. 85 Fed. Reg. at 37,164. These concerns went largely unanswered by HHS, as it explicitly (and without justification) interpreted Section 1557 as excluding protections against discrimination on the basis of gender identity and sexual orientation. *See id.* at 37,194. HHS asserted, without support, that the 2020 Rule would result in cost savings in the billions by eliminating unnecessary regulatory burdens. Further, in spurious support of the 2020 Rule, HHS relied on *Franciscan Alliance v. Burwell*, 227 F. Supp. 3d 660 (N.D. Tex. 2016).[1] However, neither that case nor HHS' unsupported promise of "cost savings" of nearly $3 billion dollars merited the 2020 Rule's enactment.

On May 6, 2024, HHS under the Biden Administration promulgated a new rule, *Nondiscrimination in Health Programs and Activities*, 89 Fed. Reg. 37,522 (the "2024 Rule"), which largely reversed the discriminatory intent and effect of the 2020 Rule:

> Finalizing the amendments to the nondiscrimination protections to explicitly prohibit discrimination on the basis of sex characteristics, including intersex traits; pregnancy or related conditions; sexual orientation; gender identity; and sex stereotypes is warranted to help remedy health care discrimination and to better address barriers to health equity for LGBTQI+ individuals.

---

[1] *Franciscan Alliance* was decided four years before the 2020 Rule and was superseded by the Supreme Court's decision in *Bostock*.

But the 2024 Rule was enjoined and never took effect due to two nationwide injunctions and one state-wide injunction.[2] As a result, the 2020 Rule remains in effect, which this Court recognized in its July 8, 2025 Memorandum and Order denying Defendants' motion to dismiss. ECF No. 62.

## APPLICABLE LEGAL STANDARD

In an APA case, the court relies on the Administrative Record for the material facts to determine if the agency's decision exceeds its authority. *See Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995) ("[A] district court's review under the arbitrary and capricious standard is limited to the administrative record."); *see also* 5 U.S.C. § 706(2)(C) (setting aside and holding unlawful "agency action" that is "in excess of statutory . . . authority."). A reviewing court "must hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E). "When a party seeks review of agency action under the APA, the 'entire case on review is a question of law' such that '[j]udicial review of agency action is often accomplished by filing cross-motions for summary judgment.'" *Am. Steamship Owners Manual Prot. & Indem. Assoc., Inc. v. United States*, 489 F. Supp. 3d 106, 128 (E.D.N.Y. 2020) (quoting *Connecticut v. U.S. Dep't of Com.*, No. 04 Civ. 1271 (SRU), 2007 WL 2349894, at *1 (D. Conn. Aug. 15, 2007)).[3]

An agency exceeds its statutory authority when "'the agency has gone beyond what Congress has permitted it to do.'" *Nat. Res. Def. Council, Inc. v. Nat'l Highway Traffic Safety*

---

[2] Mem. Op. & Order, *Tennessee v. Becerra*, No. 1:24-cv-00161-LG-BWR, 2024 WL 3283887 (S.D. Miss. July 3, 2024), ECF No. 29; Order, *Florida v. U.S. Dep't of Health & Hum. Servs.*, No. 8:24-cv-01080-WFJ-TGW (M.D. Fla. July 3, 2024), ECF No. 41; Mem. Op. & Order, *Texas v. Becerra*, No. 6:24-cv-00211-JDK, 2024 WL 3297147 (E.D. Tex. July 3, 2024), ECF No. 18.

[3] There is no legitimate dispute that the 2020 Rule is a final agency action because the 2020 Rule: (1) marks the "consummation" of the Department's decision-making process, and (2) is one "by which rights or obligations have been determined, or from which legal consequences will flow." *See, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal punctuation omitted).

*Admin.*, 894 F.3d 95, 108 (2d Cir. 2013) (quoting *City of Arlington v. FCC*, 569 U.S. 290, 297–98 (2013)). An agency abuses its discretion if it "provides no rational explanation, inexplicably departs from established policies, is devoid of any reasoning, or contains only summary or conclusory statements[.]" *Zhao v. U.S. Dep't of Justice*, 265 F.3d 83, 93 (2d Cir. 2001) (citing *Douglas v. INS*, 28 f.3D 241, 243 (2d Cir. 1994)).

An agency's decision is arbitrary or capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Nat. Res. Def. Council v. EPA*, 658 F.3d 200, 215 (2d Cir. 2011) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency is required to "'articulate a satisfactory explanation for its action' based on review of the record." *Rubin v. Miller*, 478 F. Supp. 3d 499, 503 (S.D.N.Y. 2020) (quoting *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43).

## ARGUMENT

As explained below, Plaintiff is entitled to summary judgment because the 2020 Rule violates the APA and is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). Hastily promulgated amidst the deadly coronavirus pandemic—and still in effect today—the 2020 Rule allows for discrimination against LGBTQ people and violates the Constitution's guarantee that all persons, regardless of gender identity, are entitled to "equal dignity in the eyes of the law." *Obergefell v. Hodges*, 576 U.S. 644, 681 (2015).

## I.      The 2020 Rule Exceeds HHS' Statutory Authority.

The 2020 Rule exceeds HHS' statutory authority under 5 U.S.C. § 706(2) because it was promulgated without the diligence required by the APA or any constitutionally supportable justification. While Section 1557 permits HHS to "promulgate regulations to implement" the ACA's non-discrimination provision, 42 U.S.C. § 18116(c), HHS instead eliminated important nondiscrimination provisions and interprets "sex" to be solely "biological sex," *i.e.*, based on a person's sex assigned at birth. *See* 85 Fed. Reg. at 37,168, 37,177-79, 37,189. These actions directly contradict the well-established meaning of "sex", thus exceeding HHS' statutory authority. The ACA did not delegate authority to HHS to promulgate regulations that rewrite the ACA's protections against discrimination on the basis of sex and gender identity.

In addition, Congress limited HHS' rule-making authority by prohibiting it from promulgating "any regulation that," among other things, "(1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care;" "(2) impedes timely access to health care services;" . . . or "(6) limits the availability of health care treatment for the full duration of a patient's medical needs." 42 U.S.C. § 18114. The 2020 Rule exceeds HHS statutory authority given its devastating impact on the LGBTQ community. *See Fam. Plan. Ass'n of Maine v. United States Dep't of Health & Hum. Servs.*, 466 F. Supp. 3d 259 (D. Me. 2020) (noting that the challenged rule "impose[s] an obstacle in the path of a patient pursuing medical care."). The 2020 Rule imposes serious barriers for LGBTQ people seeking health care and removes protections to prevent them from being denied care or coverage solely because of their sexual orientation and/or gender identity.

HHS claimed that no data showed that its interpretation of "on the basis of sex" in the 2020 Rule would "disproportionately burden individuals on the basis of sexual orientation and/or gender

9

identity." *See* 85 Fed. Reg. at 37,160, 37,182. Moreover, HHS claimed that the 2020 Rule would eliminate unnecessary regulatory burdens imposed by the 2016 Rule and thus would save about $3 billion over five years. *Id.* at 37,162-63. HHS avers that the 2020 Rule "eliminates provisions of the 2016 Rule that . . . unnecessarily duplicat[e] or overlap[] with existing civil rights law and regulations, [and] were either inconsistent or redundant with existing law and regulations, and so were likely to cause confusion about the rights of individuals and corresponding responsibilities of providers." *Id.* at 37,162.

But HHS' alleged cost savings argument is specious, at best, and not supported by any data or evidence. Cost savings with respect to Section 1557 purport to stem from "restor[ing] the rule of law by confining regulation within the scope of the Department's legal authority; restor[ing] Federalism by leaving the States decisions properly reserved to them; and remov[ing] unjustified burdens on providers' medical judgment." *Id.* at 37,163. Conspicuously absent, however, is any support for this proposition or any plan to enact any savings. On the other side, when contemplating the cost to the LGBTQ community of eliminating Section 1557's protections against gender identity-based discrimination, HHS said it did not anticipate any costs from gutting such protections, and that "any possible costs . . . are not calculable based on available data." *Id.*

This position ignored thousands of comments from concerned individuals detailing harms they could suffer if Section 1557's antidiscrimination protections for the LGBTQ community were eroded. *Id.* at 37,164. For example, several commenters expressed concern that "eliminating discrimination protections in Section 1557 will cause confusion about patients' rights and remove access to administrative remedies that were previously available." *Id.* In fact, many commenters expressed Plaintiff's concern that the 2020 Rule would "remove civil rights protection for a number of vulnerable groups, including . . . LGBT individuals." *Id.* at 37,165. Some commenters

10

forecasted that "the proposed rule would lead to increased discrimination in healthcare, which would lead people to delay or forego healthcare and would result in adverse health outcomes and greater overall healthcare costs to individuals." *Id.*

Specifically, the following comments—submitted to but unaddressed by HHS—detailed the types of harms LGBTQ individuals would suffer under the 2020 Rule (*see, e.g.*, Comments to 2020 Rule (June 14-18, 2019)):

> 1.     I am a transgender man, I have created a care space for other transmen to find advocacy. It is already impossible to find trans friendly or even trans informed medical care in my home red state of Arizona! Please dont take away our rights, Im begging you, nay Im demanding that you witness that my rights ARE HUMAN RIGHTS. We arent going away, and will grassroot and take any sane means necessary to assure that we are seen and treated like human beings. This isnt up for discussion and if I were a cis male, I and my brothers would NEVER even have to question this. Times up.

> 2.     I am a council member and for a LGBTQA religious organization in Chicago. Religious liberties are incredibly important to me. I have seen as much discrimination against myself for my minority faith as I have for my sexuality, if not more, so this is not a subject I take lightly. I am extremely concerned about the implications of overturning civil rights protections for patients in the name of religious freedom. When people are refused medical care, they suffer complications, up to and including death. No one in this country should die because their doctor or nurse has a moral issue with how that patient lives their life….

> 3.     This is absurd at best. It leaves transgender people in a vulnerable position as it concerns our health. For me, as a retired military veteran I have some degrees of access through government health care, something I feel I deserve after all my years of serving and hiding who I am for the privilege to serve this country. To deny tens of thousands of transgender people health care because we're a "burden" is reprehensible. So many people think we are asking for "special rights" and this simply is not the truth. Since when is asking for the same rights that others have special? Take the time to consider all the medical organizations that support our existence. We are too far along where information technology is concerned to be so ignorant of the medical data generated that explains who we are. Just because we make up a very small minority population in this

country does not mean we should be brushed aside, treated as if we don't exist. Concerning that, how can such a small minority, approximately 4% of the population at best be such heavy financial burden? I'm a baby boomer. Our generation is much more costly health wise than the trans population will ever be. It's well past time that the discrimination ends and we are allowed to live our lives enjoying the same benefits that all other citizens of this great country enjoys. The current Administration is trying to take everything away from us. I like to believe that I served to help preserve the rights of every citizen. Apparently my service did not protect my own rights, nor the rights of others like myself. Disgraceful that this should even be considered.

Simply put, there is no factual dispute that the 2020 Rule does and will cause significant harm to an already vulnerable and population of Americans, as evidenced by the Administrative Record. Accordingly, HHS exceeded its statutory authority by failing to account for the consequences the 2020 Rule would inflict.

## II.    The 2020 Rule is Not In Accordance with the Law.

Contrary to protections guaranteed in 5 U.S.C. § 706(2)(A), HHS consistently ignored and intentionally contradicted multiple laws when it promulgated the 2020 Rule. "[A]n administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress." *Sierra Club v. Pruitt*, 293 F. Supp. 3d 1050, 1058 (N.D. Cal. 2018) (*quoting FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000)); *City of Arlington*, 569 U.S. at 297–98. HHS is not entitled to deference to its interpretations, including redefining discrimination "on the basis of sex" to mean only biological sex. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 396 (2024). Accordingly, the 2020 Rule is not in accordance with the language and intent of the ACA or case law holding that sex discrimination includes discrimination on the basis of gender identity or gender expression.

12

**A. HHS Ignored Well-Established, Pre-*Bostock* Case Law That Includes Gender Identity-Based Discrimination within Sex Discrimination.**

Section 1554 of the ACA prohibits the Secretary of HHS from promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care," "impedes timely access to health care services," "interferes with communications regarding a full range of treatment options between the patient and the provider," or "limits the availability of health care treatment for the full duration of a patient's medical needs." 42 U.S.C. § 18114. Section 1557 prohibits discrimination as articulated in "title VI, title IX, section 794, or such Age Discrimination Act." 42 U.S.C. § 18116(a). These statutes referenced and incorporated into Section 1557 evidence Congress' intent to create a new, health-specific, anti-discrimination cause of action that is subject to a singular standard, regardless of a plaintiff's protected class status." *Rumble v. Fairview Health Servs.*, No. 14-cv-2037, 2015 WL 1197415, at *7 n.3, 10 (D. Minn. Mar. 16, 2015).

Prior to enacting the ACA in 2010, several federal courts, including the Supreme Court, interpreted sex discrimination under the relevant statutory regimes incorporated by reference into Section 1557 to include discrimination based on gender identity and sexual orientation. *See Price Waterhouse*, 490 U.S. at 250–52 (concluding that "sex stereotyping" is sex discrimination); *Kastl. v. Maricopa Cnty. Cmty. Coll. Dist.*, No. 02-cv-1531 (PHX/SRB), 2004 WL 2008954 at *2 (D. Ariz. June 3, 2004) ("It is well settled that Title VII's prohibition on sex discrimination encompasses discrimination against an individual for failure to conform to sex stereotypes."); *Miles v. New York University*, 979 F. Supp. 248, 250 n.4 (S.D.N.Y. 1997) ("the Title IX term 'on the basis of sex' is interpreted in the same manner as similar language in Title VII"); *See, e.g., Schwenk v. Hartford*, 204 F. 3d 1187, 1198–1203 (9th Cir. 2000) (finding gender identity to be covered under the GMVA); *Rosa v. Park West Bank & Trust Co.*, 214 F.3d 213, 215–16 (1st Cir.

2000) (finding gender identity to be covered under the Equal Credit Opportunities Act); *Smith*, 378 F.3d at 574 (finding gender identity to be covered under Title VII); *Barnes*, 401 F.3d at 741 (same); *Schroer*, 577 F. Supp. 2d at 306–08 (same); *Lopez v. River Oaks Imaging & Diagnostic Grp., Inc.*, 542 F.Supp.2d 653, 660–61 (S.D. Tex. 2008) (same).

The breadth of case law prior to *Bostock* held that "[b]ecause the term 'transgender' describes people whose gender expression differs from their assigned sex at birth, discrimination based on an individual's transgender status constitutes discrimination based on gender stereotyping." *Rumble*, 2015 WL 1197415, at *2; *see also Boyden v. Conlin*, 341 F. Supp. 3d 979, 997 (W.D. Wisc. 2018) ("Whether because of differential treatment based on natal sex, or because of a form of sex stereotyping where an individual is required effectively to maintain his or her natal sex characteristics, the Exclusion on its face treats transgender individuals differently on the basis of sex, thus triggering the protections of Title VII and the ACA's anti-discrimination provision."); *Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1099 (S.D. Cal. 2017) (stating that Section 1557 covered discrimination based on gender identity); *Cruz v. Zucker*, 195 F. Supp. 3d 554, 580 (S.D.N.Y. 2016) (determining that sex discrimination comprised discrimination on the basis of gender identity); *Kadel v. Folwell*, 446 F. Supp. 3d 1, 18 (M.D.N.C. 2020) ("The characteristics of sex and gender are directly implicated . . . the diagnosis at issue—gender dysphoria—only results form a discrepancy between assigned sex and gender identity."); *Flack v. Wis. Dep't of Health Servs.*, 395 F. Supp. 3d 1001, 1014–15 (W.D. Wis. 2019) (holding that Section 1557 barred discrimination based on gender identity).

When HHS promulgated the 2016 Rule, it did so in a manner that was consistent with prevailing case law, including sexual orientation and gender identity-based discrimination within sex-based discrimination. The 2020 Rule does not consider the abundance of cases contradicting

14

its repeal of the 2016 Rule definitions, nor does HHS offer any sound justification for doing so.

Therefore, the 2020 Rule is contrary to law.

**B.  The 2020 Rule Contradicts Supreme Court Precedent in *Bostock*.**

The 2020 Rule contradicts *Bostock*, which was briefed, argued and decided before the 2020

Rule took effect. Moreover, HHS explicitly acknowledged in promulgating the 2020 Rule that

*Bostock*, which was pending before the Supreme Court could impact its interpretation of sex-based

discrimination. *See, e.g.*, 84 Fed. Reg. 27846,27855, n.62 (June 14, 2019):

> On April 22, 2019, the U.S. Supreme Court granted three petitions
> for writs of certiorari, raising the question whether Title VII's
> prohibition on discrimination on the basis of sex also bars
> discrimination on the basis of gender identity or sexual orientation.
> Because Title IX adopts the substantive and legal standards of Title
> VII, a holding by the U.S. Supreme Court on the definition of 'sex'
> under Title VII will likely have ramifications for the definition of
> 'sex' under Title IX, and for the cases raising sexual orientation or
> gender identity claims under Section 1557 and Title IX which are
> still pending in district courts.

This Court also recognized that HHS conceded that the determination in *Bostock* could

impact the 2020 Rule. Memorandum Opinion  Order, ECF No. 23 at 22 ("To be sure, *Bostock*

interpreted Title VII, but HHS itself recognized that the case would have 'ramifications' because

'Title VII case law has often informed Title IX case law with respect to the meaning of

discrimination on the basis of sex[.]'" (quoting 85 Fed. Reg. at 37,168). Yet despite this

acknowledgement, HHS continued to promulgate the 2020 Rule.

*Bostock* rejected HHS' narrow interpretation of "on the basis of sex" in the context of Title

VII and held that "it is impossible to discriminate against a person for being homosexual or

transgender without discriminating against that individual based on sex." 590 U.S. at 660. Section

1557's prohibition of discrimination "on the basis of sex" is a "straightforward application of legal

terms with plain and settled meanings" because for an individual "to discriminate against" another

individual "for being homosexual or transgender," they must "discriminate against individual men and women in part because of sex." *Id.* at 662.

After *Bostock* was issued by the Supreme Court (and before the 2020 Rule took effect), HHS still cited arguments raised in the briefing but that were explicitly rejected by the Supreme Court in its decision. *See* 85 Fed. Reg. 371660,37178, n.74 (June 19, 2020) ("As noted in briefs recently submitted by the Federal government to the Supreme Court, discrimination on the basis of sex means discrimination on the basis of the fact that an individual is biologically male or female"). The Supreme Court ultimately rejected this dichotomous approach. If anything, *Bostock* clarifies that the meaning of "sex" inclusive of gender identity and gender-based stereotyping is consistent with the 2016 Rule's definitions, and that the 2020 Rule's proposed revisions were therefore unlawful.

### C. The 2020 Rule is Contrary to Law and Motivated by Animus Toward the LGBTQ Community.

This Court need only look to HHS' actions to conclude that the 2020 Rule ignores harm to the LGBTQ community. In response to comments on the 2020 Rule, HHS was silent on offering protections from discrimination based on sexual orientation and/or gender identity in health care, contradicting the legal authorities and principles in effect, as discussed above at *supra* Part I. 85 Fed. Reg. at 37,175. HHS explicitly stated that "sex" refers only to "the biological binary of male and female that human beings share with other mammals." *Id.* at 37,178. Furthermore, HHS took and continues to take the position that gender identity discrimination is not encompassed within Title VII or Title IX. *See id.* at 37,183, *id.* at 37,185.

For example, the current Trump Administration's 2025 executive order titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" attacks "idealogues who deny the biological reality of sex" and defines "sex" to refer

16

to "an individual's immutable biological classification as either male or female." Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) (the "Executive Order"). The Executive Order also states that sex "is not a synonym for and does not include the concept of 'gender identity.'" *Id.* Tellingly, the Executive Order acknowledges that *Bostock* "requires gender identity-based access" yet refuses to implement its holding—instead directing the Attorney General to ignore Supreme Court authority and "immediately issue guidance to agencies to correct the misapplication of . . . *Bostock.*" *Id.*

The Trump Administration has issued several other executive orders attacking "gender ideology." *See, e.g.*, Exec. Order No. 14183, 90 Fed. Reg. 8757 (Jan. 27, 2025) ("Beyond the hormonal and surgical medical interventions involved, adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life. A man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a service member."); Exec. Order 14190, 90 Fed. Reg. 8853 (Jan. 29, 2025) ("eliminating Federal funding or support for illegal and discriminatory treatment and indoctrination in K-12 schools, including based on gender ideology"); Exec. Order No. 14201, 90 Fed. Reg. 9279 (Feb. 5, 2025) (prohibiting participating in sports programs based on gender identity).

Any seemingly non-discriminatory justification offered by HHS in promulgating the 2020 Rule is undermined by the slew of executive orders recently issued targeting the LGBTQ community by the same President whose administration promulgated the 2020 Rule. Accordingly, the 2020 Rule—motivated by animus toward LGBTQ people, is contrary to law.

17

### III.   The 2020 Rule is Arbitrary and Capricious and an Abuse of Discretion.

Courts must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Here, HHS failed to perform a "reasoned analysis" indicating that it "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 42–43 (citation and internal quotation marks omitted). HHS "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* at 43. Finally, HHS offers no justification for its changed position and departure from well-established case law stating that "on the basis of sex" discrimination includes gender identity-based discrimination.

#### A.   HHS Misinterpreted the Administrative Record and Failed to Consider or Meaningfully Address Evidence of Severe Harms Caused by the 2020 Rule.

Under the APA, a regulation is arbitrary and capricious if the agency, among other things, "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. Here, the 2020 Rule and HHS' justification for promulgating it are directly contradicted by the Administrative Record. Unlike the 2020 Rule, the 2016 Rule considered concrete evidence of the need for broad antidiscrimination protections in health care and concluded "[d]iscrimination in the health care context can often lead to poor and inadequate health care or health insurance or other coverage for individuals and exacerbate existing health disparities in underserved communities." 81 Fed. Reg. at 31,444. By contrast, HHS in promulgating the 2020 Rule could not have meaningfully considered public health considerations when it admitted it knew "of no data showing that" the 2020 Rule would "disproportionately burden individuals on the basis of sexual

18

orientation and/or gender identity." 85 Fed. Reg. at 37,182. *See also id.* at 37,225 (HHS claiming it purportedly "lack[ed] the data necessary to estimate the number of individuals who currently benefit from covered entities' policies governing discrimination on the basis of gender identity who would no longer receive those benefits after publication of this rule—nor data to estimate how many of those individuals may experience the workplace and health-related negative consequences" from that rule).

As described in detail above, *see supra* at Part I, the Administrative record is *replete* with such evidence of harm in the forms of thousands of personal testimonials and public comments. HHS received nearly 200,000 comments in response to its 2019 notice of proposed rulemaking preceding the 2020 Rule, and commenters extensively informed HHS that the 2020 Rule would increase the likelihood of unlawful discrimination against the LGBTQ community. HHS failed to consider this evidence and offered only conclusory and boilerplate responses in support of the 2020 Rule. Thus, HHS failed to consider evidence showing that the 2020 Rule would undermine the provision of medical services to LGBTQ individuals. For HHS whose sole purpose is to "enhance the health and well-being of all Americans, by providing for effective health and human services and by fostering sound, sustained advances in the sciences underlying medicine, public health, and social services," this is unforgivable and unlawful. *See Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 33 (2020) (explaining that the Department's complete failure to consider reliance interests and integral evidence was arbitrary and capricious).

The harm imposed by the 2020 Rule is factually undisputed in the Administrative Record. Counsel for Plaintiff could not identify a *single* comment in the Administrative Record supporting any theory that the 2020 Rule advances access to health care for any American.

### B. HHS' Justifications for the 2020 Rule Cannot Withstand Scrutiny.

HHS fails to advance *any* evidence that the 2020 Rule advances the purpose of Section 1557 or the ACA as a whole. Courts will not "defer to an agency's unsupported reasoning which is directly contradicted by the record." *Georgia River Network v. U.S. Army Corps of Eng'rs*, 517 F. App'x 699, 701 (11th Cir. 2013); *accord Defs. of Wildlife v. Babbitt*, 958 F. Supp. 670, 681 (D.D.C. 1997) (reversing agency action where agency "made several critical factual findings that are directly contradicted by the undisputed facts in the Administrative Record"); *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1220 (9th Cir. 2008). While agencies are free to change existing policies "when an agency changes course . . . it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016)). HHS' 2020 Rule is arbitrary and capricious because the purported justifications do not support the changes it seeks to make.

As argued above, *see supra* Part I, HHS vaguely invokes "inconsistencies" with "long-standing existing civil rights regulations," and accuses courts of "caus[ing] confusion as to the meaning of sex in civil rights law." 85 Fed. Reg. at 37,180. This justification falters because the 2020 Rule directly contradicts Supreme Court precedent in *Bostock*, and in doing so, it causes the "confusion." *See supra* Part II B. And even before *Bostock*, the 2020 Rule conflicted with established federal case law interpreting "on the basis of sex" discrimination to include discrimination based on gender identity and gender expression. Moreover, conclusory goals of avoiding "confusion," without more, do not justify a rule change. *See New York v. U.S. Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475, 549 (S.D.N.Y. 2019) (rejecting an agency's "terse

20

explanation" as inadequate to justify a policy reversal); *Encino Motorcars LLC*, 579 U.S. at 223–24 (noting that conclusory statements that the agency considered all comments and analysis for and against proposed rule changes amount to an agency "say[ing] almost nothing").

HHS further purports that the 2020 Rule will save regulatory and administrative costs. *See supra* at Part I. However, the Administrative Record is void of any factual evidence supporting such self-serving conclusory fictions. Furthermore, although HHS purports that the 2020 Rule would result in cost savings of approximately $3 billion, those savings are not tied to the definitions at issue in this case and thus cannot be relied upon to support these specific rule changes. *Cf. Dep't of Homeland Sec.*, 591 U.S. at 28–29 (observing that an explanation for altering one part of a policy is not sufficient to "cast doubt" on other parts of the policy).

HHS cannot point to an absence of evidence to satisfy its rulemaking authority. Instead, HHS needed to consider the data before it—or engage in further fact finding—and then balance those harms with the purported savings. *See Public Citizen, Inc. v. Mineta*, 340 F.3d 39, 58 (2d Cir. 2003) (explaining that an agency must, among other things, "explain why the costs saved were worth the benefits sacrificed"); *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004) (noting courts "do not defer to [an] agency's conclusory or unsupported suppositions"). Accordingly, the 2020 Rule is arbitrary and capricious.

Furthermore, this Court acknowledged in its decision denying Defendants' motion to dismiss that HHS should have considered *Bostock* when promulgating the 2020 Rule. *See* Memorandum Opinion & Order, ECF No. 23 at 24–25 ("Whether or not it is dispositive of that issue with respect to Title IX and § 1557, *Bostock* is at least 'an important aspect of the problem,' *State Farm*, 463 U.S. at 43. By its own admission, HHS knew that the case was pending and would have 'ramifications'; it must also have known that a decision would be handed down before the

21

end of the Supreme Court's term. It then had an (admittedly brief) opportunity to re-evaluate its proposed rules after the case was decided contrary to its expectations."). This Court correctly identified that the timing of the 2020 Rule—promulgated four days *after* the Supreme Court's decision in *Bostock*, "might even suggest to a cynic that the agency pushed ahead specifically to avoid having to address an adverse decision. But whether by design or bureaucratic inertia, the fact remains that HHS finalized the 2020 Rules without addressing the impact of the Supreme Court's decision in *Bostock*. This makes it likely that plaintiff will succeed on their claim that the rules are arbitrary and capricious." *Id.*

### C. The 2020 Rule is Unconstitutional.

The 2020 Rule is "contrary to constitutional right, power, privilege or immunity," 5 U.S.C. § 706(2)(B), and accordingly should be held to be unconstitutional. The Fifth Amendment guarantees equal protection under the law and prevents the government from denying medical treatment and health care to LGBTQ persons on the basis of sex. *See, e.g.*, *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015); *Norsworthy v. Beard*, 87 F. Supp. 3d. 1104, 1119 (N.D. Cal. 2014) ("discrimination based on transgender status independently qualifies as a suspect classification"). The basic precept of "equal dignity in the eyes of the law," *Obergefell*, 576 U.S. at 681, is prohibiting facially discriminatory laws and regulations against suspect classes. Thus, the governing may only limit the rights of LGBTQ people when it has a compelling interest and when it acts in a manner that is narrowly tailored. *See e.g.*, *Windsor v. United States*, 699 F.3d 169, 185 (2d Cir. 2012) (stating that gays and lesbians are a "quasi-suspect" class, and classifications based on sexual orientation are subject to "heightened scrutiny"), *aff'd*, 570 U.S. 744 (2013).

HHS' conduct falls far short of this heightened standard. HHS promulgated the 2020 Rule during the deadly coronavirus pandemic and ignored invitations to revisit the rule after the

22

Supreme Court ruling in *Bostock*. HHS diminished any impact the 2020 Rule might have on LGBTQ individuals, particularly during the pandemic, when stating "to the extent that LGBT individuals suffer future harms, it cannot be attributed to the Department's finalizing this rule, as opposed to other causes." 85 Fed. Reg. at 37,182.

Ultimately, the 2020 Rule is nothing more than an unlawful "general announcement" that LGBTQ persons shall no longer "have any particular protections" under the ACA. *Romer v. Evans*, 517 U.S. 620, 631–32 (1996). The 2020 Rule and its flimsy justifications, coupled with the Administration's longstanding animus toward the LGBTQ community across two administrations "raise[s] the inevitable inference that the disadvantage is born of animosity." *Id.* at 634–35. Under any level of scrutiny, the 2020 Rule is unconstitutional and therefore violates the APA.

## CONCLUSION

The undisputed facts show that HHS in promulgating the 2020 Rule directly contradicted the Supreme Court's decision in *Bostock*, ignored Congress' use of the term "sex" and well-established case law interpreting sex-based discrimination, and contravened the basic requirements of agency action. Accordingly, Plaintiff is entitled to summary judgment.

Dated: November 20, 2025                                    Respectfully submitted,

*/s/ Cynthia C. Weaver*                                     */s/ Edward J. Jacobs*
Cynthia C. Weaver                                          Edward J. Jacobs
(New York Bar No. 5091848)                                 (New York Bar No. 4168126)
*cynthia.weaver@hrc.org*                                   *ejacobs@bakerlaw.com*
**HUMAN RIGHTS**                                           Kathryn M. Zunno-Freaney
**CAMPAIGN FOUNDATION**                                    (New York Bar No. 4572004)
1640 Rhode Island Ave, NW                                  *kzunno@bakerlaw.com*
Washington, DC 20036-3278                                  Michael A. Sabella
Telephone: (202) 527-3669                                  (New York Bar No. 4555504)
Facsimile: (202) 347-5323                                  *msabella@bakerlaw.com*
                                                           **Baker & Hostetler LLP**
*Counsel for Plaintiff*                                    45 Rockefeller Plaza
*Tanya Asapansa-Johnson Walker*                            New York, New York 10111-0100

23

Telephone: (212) 589-4200
Facsimile: (212) 589-4201

Saidah A. Grimes**
*sgrimes@bakerlaw.com*
**Baker & Hostetler LLP**
One North Wacker Drive
Suite 3700
Chicago, Illinois 60606-2841
Telephone: (312) 416-6200
Facsimile: (312) 416-6201

Gregory A. Tanner**
*gtanner@bakerlaw.com*
**Baker & Hostetler LLP**
1170 Peachtree Street, NE
Suite 2400
Atlanta, Georgia 30309-7676
Telephone: (404) 459-0050
Facsimile: (404) 459-5734

*Counsel for Plaintiff*
*Tanya Asapansa-Johnson Walker*

**Motion for pro hac vice admission pending*

24

## <u>CERTIFICATION OF WORD COUNT</u>

As required by Local Rule 7.1, I certify that this memorandum of law was prepared using Microsoft Word, and the total number of words in this memorandum of law, excluding the caption, table of contents, table of authorities, and signature block is 7,447 words.

Dated:  November 20, 2025
       New York, New York

                                          **BAKER & HOSTETLER LLP**

                                          */s/ Edward J. Jacobs*

                                          Edward J. Jacobs
                                          45 Rockefeller Plaza
                                          New York, NY 10111
                                          (212) 589-4200
                                          *ejacobs@bakerlaw.com*